# EXPERT REPORT OF SUSAN A. HAYES, PHARMACY OUTCOMES SPECIALISTS

Pharmacy Outcomes Specialists is a pharmacy benefit consulting firm, founded in 1996. It provides the following services to plan sponsors of pharmacy benefit programs:

- Audits of pharmacy benefit managers (PBMs);
- Procurement of PBM services for plan sponsors;
- On-site and desk audits of retail, mail order, long term care and home infusion pharmacies;
- Fraud, waste and abuse programs under Medicare Part D;
- Expert Witness analysis and testimony;
- General clinical and benefits consulting; and,
- An annual educational conference for the industry on PBM topics.

The firm provides pharmacy benefit consulting for large government agency clients such as the Department of Defense and the Office of Personnel Management, as well as regional health plans, insurance companies, union and multi-employer health funds and employers of all sizes. In the last 18 years, Pharmacy Outcomes Specialists has performed over 500 audits of PBMs, 100 rebate audits, and several hundred procurements for PBM services and is in its eighth year of producing an educational conference.

As part of all consulting projects that involve implementation of new PBMs, Pharmacy Outcomes Specialists assists clients with pricing and plan design. As such, the Principals of Pharmacy Outcomes Specialists have an in-depth understanding of what pricing information should be transmitted from a retail pharmacy to a PBM. Further, Pharmacy Outcomes Specialists assists clients in the implementation process for plan design purposes. Pharmacy Outcomes Specialists' assistance includes helping clients decide on key design features such as deductibles, co-pays, and generic savings programs.

Pharmacy Outcomes Specialists has provided PBM auditing services to plan sponsors for 18 years. As such, the firm, and Susan Hayes, who is a Principal, owner and founder of Pharmacy Outcomes Specialists, has an in-depth knowledge of the pricing algorithms used to adjudicate pharmacy benefit claims. These algorithms entail detailed and combined discounts off Average Wholesale Price ("AWP") (a benchmark price used in the industry and published by pricing guides), usual and customary pricing, maximum allowable cost programs, and dispensing fees. Pharmacy Outcomes Specialists has audited both the submission of usual and customary pricing, maximum allowable cost provisions and discounts off AWP for large plan sponsors and has significant expertise in this area.

The firm is owned by two partners, Kevin Johnson and Susan Hayes. We each have over 25 years' experience in the PBM industry. Johnson is a CPA, Master of Finance and has been involved in financial analysis his entire career, the last 25 years specifically in the PBM industry. I have been in health care consulting since 1980 and in the PBM industry since 1985. I am a pharmacy technician and have a degree in Criminal Justice. The firm also employs two pharmacists, a financial analyst and a pharmacy technician.

I have provided expert witness testimony in the past and my CV is attached. Most recently, I was involved in the *CALPERS v. Caremark* case, which involved Caremark's alleged practice of routinely approving changes to prescription orders without prescriber consent.

The plaintiff-relator in this case alleges that Kmart has submitted inflated and false claims to Medicare, Medicaid and other third-party payors for generic drugs. According to the Complaint, Kmart sold generic drugs to the cash-paying public at highly discounted prices but did not include those sales in its determination of its "usual and customary" charge. The plaintiff alleges that Kmart was required to include the prices it charged under its discount generic drug programs when determining its usual and customary charge for government and other third-party payors. Because Kmart did not consider sales under its generic drug discount programs when calculating its usual and customary charge, it substantially over-charged government and other third party payors.

I have been asked to provide expert testimony regarding industry standards and practices for pharmacy reimbursements. This includes the industry standards and practices regarding the meaning of contractual terms relating to pharmacy reimbursements and what constitutes "Usual and Customary" (U&C) pricing in the context of prescription drug programs.

In addition to private third-party payors, pharmacies such as Kmart are reimbursed for prescription drugs under numerous government programs, including Medicare, State Medicaid programs, the Federal Employee Plan, Tricare, the Veterans Administration, the Program of All-inclusive Care for the Elderly (PACE), the Children's Health Insurance Program (CHIP), the National Breast and Cervical Cancer Early Detection Program, and workers' compensation programs, where federal, state or a combination of both bear the overwhelming cost of treatment.

Every government and third-party payor, regardless of the program, has contracts with pharmacies to be providers in their network. Pharmacies are reimbursed based on the rates they negotiate with the payors. Typically, large pharmacy chains such as Walgreens, CVS, Rite Aid and Wal-Mart have entire departments, called Third Party Network Contracting, that deal directly with PBMs and are in constant negotiation with both large and small PBMs for pricing terms.

