**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXPERT REPORT OF JOEL W. HAY, Ph.D.**

*U.S. et al. ex rel. James Garbe v. Kmart Corporation*,
No. 3:12-cv-00881-NJR-PMF
United States District Court
For the Southern District of Illinois

July 14, 2014

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I.     INTRODUCTION

I have been retained by relator's counsel to provide expert damages and other calculations in this matter. The premise of the lawsuit is that Kmart overcharged government and certain private health care programs for prescription drugs from 2004 to the present. According to the complaint, Kmart misrepresented its "Usual and Customary" (U&C) prices to government and third party payers as being higher than they actually were, for the purpose of maximizing the amounts those payers reimbursed Kmart for insured drug purchases. Based on the data Kmart has provided, I have calculated Kmart's U&C prices based on the actual amounts it charged to customers who purchased drugs from Kmart without using any insurance benefits; identified each instance in which Kmart reported an overstated amount; calculated damages to government healthcare programs, measured as the difference between what government healthcare programs and private insurers in Illinois and California paid and what they would have paid if Kmart had charged them the U&C prices I have calculated, measured as the difference between what they paid and what they would have paid if Kmart had charged them the U&C prices I have calculated.

My analysis is based on the data and explanations of the data fields Kmart has provided to date. As Kmart provides new or additional data or information, I anticipate I will be asked to supplement and revise my report.

## II.    SUMMARY OF OPINIONS

The prices Kmart charged under its discount drug programs were the prices Kmart charged for the overwhelming majority of cash purchases of the drugs Kmart included on its discount drug formularies. Many times, Kmart charged an even lower price for these drugs. When Kmart submitted claims for reimbursement to government and private third party payers, however, it reported Usual & Customary prices for these drugs that were more than both its program prices and its typical cash prices. As a result, Kmart caused third party payers to reimburse it for amounts many times greater than its prevailing cash price by third-party payers for sales of these drugs. Using the most conservative assumptions and methods, the transaction data shows that Kmart overstated its Usual & Customary price more than 26 million times to Government Health Plans and as a result of its overstatement received more than $175 million in excess reimbursements from the government and private payers represented in this case. Should any portion of these damages be modified by any court rulings, I would be able to recalculate the amount of damages consistent with any such rulings.

## III.   QUALIFICATIONS

In 1974, I received my B.A. in Economics, *summa cum laude*, from Amherst College. I then went on to receive my M.A. in Economics in 1975 and my M.Ph. in Economics in 1976 from Yale University. In 1980, I received my Ph.D. in Economics from Yale.

I am a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Department of Economics and at the Schaeffer Center for Health Policy and Economics at the University of Southern California ("USC"). I also serve as the USC Project Coordinator for the Rand Evidence-Based Medicine Practice Centers of Southern California funded by the U.S. Agency for Health Research and

Quality. I am a Health Economics Research Scholar at the UCLA Center for Pediatric Vaccine Research. I am a founding Executive Board member of the American Society for Health Economics and a founding member and founding Executive Board member of the International Society of Pharmacoeconomics and Outcomes Research.

From 1978 to 1980, I was an Assistant Research Professor at USC. Then from 1980 to 1984, I was an Assistant Professor in the Department of Behavioral Sciences and Community Health and Department of Economics at the University of Connecticut. I was also a Senior Policy Analyst with Project Hope from 1983 to 1985. Then from 1985 to 1992, I was a Senior Research Fellow at the Hoover Institution at Stanford University. In 1992 I was recruited to USC to found the Department of Pharmaceutical Economics and Policy. I have been a tenured USC faculty member since then.

I have authored or coauthored over 450 scientific abstracts, reports, and presentations, including 175 peer-reviewed scientific articles in the fields of pharmaceutical markets, pharmaceutical economics, health economics, outcomes research, disease management, statistics, econometrics, epidemiology, and health care in journals including:

> *American Journal of Cardiology;*
> *American Journal of Health-Systems Pharmacy;*
> *American Journal of Managed Care;*
> *American Journal of Public Health;*
> *Archives of Neurology;*
> *Cancer;*
> *Haemophilia;*
> *Health Care Financing Review;*
> *Health Affairs;*
> *Health Economics;*
> *Health Policy;*
> *JAMA;*
> *Journal of AIDS;*
> *Journal of the American Geriatrics Society;*
> *Journal of Business & Economic Statistics;*
> *Journal of Clinical Gastroenterology;*
> *Journal of Health Economics;*
> *Journal of Health Politics, Policy and Law;*
> *Journal of Human Resources;*
> *Journal of Managed Care Pharmacy*
> *Journal of the Royal Statistical Association;*
> *Medical Care;*
> *Pediatrics;* and
> *Value in Health*.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

In addition to the hundreds of pharmaceutical and pharmacy market studies that I've conducted, I have published numerous peer-reviewed scientific articles and abstracts on the structure and organization of the market for U.S. pharmaceuticals.