Likewise, an employer or plan (General Motors) may contract with a PBM as a payer (Express Scripts) to provide pharmacy benefit services to its members. Express

Scripts then contracts with pharmacies to reimburse under the rules General Motors puts in place. Government plans work generally the same way. For example, Tricare contracts with Express Scripts to provide pharmacy benefit services to its beneficiaries. Express Scripts then contracts with pharmacies to reimburse them in accordance with the limits that Tricare sets.

In preparing my testimony, I have reviewed hundreds of contracts between Kmart and the PBMs that govern reimbursement for sales to private and government beneficiaries. These PBMs, in turn, contract with plan sponsors (corporations, unions, managed care and government agencies).

Virtually all of these arrangements involve the "lower of U&C or contracted price" logic for payment and reimbursement. The contract price is generally the sum of the discounted AWP or WAC plus a dispensing fee. MAC is typically used for pricing the ingredient cost for multiple-source generic drugs. The actual payment to the pharmacy is supposed to be the lower of the contract price or U&C price minus the member cost-share amount (co-payment).

The contracts, subject to statutory and regulatory restrictions, between pharmacies and third-party or government payors determine pharmacy reimbursement rates based upon standard measures. These measures include Wholesale Acquisition Cost (WAC), Average Wholesale Price (AWP), Average Manufacturer Price (AMP), Best Price, Maximum Allowable Cost (MAC), Federal Upper Limit (FUL), Federal Supply Schedule (FSS), and the pharmacies' Usual and Customary (U&C) charge.

**Wholesale Acquisition Cost (WAC)** is the price published by the drug manufacturer for sale to wholesalers. Many pharmacies buy drugs from wholesalers (Amerisource Bergen, Cardinal Health, and McKesson are the three largest drug wholesalers). However, WAC pricing does not exist for all drugs. Since WAC is generally a "wholesaler" price, drug manufacturers who only sell their drugs directly to pharmacies sometimes do not publish a WAC.

**Average Wholesale Price (AWP)** is the average list price that manufacturers suggest that PBMs charge plans and can be the basis for PBM reimbursement to pharmacies (alternatively, PBMs may reimburse pharmacies on a WAC basis). AWP is referred to as a "sticker price" because it is not the actual price typically paid by purchasers, but is rather a baseline from which discounts are negotiated. Many PBMs base their drug reimbursement to a pharmacy on a discount off AWP, specifically for brand drugs. AWP is related to WAC. Typically, the relationship of AWP to WAC is that AWP=1.20 x WAC. A 2009 settlement capped AWP for most brand drugs at this amount. While multiple source generic drugs may have WACs from which AWPs can be calculated, their reimbursement is typically based instead on maximum allowable cost (MAC) pricing, described below.

**Average Manufacturer Price (AMP)** is the average price paid to the manufacturer for the drug in the U.S. by wholesalers for drugs distributed to the retail pharmacy class of trade, excluding customary prompt pay discounts extended

to wholesalers. The AMP helps determine the Federal Upper Limit (FUL) price. The AMP is retrospectively calculated by manufacturers based on actual sales data, is reported to the Centers for Medicare & Medicaid Services (CMS), and was made available to State Medicaid programs monthly beginning in October 2009, but is not publically available.

**Best Price** applies to brand name drugs and is defined as the lowest price available from the manufacturer during the rebate period to any entity in the U.S. in any pricing structure. This price is listed to ensure that Medicaid has the best available price for any given brand drug after taking into account rebates. No private payer can pay less than what Medicaid pays for a drug. Prices charged to certain governmental purchasers are statutorily excluded from best price including prices charged to the Veterans Administration, Department of Defense, Indian tribes, the Federal Supply Schedule, State Pharmaceutical Assistance Programs, Medicaid, Public Health Service "340B" entities, and Medicare Part D prescription drug plans (starting in 2006). Best price data is reported by manufacturers to CMS, but is not publicly available.

**Maximum Allowable Cost (MAC**) applies to many multi-source generic drugs and is determined by the payer or most commonly the PBM. Establishment of a MAC price allows payers to pay the same price for a generic drug, no matter the manufacturer dispensed by the pharmacy. Payers have different MAC lists, which are often proprietary to the specific payer or PBM.

**Federal Upper Limit (FUL)** is the CMS published price specific to a drug entity, strength and dosage form. It is similar to the MAC price for Medicaid. Federal Medicaid will fund state Medicaid drug programs up to this limit for multi-source drugs plus a dispensing fee. Like the MAC, it prevents a payer from over-reimbursing when a less expensive alternative is available. It is generally available for multi-source brand and generic drugs. Several studies by the Office of Inspector General and the General Accounting Office have demonstrated that the FUL amounts are much higher than pharmacies' actual acquisition costs.