I have served as a consultant to the U.S. Centers for Medicare and Medicaid Services, U.S. Agency for Healthcare Research and Quality, U.S. Centers for Disease Control and Prevention, U.S. Public Health Service, U.S. Food and Drug Administration ("FDA"), U.S. Environmental Protection Agency, State Attorneys General Working Group on Competition in the Pharmaceutical Benefits Management Market, Government of Hungary, Hong Kong Centre for Economic Research, Hong Kong Medical Executives Association, World Bank, California AIDS Commission, California Medi-Cal Drug Advisory Board, County of San Diego Medically Indigent Adult Program, and County of Sacramento Homeless Program.

I have also written numerous health-related op-eds published in papers such as Los Angeles Times, New York Times, Wall Street Journal, San Francisco Chronicle, San Diego Union, Sacramento Bee, and Newsday. I have been interviewed numerous times on television and radio regarding health-related and drug-related policy issues, including media networks such as PBS, CBS, ABC, NBC, Fox News, C-SPAN, and Air America.

I have served as a member of the Expert Advisory Panel on Drug Utilization Review, United States Pharmacopeial Convention; an Executive Committee member for the federally sponsored Southern California Evidence-Based Medicine Practice Center; and a member of the JAMA Web Site HIV/AIDS Editorial Review Panel. I am also serving a third consecutive two-year term as a Study Section member for the Extramural Grants Review Program for the Agency for Healthcare Research and Quality of the U.S. Department of Health and Human Services.

From 2004 to 2010, I was a founding member of the Health Policy Scientific Council of the International Society for Pharmacoeconomics and Outcomes Research. From 2006 to 2010, I was founding Co-Chair of the International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Drug Cost Task Force. In 2010 this Task Force published six peer-reviewed guideline papers on pharmaceutical costing methodology in the journal *Value in Health*, all of which I edited and co-authored.

I served as the Founding Editor-in-Chief of *Value in Health*, the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research, from its 1998 inception until 2003. In its first scientific citation impact factor, *Value in Health* was ranked number one in two categories for the year 2004 by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. *Value in Health* led all other journals listed in both the Health Care Sciences and Services category of the JCR Science Edition and in the Health Policy & Services category of the JCR Social Sciences Edition. These categories include all journals relating to health economics and pharmaceutical economics.

IV.     FACTS AND DATA CONSIDERED AND OPINIONS.

**Background on Pharmaceutical Sales within U.S. Retail Pharmacies**

The U.S. market for pharmaceuticals is quite complex (see figure below), with numerous parties and intermediaries involved on both the demand and supply sides of the market.[1] On the supply side, while pharmaceutical manufacturers produce and sell both branded and generic drugs, they typically do not sell directly to the end users of the medication (*e.g.*, patients). Usually the manufacturers sell to drug wholesalers (*e.g.*, Cardinal, McKesson and Amerisource Bergen), specialty pharmacies or group purchasers.[2] The wholesalers and other intermediaries then sell outpatient drugs to retail pharmacies and pharmacy chains such as Kmart and to mail order fulfillment centers. For the types of generic drugs covered by the Kmart RMP program, the overwhelming majority of drugs would be purchased by Kmart retail pharmacies from drug wholesalers.



*Source: AMCP 2013, pg. 11*

Retail pharmacies sell prescription medicines to consumers at prices that depend on the type of drug benefit program that each customer belongs to.[3] If a customer has no insurance program

---

[1] Academy of Managed Care Pharmacy (AMCP). AMCP Guide To Pharmaceutical Payment Methods, 2013 Update (Version 3.0). Washington D.C., 2013. Academy of Managed Care Pharmacy. AMCP Guide to Pharmaceutical Payment Methods, 2009 Update (Version 2.0). Journal of Managed Care Pharmacy; Supplement August 2009 Vol. 15, No. 6-a: pp. S1-S66.