**Federal Supply Schedule (FSS)** is the price available to all federal purchasers for drugs listed on the FSS. The FSS is intended to equal or better the prices charged to a manufacturer's most favored nonfederal customer under comparable terms and conditions. FSS is publically available and administered by the Veteran's Administration.

**Usual and Customary (U&C)** price is the cash price. The National Council of Prescription Drug Programs (NCPDP), which maintains the industry standard for electronic transmission and adjudication of pharmacy claims, defines U&C as the "Amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." The Academy of Managed Care Pharmacy defines U&C price as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider." Other industry groups and statutes

and regulations define U&C, but regardless of the wording, the meaning is the same: U&C pricing can vary from pharmacy chain to pharmacy chain, by pharmacy within the chain, by drug, by drug type (brand or generic) and by day, but the U&C price is the price a self-paying customer would pay.

Under both government and private third-party prescription drug programs, the reimbursement due to pharmacies is generally based upon a "lesser of" formula, whereby the pharmacy is reimbursed the lesser of U&C price and one or more of the other formulas. Thus, if the cash price is lower than the other measures, the pharmacy cannot be reimbursed more than the U&C rate.

### CMS

The Centers for Medicare & Medicaid Services (CMS), a federal agency and branch of the U.S. Department of Health & Human Services, administers Medicare, Medicaid and the Children's Health Insurance Program (CHIP) in partnership with state governments and private health insurance programs, including Health Insurance Marketplaces. CMS provides information for health professionals, regional governments, and consumers. Medicare is the nation's largest health insurer, handling more than 1 billion claims per year. Medicare and Medicaid together provide health care insurance for over 100 million Americans.

### Medicare

Medicare is a federal health insurance program funded through the Social Security system. Medicare is offered to people who are 65 or older, have been permanently disabled and are getting disability benefits from Social Security, or have permanent kidney failure treated with dialysis or a transplant.

Medicare has four parts: Parts A, B, C and D.

<u>Part A</u> pays for hospital care, home health care, hospice care, and care in Medicare-certified nursing facilities. Part A coverage can be supplemented by a Medigap policy or other supplemental coverage that may pay deductibles, co-insurance, or other costs that are not covered by Part A. An example of a prescription filled at a retail pharmacy which could qualify to be submitted to Part A includes drugs administered for pain and symptom relief as part of hospice care. Part A also includes drugs administered during a covered stay in a skilled nursing facility (SNF).

<u>Part B</u> covers diagnostic studies, doctors' services, durable medical equipment used at home and ambulance transportation. Part B coverage is optional. Retail pharmacies dispensing diabetic testing supplies would bill Medicare through Part B. Other drugs dispensed by retail pharmacies that could be billed through the Part B program, if applicable, include: drugs administered through a nebulizer; injectable osteoporosis drugs; erythropoiesis-stimulating agents for end-stage renal disease or anemia related to certain conditions; blood clotting factors if self-administered; injectable and infused drugs administered by a licensed medical provider; oral end-stage renal

disease drugs (ESRD); parenteral and enteral nutrition (intravenous and tube feedings) for individuals who cannot absorb nutrition through their gastrointestinal tracts or cannot take food by mouth; intravenous immune globulin (IVIG) provided in the home for individuals with a diagnosis of primary immune deficiency disease, approved as medically necessary by a licensed medical provider; vaccinations including flu shots, pneumococcal shots, and hepatitis b shots; and other shots (vaccines) when directly related to the treatment of an injury or illness (i.e., a tetanus shot after stepping on a nail).

Part B does not cover self-injected medications (i.e. insulin) or medications that a patient purchases at a pharmacy and then takes to a physician's office for administration. However, Part B would cover eligible drug claims for albuterol for home nebulizer treatments, oral drugs to treat ESRD, flu shots, oral immunosuppressant drugs if a patient received an organ or tissue transplant for which Medicare made payments, oral cancer drugs, oral anti-nausea drugs when used as part of an anti-cancer chemotherapeutic regimen. For the above covered medications under Part B received from a retail pharmacy, the patient is responsible for 20% of the Medicare-approved amount and the Part B deductible applies. Retail pharmacies billing Medicare Part B must accept assignment, so they may not ask patients to pay more than the co-insurance or co-payment for the drug itself.

<u>Part C</u> is actually a combination of Parts A and B, but it is only known as Part C when provided by private insurers and is referred to as Medicare Advantage. Some private insurers offering Medicare Advantage plans include the Part D prescription drug coverage. There is also a Part C Medicare Special Needs plan, which is designed for people with long-term health problems. These plans must include Parts A, B, and D coverage.

<u>Part D</u> is optional and helps pay for some prescription drugs usually obtained at a retail or mail order pharmacy. There is a monthly premium and a yearly deductible, which vary by plan. Individuals also pay a portion of the cost of the prescriptions, including co-pays or co-insurance. Member costs vary by plan and by drug.