[2] http://www.mdm.com/2013_pharmaceuticals_mdm-market-leaders (accessed June 7, 2014).

[3] Hay JW, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug

4

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

with covered drug benefits and is not eligible for government assistance such as Medicare or Medicaid, disability coverage or another government program, then the customer herself must pay the pharmacy's full retail price for a prescription. (I refer to such customers in this report as "self-paying" or "cash-paying" customers, whether they pay with cash, credit card or check. Such customers pay 100% of the prescription drug price without using any form of insurance or government program benefit.)

If the patient has private insurance with covered drug benefits, then the retail pharmacy can only be reimbursed an "allowed" amount for each drug that is negotiated between the pharmacy (or its corporate owner) and the third party payer.[4] In this situation, the patient is also typically liable for a copayment amount, paid directly to the pharmacy, based on the level and scope of drug benefit available through their insurance plan. Such copayments include deductibles, coinsurance and payments over the plan's maximum drug benefits (annual or lifetime cap).

If the patient has drug coverage under certain government health care programs, such as Medicare or Medicaid, then the retail pharmacy will similarly be reimbursed an "allowed" amount that is either negotiated with the government program or set by federal or state statute. While many federal and state health care programs use retail pharmacy networks like Kmart to dispense prescribed medicines, some federal and state health care programs (*e.g.*, Veterans Health, Indian Health Service, 340B health clinics, certain Department of Defense facilities, correctional facilities, etc.) provide drugs directly to their beneficiaries and do not use retail pharmacies like Kmart to provide prescribed medications.

Medicare was the largest government health care program until 2014, covering nearly all Americans over the age of 65, as well as younger adults with long-term disabilities and those with either end stage renal disease (ESRD) or amyotrophic lateral sclerosis (ALS).[5] Medicare is an exclusively federal program with equivalent benefits and regulations in every U.S. jurisdiction. It is responsible for about 12% of the federal budget and 20% of U.S. health care expenditures.[6] Medicare covers typical outpatient medications at retail pharmacies under the Medicare Part D program and, to a lesser extent, through the Medicare Advantage Program (prepaid health plans), as well as Medicare Part B (specialty drugs and injectables provided by doctors and clinics).[7]

With the implementation of the Affordable Care Act, Medicaid has become the largest health care program in 2014 and the largest government program covering drug benefits for program

---

Cost Task Force. Value in Health 2010; 13(1):3-7.

[4] Mansley E, Carroll N, Chen K, Shah N, Tak Piech C, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. Value in Health 2010; 13(1):14-17.

[5] Kaiser Family Foundation. Medicare: A Primer, April, 2010.
http://kaiserfamilyfoundation.files.wordpress.com/2013/01/7615-03.pdf (accessed June 7, 2014).

[6] Ibid.

[7] Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. Value in Health 2010; 13(1):18-24.

beneficiaries.[8] Medicaid is a joint federal-state program run independently by the states (as well as Puerto Rico, Guam and the District of Columbia) with eligibility and coverage determined by each state subject to federal requirements and federal funding contributions. Medicaid provides outpatient medications through retail pharmacies for most beneficiaries based on state-level reimbursement formulae.[9] Since Medicaid is targeted at recipients who are mostly poor and medically needy, the Medicaid drug copayment amounts are negligible and often zero.

**Kmart's Generic Programs**

Since 2004, Kmart has offered certain prescription drugs at discount prices under various company program names, such as its "Kmart Maintenance Program" ("KMP"), "Retail Maintenance Program" (RMP), Generics+, 90 Day Generics and "Prescription Savings Club." As originally conceived, these programs were intended to be limited to a list (known as a "formulary") of several hundred generic drugs for a 90-day supply, which Kmart offered for $15. The transaction data show, however, that Kmart pharmacies routinely prorated prices for 30-day and 60-day supplies (at $5 and $10), as well as routinely price-beating or price-matching competitor's prices (such as matching Walmart's $4/30-day price or undercutting it with a $3.89/30-day price). Kmart changed these programs over time, offering 30, 60, 90, 120-day prescriptions for $5, $10, $15 and $20 (or less), respectively. For simplicity, I refer to these programs collectively as the RMP program.