Medicare Part D coverage is provided through private drug plans offered by plan sponsors for which the government bears most of the cost. These private drug plans enter into a contract with a PBM to assist in administering Medicare Part D drug benefits to beneficiaries. A PBM typically provides several services, including: contracting with a network of pharmacies; establishing payment levels for network pharmacies; negotiating rebate arrangements; developing and managing formularies, preferred drug lists, and prior authorization programs; conducting patient compliance programs; performing drug utilization review; and operating disease management programs. The government transfers monthly amounts from the Medicare trust fund to the Plan Sponsor to pay beneficiaries' drug claims.

Part D sponsors offer drug benefits through: (1) stand-alone prescription drug plans (PDP); and (2) Medicare Advantage prescription drug plans (MA-PD), which provide integrated medical coverage, including drugs, through managed care plans.

Part D sponsors are offered by PBMs and commercial health plans, and are required by the MMA to offer, at a minimum, a basic prescription drug benefit that is either the standard prescription drug benefit or is actuarially equivalent to the standard benefit. Member enrollment in a Part D program is voluntary. Most beneficiaries who elect part D coverage are responsible for certain costs, which may include a monthly premium, an annual deductible, and co-insurance. The standard drug benefit has four phases: (1) a front end deductible, (2) an initial coverage phase, in which the beneficiary contributes a percentage co-insurance towards their drugs costs; (2) a coverage gap phase in which beneficiaries are responsible for 100 percent of their drug costs; (3) and a catastrophic coverage phase in which beneficiaries typically pay a minimal percentage co-insurance towards their drug costs. Part D plans may also offer enhanced benefit packages for an increased monthly premium. Enhanced plans include benefits such as lower (or no) deductibles and coverage during the coverage gap phase. Starting in 2014 and as a result of the Affordable Care Act (ACA), the coverage gap (or "donut hole" as it is commonly referred to) is being closed by drug manufacturer subsidies.

Beneficiaries enrolled in Medicare's voluntary drug benefit typically obtain drugs from pharmacies. Pharmacy reimbursement under Part D is based on negotiated prices. CMS defines negotiated prices (or point-of-sale prices) as prices for covered Part D drugs that: (1) are available to beneficiaries at the point of sale at network pharmacies; (2) are reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remunerations that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) include any pharmacy dispensing fees. These prices are typically based on agreements between manufacturers, plan sponsors, and their affiliated contractors, such as PBMs.

Negotiated prices are made up of three elements: ingredient cost, dispensing fee, and sales tax. Sales tax is imposed in a limited number of states, parishes, municipalities and counties. Ingredient costs are usually based on the average wholesale price (AWP) discounted by a specific percentage or maximum allowable cost (MAC) set by the plan sponsors and PBM, and may or may not be based on the actual reimbursement to the pharmacies. The portion of the negotiated price paid by the plan sponsor and the portion paid by the beneficiary are determined by the plan's cost-sharing rules. Notwithstanding the foregoing, if the Usual and Customary (U&C) price is less than the combination of the ingredient costs plus the dispensing fee (not including sales tax if applicable), the PBM is obligated to reimburse the pharmacy or charge the plan sponsor only the U&C price. 42 C.F.R. § 50.504 ("The maximum amount which may be expended from program funds for the acquisition of any drug shall be the lowest of (1) … MAC …; (2) … acquisition cost … plus a dispensing fee …; or (3) The provider's usual and customary charge to the public for the drug ….") This is referred to as the lower of the U&C or negotiated/contracted price.

As a condition of payment, all Part D plan sponsors submit data and information necessary for CMS to determine and make payments. Every time a beneficiary fills a

prescription covered under Part D, plans must submit a summary called the prescription drug event (PDE) record. The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit. Part D plan sponsors submit one PDE record each time a Part D covered drug is dispensed to its enrollees, *including those events in which enrollees have 100 percent cost sharing*.

When Kmart became a Medicare Part D provider, it agreed that it would submit the prescription claims data and information necessary for CMS to determine and make payment to all Medicare Part D plan sponsors through agreements with the PBM and plan sponsors.

### Medicaid

Medicaid is another government program that covers much of the cost of medical care. To be eligible to be covered under Medicaid, an individual's income and assets must be below a certain level, which vary from state to state.

Some examples of people who are eligible for Medicaid include: low-income families with children and supplemental security income (SSI) recipients; children under age 6 from low-income families may be eligible in some states (even if other family members are not); pregnant women whose income is below the family poverty level; and infants born to Medicaid-eligible pregnant women.

Currently, every State Medicaid program includes an outpatient prescription drug benefit. Medicaid beneficiaries also receive covered drugs through pharmacies, which are reimbursed for these drugs by the State Medicaid agencies who administer the programs.