**Usual and Customary Reimbursement (U&C)**

In the pharmacy context, Usual & Customary (U&C) price is the cash price for which a drug is sold. The National Council of Prescription Drug Programs (NCPDP), which maintains the industry standard for electronic transmission and adjudication of pharmacy claims, defines U&C as the "Amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." The Academy of Managed Care Pharmacy defines Usual and Customary price as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider."[10]

Many government programs and third party payers have explicit requirements that they will not reimburse pharmacies more than the U&C charges for any medication. This is referred to as the U&C "fee screen." Fee screens are often established for drugs and other medical care items to ensure that the payer is obtaining these goods and services at prudent and reasonable rates.[11] Medicaid and other payers often have additional fee screens, such as the Maximum Allowable Cost (MAC) limit for generic drugs. Typically a government or third party payer will only reimburse the minimum of actual charges and any applicable fee screen amounts for each prescription transaction.

---

[8] Kaiser Family Foundation. Medicaid: A Primer, March, 2013.
http://kaiserfamilyfoundation.files.wordpress.com/2010/06/7334-05.pdf (accessed June 7, 2014).

[9] Mullins et al., 2010; op. cit.

[10] AMCP 2013, pg. 75.

[11] Yett, D., Der, W., Ernst, R. and Hay JW. "Fee Screen Reimbursement and Physician Fee Inflation," Journal of Human Resources 20(2), (Spring, 1985), pp. 278-291.

A typical TPP or government program with multiple fee screens will reimburse for generic pharmaceuticals based on the minimum fee screen amount. According to the AMCP,[12]

> This product-based reimbursement formula in community pharmacy is expressed as an ingredient cost calculation plus dispensing fee, such as the following, subject to 'lower of' provisions, i.e., against pharmacy usual & customary pricing:
>
> Average Wholesale Price (AWP) – X% + $x.xx
> Wholesale Acquisition Cost (WAC) + X% + $x.xx
> Maximum Allowable Cost (MAC) + $x.xx (for multiple-source drugs)
> *Usual and Customary* [emphasis added]

### Analysis of Kmart Data

Kmart has made data extracts from three databases available for our analysis (PDX, Accounts Receivable (AR), and a Third Party Payer (TPP) lookup table). The PDX data (PDXInc.com, Dallas, TX) are extracted from the real-time pharmacy transactions records captured at each Kmart retail pharmacy from 2005 through 2013.[13] PDX records log relevant pharmacy transaction information at the point of sale, including information about the customer, the prescription, any third party payer codes and the date and location of the transaction.[14] PDX software has been used since 1985 to transmit pharmacy transactions between retail pharmacies and third party payers including government programs like Medicaid and Medicare. Currently one-fourth of all U.S. pharmacy transactions are captured in PDX data systems, covering 8,700 pharmacies and over 2 billion pharmaceutical prescriptions per year, including all of the pharmacies in Kmart's retail network.

Kmart's Pharmacy Accounts Receivable (AR) data are also maintained by an outside vendor. The AR data system is currently managed for Kmart by Inmar (www.inmar.com).[15] When payments are received from TPPs, Inmar reconciles the PDX billing information against the payments and posts the information into the AR data system. In order to assess what amounts were billed and paid for each Kmart pharmacy transaction, one must join the PDX transaction records with the AR records and verify the payment source using Kmart's TPP lookup table.

### Methodology

I begin by calculating the U&C price for drugs appearing on Kmart's RMP formulary and then compared the U&C price to the amount actually reimbursed for each transaction according to Kmart's Accounts Receivable records.

### Usual and Customary Price Estimation: Kmart's Discount Pricing Based on Daily Supply

I calculated the Usual & Customary Price two ways. Initially, we observed that the cash price

---

[12] AMCP 2013, pg. 47.

[13] Production of this data is ongoing. Only a small portion of Kmart pharmacy transactions was provided for 2005 and only one transaction was provided for the year 2014.

[14] https://pdxinc.com/software/default.asp (accessed June 7, 2014).