States, in conjunction with the Federal Government, determine pharmacy reimbursement under broad Federal guidelines. Many State Medicaid agencies contract with PBMs for assistance in managing their prescription drug programs, while others contract with a claims processing agency. States that do not hire PBMs may use the Medicaid Management Information System (MMIS). The MMIS is an integrated group of procedures and computer processing operations (subsystems) developed at the general design level to meet principal objectives including: program control and administrative costs; service to recipients, providers and inquiries; operations of claims control and computer capabilities; and management reporting for planning and control. States may also contract out the operations of the MMIS to a private vendor.

Regulations define estimated acquisition cost to be the State's "best estimate" of the price generally and currently paid by providers for the drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers. Most States typically calculate the estimated acquisition cost based on the AWP discounted by a specific percentage plus a dispensing fee. For certain drugs, States also use the Federal upper limit or State maximum allowable cost programs, which establish ceiling prices for certain multiple source drugs

(described in more detail below). Some states have also implemented average acquisition cost (AAC)-based reimbursement. Because CMS allows States the above mentioned flexibility in determining what constitutes the ingredient cost of drugs covered by their Medicaid programs, Medicaid reimbursement varies across States.

<u>Federal upper limit program.</u> The Federal upper limit program was created to ensure that the Federal Government acts as a prudent buyer of drugs by taking advantage of current market prices for multiple-source drugs (i.e., drugs available from more than one manufacturer). This program establishes a ceiling price that, in the aggregate, limits Medicaid payments to pharmacies.

<u>State maximum allowable cost programs.</u> Many states have implemented maximum allowable cost programs to limit reimbursement amounts for certain drugs. A maximum allowable cost is a ceiling price that applies to a group of multiple-source drugs. Individual States determine which drugs are included in their programs and the methods by which the maximum allowable cost for a drug is calculated.

### Tricare

Tricare covers all eligible active uniformed service members, retirees, spouses and eligible dependents of military personnel within the U.S. Department of Defense. Tricare was formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). The Tricare program is managed by Tricare Management Activity (TMA) under the authority of the Assistant Secretary of Defense (Health Affairs).

Tricare encompasses the civilian care component and the Military Health System, although historically it only included health care delivered in the military medical treatment (MTM) facilities. Medicare-eligible beneficiaries are able to use the Tricare Pharmacy Program benefits. Tricare beneficiaries who turned 65 on or after April 1, 2001, however, are required to enroll in Medicare Part B. If they choose not to enroll, their pharmacy benefit is limited to the medications available at military treatment facility (MTF) pharmacies.

TRICARE payment logics and definitions are found in the TRICARE manuals as well as Title 32 of the Code of Federal Regulations, Chapter 199.  The TRICARE manual limits reimbursement to the lesser of U&C, the maximum allowable cost (MAC), or TPharm's contractor's contracted rate for ingredient cost. The TRICARE manual also provides alternative payment logic for Network Provider Reimbursement that may include, but is not limited to, negotiated or discounted fee schedules, or U&C fees.

### Office of Worker's Compensation Programs (OWCP)

The Federal Employees' Compensation Act provides workers' compensation coverage to three million federal and postal workers around the world for employment-related injuries and occupational diseases. The Division of Federal Employees'

Compensation (DFEC) has responsibility for administering the Act through its twelve district offices and national office.

Managed under the U.S. Department of Labor within the Division of Federal Employees Compensation (DFEC), the OWCP administers four major disability compensation programs, which provide wage replacement benefits, medical treatment, pharmaceuticals, vocational rehabilitation and other benefits to certain workers or their dependents that experience work-related injury or occupational disease. These programs include: the Energy Employees Occupational Illness Compensation Program, the Federal Employees' Compensation Program, the Long Shore and Harbor Workers' Compensation Program, and the Coal Mine Workers' Compensation Program. These programs serve the specific employee groups who are covered under the relevant statutes and regulations by mitigating the financial burden resulting from workplace injury.

### Generic Drug Programs

Kmart's and other pharmacy's generic drug programs are aimed at people who must take maintenance medications that keep the customer coming into the pharmacy each and every month. People who buy low cost generics are typically using other medications and will use the pharmacy to purchase those drugs as well.

Pharmacies have long been aware that government-funded insurance plans and many private plans require pharmacies to compare the negotiated plan rate for generic prescription reimbursement with the usual and customary cash price. If the amount the retailer usually charges a cash-paying customer is lower than the negotiated plan rate, the pharmacy is to be reimbursed for that lower U&C price. *See* Ayshford Dep. at 7:7-11 ("[A pharmacy] cannot bill any government healthcare program for more than the pharmacy's usual and customary prices.").