[15] Zander Deposition, 2/27/14; pg. 20.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

charged to purchasers of these drugs was equal to or less than Kmart's RMP price for approximately 99% of all cash sales, and less than Kmart's RMP price for a quarter of all cash sales. In order to estimate the usual and customary (U&C) price, we make the conservative assumption that the cash price for a prescription is based on Kmart's discount drug prices.[16] We then compute the U&C Price based on the RMP prices of $5/ $10/ $15/ $20 for a 1/ 2/ 3/ 4 month supply where we determine the number of months based on using D001-DAYS-SUPPLY from the PDX database in the following formula:

1 month - $5: DAYS-SUPPLY <= 30

2 month - $10: DAYS-SUPPLY <= 60 and DAYS-SUPPLY > 30

3 month - $15: DAYS-SUPPLY <= 90 and DAYS-SUPPLY > 60

4 month - $20: DAYS-SUPPLY > 90

There are clear peaks in the distribution of DAYS-SUPPLY at 30, 60 and 90 days adding evidence that these are logical points to split into bins. The key assumption in this method is that DAYS-SUPPLY can be used to define the number of months for use in the RMP and that the RMP price is the price that a cash customer would pay.

Alternatively, we have calculated a U&C price by using the Kmart data that we have and generating the various price quantiles for the cash paying customers; these price quantiles were calculated based on price screens (minimum, 1%, 25%, mean, median, 75%, 99%, maximum) for each unique drug dose and quantity at both the Kmart Store and Price Region levels.

To compute damages for a record in the AR database, we first match an AR record with its associated PDX record using the store number, prescription number, and date filled. When multiple matches are possible on the PDX or the AR side, we make the conservative choice to omit the records involved. We then identify the payer type from the third party payer lookup table.[17] Conservatively, we left out all PDX transactions indicating either a returned prescription or a split billing, due to the complexity in determining the ultimate contribution of such transactions to damages and damages transactions. This means that our calculation of damages is conservative by approximately 1%.

---

[16] We also relax this assumption allowing for minimum cash prices to reflect the U&C price quantile screens that we calculate. This can only increase the damages calculations, since the U&C price is then the minimum of the RMP price and the price incorporating any additional discounts shown to have been provided to cash-paying customers in Kmart's pharmacy transactions data.

[17] A purported replacement for the TPP file was sent by Kmart on June 16, over two weeks after Kmart had provided what was supposed to be the final data submission. Due to data quality issues (in particular, a significant number of PDX records whose payer information had no apparent match in the new TPP file) and the late submission of the data, it was necessary to use the previous TPP file until these data discrepancies are resolved. Initial analysis using loose matching criteria suggests that the newer file would have increased the number of records in the damage basis, so using the older file appears to be a conservative assumption.

8

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Damage Formula**

Damages are calculated as:

$$\text{Maximum}(0, \text{pay\_amt} - \max(0, \text{U\&C Price} - \text{CoPay}))$$

Where pay_amt comes from the AR database, CoPay is C002-COPAY from the PDX database and the U&C price is computed as described above.

**Kmart's Fictitious U&C Price Representations**

Based on the U&C Price field (P007_UCPRICE) in Kmart's PDX data provided for 2005 through 2013 we calculate that for more than 26 million pharmacy transactions where the payer type was MEDICARE PART D, MEDICAID, OTHER FED PLAN, WORK COMP, OTHER ST PLAN, MEDICARE PART B, and ambiguously labeled MEDICAID/NOT SPECIFIED, Kmart's stated U&C price exceeded both the RMP price and our calculated U&C price screens as described immediately above. Calculated conservatively with RMP pricing reflecting actual U&C pricing the amount across all government payer transactions by which Kmart's stated U&C price exceeded the actual U&C price was larger than $5 billion. While government payers did not pay most of these excessive charges they paid a substantial excess amount as we now demonstrate.

**Damages Calculations**

We ran initial calculations on the currently provided Kmart prescription transactions data, which runs from part of 2005 through the end of December, 2013 (there is one transaction reported for 2014). Using the RMP pricing method for calculating the U&C price and the damage estimation method outlined above we compute damage counts and totals. The second row computes damages over all records which could possibly be a government health care provider with Kmart's reported payer types: NOT SPECIFIED, MEDICARE PART D, MEDICAID, OTHER FED PLAN, WORK COMP, OTHER ST PLAN, MEDICARE PART B, and ambiguously labeled MEDICAID/NOT SPECIFIED. The next row includes only the records where we have evidence that there is a government health care provider involved. The difference reflects removing the "NOT SPECIFIED" records. In the last three rows we report the damages using an additional price screen based on the 1% quantile of prices within each Kmart Price Region for each days of supply, dose and strength for each drug type.