The industry also recognized that these generic discount programs impact retailers' contracted rates with third-party payers and PBMs.  As a result, retailers will be reimbursed at the "usual and customary" rates rather than higher contracted rates because these low cost programs will establish the "new low" in less than payment schemes as U&C pricing will be less than the contracted rate.

Third-party payors and PBMs such as Coventry and Express Scripts sent notices to pharmacies reminding them that they are required to bill the "lowest possible price for the drug."

CMS also issued guidance confirming this result:

> Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The law Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To

> illustrate, suppose a Plain's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit [year] for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay.

CMS, HPMS Q & A – Lower Cash Price Policy (October 11, 2006).

Moreover, review of Kmart's contracts show that the cash price paid under Kmart's discount generic drug programs constitutes the U&C price to be reimbursed under virtually all of Kmart's contracts for reimbursement.

The three largest PBMs during the timeframe of this litigation (2004 to 2013) were Medco, Express Scripts and Caremark. Express Scripts is the PBM for the Department of Defense. Caremark is a leader in Medicaid claims and has a significant government clientele. Other large PBMs include Catalyst and Prime Therapeutics (which is the PBM for approximately half of the Blue Cross and Blue Shield plans in the United States). Kmart's contracts with these PBMs leave no doubt that its discount generic drug pricing was its U&C price.

Medco Definition of U&C

> Retail Price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed…. This would include any advertised price. KM-GAR-041-0001635: 2013 Medco Memorandum to All Pharmacy Providers.

> The Medco Manual describes the payment formula as the lowest net price a cash patient would have paid the day the prescription was dispensed, inclusive of all applicable discounts. These discounts include, but are not limited to, senior citizen discounts, "loss leaders" frequent shopper or special customer discounts, competitor's matched price, and other discounts offered customers, including but not limited to buyer's clubs, discount buying cards and programs. KM-YAR-002-022310: 2007-2008 Medco Pharmacy Services Manual.

Express Scripts Definition of U&C

> Usual and Customary Retail Price as defined in the Provider Agreement. If not defined in the Provider Agreement, then Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, inclusive of "loss leaders", frequent shopper or special customer discounts or programs, competitor's matched price of any and

> all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date. Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers including Members. KM-YAR-038-002577: 2007 Express Scripts Pharmacy Provider Agreement.

Caremark Definition of U&C

> Usual and Customary is the lowest price Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location. This price must include any applicable discounts offered to attract customers. Caremark audits for appropriate U&C pricing during several audit processes, including on-site visits. Provider is required to allow plan participant to pay either the U&C price or the patient pay amount, whichever is lower unless a Plan otherwise requires. Provider must still submit a claim to Caremark even if the claim pays at U&C. KM-YAR-002-047463: 2008 Caremark Network Updates.

Being part of the "RMP Club," the public was receiving Kmart's cash price. Therefore, the RMP price is the U&C price and what should have been billed under these contracts for services versus any other higher price.

The definitions of U&C price contained in these leading PBMs contracts do not substantially differ from the definitions in the additional contracts produced by Kmart. For example:

Catalyst Rx Definition of U&C

> U&C is the price at which a Pharmacy Service is available for sale to the public at the individual Pharmacy providing said Pharmacy Service. Pharmacy shall always submit its Usual and Customary charge for all claims transmitted to the Catalyst Rx POS system. Where reimbursement rate is lower than the Member's Copayment, Pharmacy shall reimburse the lesser of (1) the Member's Co-payment or (2) the Usual and Customary Price submitted by the Pharmacy. KM-GAR-005-0006516: 2008 Catalyst Rx Pharmacy Provider Agreement.

> Price at which a Pharmacy Service is available for sale to the public at the individual Network Pharmacy providing said Pharmacy Service. The U&C price submitted to the Catalyst RX POS system will be inclusive of all applicable customer discounts such as, but not limited to, senior citizen, baby, or special customer discounts. KM-GAR-018-0000310: 2008 Catalyst Rx Pharmacy Provider Agreement.

Prime Therapeutics Definition of U&C

Lowest price Pharmacy would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed. This includes any applicable discounts including, but not limited to, senior citizen discounts, frequent shopper discounts, and other special discounts offered to attract customers. KM-OIG-17-0001630: 2005 Prime Therapeutics Pharmacy Participation Agreement.

PerformRx Definition of U&C

Price the Pharmacy charges a customer who does not have any form of prescription drug coverage for a Covered Medication, on the same date of service and for the same drug(s), net of all applicable customer discounts such as (but not limited to) "senior citizen" or "preferred customer" discounts. KM-YAR-002-023197: 2008 PerformRx Participating Pharmacy Agreement, Attachment 1 to Addendum.