Table 1: Government Payer Damage Calculations and Number of Transaction Records with Positive Damages

| Using RMP Pricing | Damages | # Records with Positive Damages |
|---|---|---|
| Including "Not Specified" | $292,682,771.28 | 35,043,552 |
| Excluding "Not Specified" | $166,452,712.91 | 20,099,119 |

9

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Using 1% U&C Price Screen | Damages | # Records with Positive Damages |
|---|---|---|
| **Including "Not Specified"** | $362,865,497.37 | 45,764,527 |
| **Excluding "Not Specified"** | $220,273,611.11 | 26,877,653 |

As shown in Table 1 above, using the RMP pricing the damages for this period are calculated at $292.7 million with 35.0 million transactions with positive damages including the payer type "Not Specified" and $166.5 million excluding this payer type. As shown above, using a U&C Price Screen based on the smallest 1% of cash prices for each drug (by days of supply, dose and strength) as a measure of the true Usual and Customary price level the damages for this period are calculated at $362.9 million with 45.8 million transactions with positive damages including the payer type "Not Specified" and $220.3 million in damages and 26.9 million transactions excluding this payer type.

The calculated damages to private Illinois and California third party payers is negligible among payer types actually identified as "PRIVATE" in Kmart's data files provided to us. In fact, such damages are only $0.05 for third party payers reimbursing for patients residing in Illinois in 2012 and are zero for all other years and for all years in the state of California. If we assume that most of the payer types identified by Kmart's data files as "NOT SPECIFIED" actually consist of damages to private (non-government) third party payers in Illinois and California, then we can calculate the upper bound of the damages for 2005 through 2013 as shown in Table 2.

**Table 2: Illinois and California Private Third Party Payer Damage Calculations and Number of Transaction Records with Positive Damages**

| Using RMP Pricing | Damages | # Records with Positive Damages |
|---|---|---|
| **Illinois TPP** | $6,434,246.42 | 787,861 |
| **California TPP** | $2,969,132.25 | 406,896 |
| **Using 1% U&C Price Screen** | **Damages** | **# Records with Positive Damages** |
| **Illinois TPP** | $7,591,627.50 | 1,043,353 |
| **California TPP** | $3,640,925.33 | 548,879 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As shown in Table 2 above, using the RMP pricing the Illinois Third Party Payer upper bound damages for this period are calculated at $6.43 million with 0.8 million transactions with positive damages. For California Third Party payers upper bound RMP damages are calculated as $3.0 million with 0.4 million transactions with positive damages. As also shown above, using a U&C Price Screen based on the smallest 1% of cash prices for each drug (by days of supply, dose and strength) as a measure of the true Usual and Customary price level the Illinois upper bound damages for this period are calculated at $7.6 million with 1.0 million transactions with positive damages while the California upper bound damages are calculated at $3.6 million with 0.5 million transactions with positive damages.

Using higher cash price quantiles (e.g., 25%, 50%, 75%, 99%) leads to damage and transaction calculations to government and private third party Illinois and California payers that lie between the extreme values shown in Tables 1 and 2. More detailed results are provided in an electronic appendix to the report, by Year, Payer Type, Drug Name and Days of Supply for each drug.

## V. CONCLUSIONS

The calculated damages to government payers for the period from part of 2005 through 2013 (also including one transaction in 2014) range from $166.5 million to $362.9 million and the number of associated pharmacy transactions with positive damages range from 20.1 million to 45.8 million.

The calculated upper bound damages to Illinois private third party payers from part of 2005 through 2013 range from $6.4 million to $7.6 million with the number of transactions with positive damages ranging from 0.4 to 0.5 million.

The calculated upper bound damages to California private third party payers from part of 2005 through 2013 range from $3.0 million to $3.6 million with the number of transactions with positive damages ranging from 0.8 to 1.0 million.

## VI. TESTIMONY AND COMPENSATION.

I am compensated at a rate of $750 per hour on this matter, and I am reimbursed for all expenses. My compensation is in no way dependent on the substance of my opinions or testimony, or on the outcome of this litigation.

My CV, attached as Exhibit 1, includes all of my trial and deposition appearances as an expert witness in the last four years.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and ability.

Dated: July 14, 2014

_____
Joel W. Hay, Ph.D.