Blue Cross Blue Shield (Illinois) Definition of U&C

Reasonable and customary retail price charged for a Prescription Drug Services that Pharmacy would have charged a particular Eligible Member, on the date dispense, if such person were a cash customer. This includes any applicable discounts including, but not limited to, senior discounts, frequent shopper discounts, and other special discounts offered to attract customers. KM-YAR-035-000766: 2006 Blue Cross Blue Shield of Illinois HMO Participating Pharmacy Agreement.

CareFirst Blue Choice Definition of U&C

Pharmacy's U&C cash price for a specific prescription, including any applicable discount for which a Member would qualify at the time that the prescription is dispensed that the Pharmacy would charge any other person, whether such person is a Member or not. KM-YAR-002-027752: 2004 CareFirst Blue Choice Pharmacy Provider Agreement.

NRx Definition of U&C

Lowest Price the Pharmacy would charge to a cash-paying customer with no insurance for an identical pharmaceutical good or service on the date and at the location that the prescription is dispensed. This includes sales, specials, "loss leaders", and promotional prices set by Pharmacy. KM-GAR-005-0008027: 2008 NRx Participating Pharmacy Agreement.

Optum Rx Definition of U&C

The price, including all applicable customer discounts, such as special customer, senior citizen and frequent shopper discounts, that a cash paying customer pays Company for Drug Products, devices, products and/or supplies. KM-GAR-027-0002359: 2011 OptumRx Pharmacy Network Agreement.

Paramount Rx Definition of U&C

Reasonable, usual or customary fees charged by Pharmacy, including all applicable discounts, which do not exceed the fees Pharmacy would charge any other person regardless of whether the person is an Enrollee. KM-GAR-018-0002523: 2008 Paramount Rx Pharmacy Provider Agreement.

SavRx Definition of U&C

With respect to any Covered Medications, the U&C retail price of a prescription, charged to the public by Provider or Participating Pharmacy dispensing the prescription, on the date that the prescription is dispensed, including any special promotions or discounts available to the public on such date of dispensing. KM-YAR-002-050979: 1997 SavRx Pharmacy Provider Agreement.

ScriptGuide Rx Definition of U&C

Price Pharmacy would have charged an Enrollee (net of any applicable discount, including, but not limited to senior citizen discounts, frequent shopper discounts, non-insurance discounts, or any other special discount offered to attract customers) on the date the service was provided for a retail prescription IF the enrollee were a cash customer. KM-GAR-036-0004247: 2010 ScriptGuide Rx Pharmacy Network Agreement.

ScriptSave Definition of U&C

Price a Covered Person would be charged for a prescribed pharmaceutical product by Pharmacy if the Covered Person were a cash customer without any prescription benefits. KM-GAR-017-0001533: 2008 ScriptSave Network Participating Pharmacy Agreement.

Universal Rx Definition of U&C

Lowest price the provider would charge to a customer if such customer were paying cash for an identical prescription on that particular day.

>KM-YAR-002-024228: 2005 Universal Rx Pharmaceutical Service Summary, Attachment A.

I am informed that Kmart defended its billing practices to PBMs and others by describing the RMP as a "members only" program and as an "Agelity program" wherein a discount card manager named Agelity purportedly managed Kmart's drug formulary and determined eligibility for the program.

None of these features would change the fact that the price paid for drugs was the cash price with no secondary payor and that this price was available to everyone. The program offers none of the signs of insurance, such as risk-sharing or requiring monthly premiums and/or co-payments. If Kmart or Agelity were in fact running an insurance plan, they would have had to submit their program to all of the relevant State Insurance Departments for approval as a new Plan, which they never did. Likewise, Kmart admits that any cash-paying customer was eligible to participate in its programs. *See* ECF No. 114: Resp. to RFA at 14 (¶ 35). And these prices were available to its cash-paying customers throughout the entire year.

Sending claims from a retail pharmacy to a switch-provider and then to a PBM (and routing from the PBM back to the pharmacy) has no effect on the transmission. The significance of a router is to direct the claim to the appropriate PBM. All 65,000 retail pharmacies in the United States cannot feasibly be responsible for "keeping track" of all plan sponsors, Medicare Part D plan sponsors, employers and other managed care entities, and which PBM these entities contracted for pharmacy benefits. The role of the switch-provider is to maintain this communication using a routing system. This routing system "directs traffic" but does not change the transmission of data. All pharmacies understand that adjudication of a claim results in that claim being passed on to the payor, including government payors, for reimbursement.

Because the prices under Kmart's discount generic drug programs were the lowest prices Kmart offered for those drugs, industry practice, statutes and regulations, and the terms of Kmart's own contracts required the cash price of generic drugs under these programs to have been reported as Kmart's U&C price.

Moreover, as a result of Kmart reporting inflated U&C prices to PBMs, those PBMs reimbursed Kmart for generic drugs at a rate substantially higher than the price Kmart charged cash-paying customers. Thus, government and third-party payors paid materially more than they would have if Kmart had reported as its U&C price the amounts paid by the general cash-paying public under its discount generic drug programs.

**Compensation and Qualifications**

I am compensated for my expert services in this matter at a rate of $300 per hour. My compensation has no affect on the testimony I will give in this case.

Attached is my Curriculum Vitae, which details my background, publications, and previous testimony as an expert.

## RELIANCE MATERIALS

Kmart contracts reviewed to date listed in the attachment.

CMS Medicare Prescription Drug Benefit Manual, Chapter 14 – Coordination of Benefits.
http://www.cms.gov/Medicare/Prescription-DrugCoverage/PrescriptionDrugCovContra/downloads/PDMChapt14COB.pdf

Department of Health and Human Services, Office of Inspector General, A Comparison of Medicaid Federal Upper Limit Amounts To Acquisition Costs, Medicare Payment Amounts And Retail Prices.
August 2009, OEI-03-08-00490 http://oig.hhs.gov/oei/reports/oei-03-08-00490.pdf

Medi-Cal Usual and Customary Charges for Brand and Generic Prescribed Drugs
http://files.medi-cal.ca.gov/pubsdoco/ncpdp/ncpdp_faq.asp#L7

Draft Methodology for Estimating National Average Retail Prices (NARP) for Medicaid Covered Outpatient Drugs
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Downloads/RPS-WebinarSlides_July-26-2012.pdf

Longer-term implications of the generic prescription drug "price war"
Paul A. London
*japha.org/data/Journals/JAPhA/20453/10.1331_JAPhA.2010.10545.pdf*

Picking a Cash Pricing Strategy
Michael Bunn, Pharm.D., M.S.
http://phsirx.com/wp-content/uploads/2011/12/ViewPoints_Jan-Feb07-Mike.pdf

Courtesy or liability? The legal implications of a pharmacy waiving co-payments
Compliance Today. August 2012
http://www.arentfox.com/sites/default/files/images/CT_0812_Trunk.pdf

Impact of Generic Drug Discount Programs on Managed Care Organizations

Harshali K. Patel, MS; Nilanjana Dwibedi, MBA, MS; Anthony Omojasola, DrPH; and Sujit S. Sansgiry, MS, PhD
Am J Pharm Benefits. 2011;3(1):45-53)
*www.ajmc.com/publications/ajpb/.../AJPB_11jan_Patel_Generic_45to53*

Four-Dollar Generics — Increased Accessibility, Impaired Quality Assurance
Niteesh K. Choudhry, M.D., Ph.D., and William H. Shrank, M.D., M.S.H.S.
N Engl J Med 363;20 nejm.org November 11, 2010
www.nejm.org/doi/full/10.1056/NEJMp1006189

Deeply discounted medications: Implications of generic prescription drug wars.
Jessica L. Czechowski, PharmD; Jennifer Tjia, MD, MSCE; Darren M. Triller, PharmD
J Am Pharm Assoc (2003). 2010 Nov-Dec;50(6):752-7. doi: 10.1331/JAPhA.2010.09114.
japha.org/article.aspx?articleid=1043858

Generic drug discount programs: are prescriptions being submitted for pharmacy benefit adjudication?
Tungol A, Starner CI, Gunderson BW, Schafer JA, Qiu Y, Gleason PP.
J Manag Care Pharm. 2012 Nov-Dec;18(9):690-700.
Prime Therapeutics LLC, 1305 Corporate Center Dr.,Eagan, MN 55121, USA.
http://www.ncbi.nlm.nih.gov/pubmed/23206212

Beyond Transparency: The $4 Dollar Effect
February 6, 2010 Alex Knight
*www.rxtimes.com/beyond-transparency-the-4-dollar-effect*

Medicare Drugs: A Pharmacist's Guide to Filing Claims.
Oct 5, 2012, Deborah Sopo, R.Ph, MBA, FMPA, Director, Medicare Pharmacy Services, BlueCross BlueShield Michigan
*www.michiganpharmacists.org/.../continuingeducation102012_medicare*

Patient Assistance Program Eligibility Criteria and Medicare Part D
http://www.rxassist.org/docx/medicare-and-paps

Discount Prescription Drug Cards, Trisha Torrey (May 2014). Retrieved from
http://patients.about.com/od/drugsandsafety/a/drugdiscounts.htm

# EXPERT REPORT OF SUSAN A. HAYES

_____  July 14, 2014
Susan A. Hayes            Date