**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel. JAMES GARBE,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 12-CV-881-NJR-PMF** |
| **vs.** | ) ) | |
| **KMART CORPORATION,** | ) ) | |
| **Defendant.** | ) | |

## <u>AMENDED MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Pending before the Court are five motions filed by Defendant Kmart Corporation ("Kmart"): a Motion for Partial Summary Judgment Based on Payers Definitions of Usual and Customary Price (Doc. 204); a Motion to Exclude the Expert Testimony of Dale A. Chamberlain (Doc. 212); a Motion for Partial Summary Judgment Based on Claims in Other Than 90-Day Quantities (Doc. 203); a Motion for Partial Summary Judgment Based on Pre-FERA Claims Relating to Medicare Part D (Doc. 205); and a Motion for Partial Summary Judgment Based on All Claims Submitted to Medicare Part D (Doc. 206). For the reasons set forth below, the Court grants in part and denies in part the Motion for Partial Summary Judgment Based on Payers Definitions of Usual and Customary Price (Doc. 204), denies the Motion to Exclude the Expert Testimony of Dale A. Chamberlain (Doc. 212), denies the Motion for Partial Summary Judgment Based on Claims in Other Than 90-Day Quantities (Doc. 203), denies the Motion for Partial

Summary Judgment based on Pre-FERA Claims Relating to Medicare Part D (Doc. 205), and denies the Motion for Partial Summary Judgment Based on All Claims Submitted to Medicare Part D (Doc. 206).

### *Summary of the Relevant Facts & Procedural History*[1]

Relator James Garbe ("Relator") has brought this action *qui tam* on behalf of the United States Government.[2]   Relator was an employee of Kmart and worked in Kmart stores in Ohio and Michigan as a pharmacist from May 2007 through October 2010, when he resigned (Doc. 207, p. 1).   Relator is currently retired (*Id.*).

Kmart Corporation currently operates 780 pharmacies in its stores in forty-six states, Puerto Rico, and the Virgin Islands (Doc. 207, p. 1).   In 2005, Kmart operated 1,120 pharmacies in its stores, and the number has been declining since then (*Id.*). Kmart's current national market share for pharmacy is less than one percent of the market (*Id.*).

Relator asserts that from approximately 2005 to the present, Kmart has violated the False Claims Act, 31 U.S.C. § 3729(a)(1), § 3729(a)(2), § 3729(a)(7) (Count I) ("FCA") and the related false claims acts of twenty-six states (Counts II, IV-VIII, XI, XIII-XXXI), and four other related state statutes (Counts III, IX, X and XII),[3] by misrepresenting its

---

[1] An overview of the events and bases for Relator's Second Amended Complaint are presented here, drawing on the parties' memoranda of law and statements of facts.   More detailed facts are presented and analyzed below, in the Court's analysis of the evidence.

[2] The government has elected not to intervene in this action (Doc. 20).

[3] In a footnote, and without citing to any case law, Kmart suggests that Relator is neither an appropriate "interested person" to bring a civil action in the name of the State of California for alleged violations of the California Insurance Frauds Prevention Act (Count III), nor is he an "interested person" under the Illinois Insurance Claims Frauds Prevention Act (Count X) (*See* Doc 204, p. 7, FN 4).   This argument is undeveloped and lacking in detail, and thus the Court declines to grant summary judgment on this issue.

"usual and customary" prices for certain generic prescription drugs and thereby overcharging Medicare Part D programs, Medicaid, Tricare, state and federal worker's compensation programs, and other state and federal prescription drug benefit programs. By specific example, Relator alleges in paragraphs 145-146 of his Second Amended Complaint as follows:

> 145. Relator discovered this scheme through his own experience as a Medicare Part D beneficiary. For example, on September 22, 2007 Relator (a Medicare Part D beneficiary) had Kmart fill a prescription for generic [Lisinopril]. [Lisinopril] is among the drugs covered by Kmart's RMP Program, and Relator expected that, after his $10 co-payment, Kmart would claim a $15 charge (the same amount paid by the cash-paying public) to his Part D plan (Paramount Elite), and seek reimbursement from Paramount for the remaining $5 (Doc. 98, p. 47).

> 146. Relator discovered, however, that his Part D plan received a claim for $60.84 charge for the [Lisinopril], and billed the Part D plan $50.84 ($60.84 - $10.00 co-payment). Kmart was reimbursed $35.84, about 240 percent more than the true "usual and customary" price (*Id.*).

In order to understand the way in which Kmart allegedly committed this fraud, it is important to understand the process by which prescriptions are dispensed. Each party's position as to how this process works is summarized as follows. A patient comes to the counter with a prescription (Doc. 207, p. 2). The pharmacist validates the prescription and submits the prescription claim through Kmart's dispensing system (referred to as a "PDX" system) (*Id.*). The PDX system enables the entry of patient information, prescriber and prescription information, and insurance or other benefit

information (*Id*.).   Once the appropriate information is entered (or verified - if the patient is a returning customer), the prescription is submitted for dispensing and "adjudication." (*Id*.).

Adjudication is the process by which a prescription claim is submitted, generally to a third party processor, to check patient eligibility for any insurance benefit, discount card, or other prescription benefit (*Id*.).   As part of the adjudication, the processor returns to the Kmart pharmacy the correct pricing for the drug and any patient pay amount (copay or co-insurance) (*Id*.).   Relator asserts that this process of adjudication is unnecessary for cash transactions (*i.e.* those involving self-paying customers that are not using insurance) (Doc. 236, p. 2).   More specifically, Relator asserts that adjudication did not occur in any of Kmart's generic drug programs, because they did not involve insurance (*Id*.).

Kmart asserts that third-party processors adjudicate prescription claims to third-party payers, or a pharmacy may utilize a "switch vendor" or "pharmacy benefit manager" ("PBM") (Doc. 207, p. 3).   To submit a pharmacy claim for adjudication by the third-party processor or PBM, Kmart explains that the pharmacist looks up the patient in PDX (or, in the case of a new patient, *enters* the information into PDX), selects the applicable insurance, government, or discount program benefit to which the patient wishes to adjudicate his or her claim, sends the claim through the switch vendor to the processor, and waits for the processor to process the claim and either return a price or reject the claim (*Id*.).   As part of this process, the third-party processor or PBM submits

the claim to the appropriate private or government payer for reimbursement (*Id*.). Specific identifiers, referred to as the BIN/PCN combination, are used in a pharmacy system to designate the specific processor to which a specific pharmacy claim should be routed (*Id*. at 4).

Over the years, Kmart has implemented various drug discount programs. In 2004, Kmart implemented a pilot generic drug discount program at a single pharmacy in Ohio, which was known as the Kmart Maintenance Program ("KMP") (Doc. 207, p. 5). The program was designed to compete with mail order pharmacies that were taking customers away from retail pharmacies (*Id*.). Kmart alleges that this program only applied to ninety-day supplies of certain generic maintenance medications and was enrollment based (*Id*.). But whether this program applied only to ninety-day supplies is in dispute.

In 2006, Kmart expanded KMP chain-wide, and the program became known as the Retail Maintenance Program ("RMP") (Doc. 207, p. 6). Kmart asserts that this program also was limited to ninety-day supplies of certain generic maintenance medications (*Id*.). This fact, however, is also in dispute, because Relator asserts that Kmart also provided discounts on thirty-day and sixty-day supplies of drugs (Doc. 236, p. 8). Kmart asserts that if the RMP member had a thirty-day or sixty-day prescription, pharmacists would call the doctor and get a new prescription for a ninety-day supply so that the customer could receive the RMP price (Doc. 207, p. 6). Kmart alleges that, although there were isolated instances where an individual pharmacist conducted a

price override to provide a discount for a different days' supply, such overrides were expressly discouraged by Kmart (*Id*.).   Kmart further asserts that, in order to participate in the RMP, customers were required to complete an "enrollment process" (*Id*. at 7). Any Kmart pharmacy customer was eligible to enroll in RMP (*Id*. at 8).   The enrollment aspect of this program is disputed (*see* Doc. 236, p. 11).

In June 2008, Kmart expanded its generic drug discount program to include additional generic drugs (Doc. 207, p. 9).   This program was formally known as "Generics Plus," but sometimes was still referred to as RMP (*Id*.).   Kmart alleges that this program was enrollment based and, during a period in time, Kmart may have permitted verbal enrollment (*Id*.).   As with RMP, the "enrollment" aspect of this program is in dispute.

In July 2009, Kmart implemented the Prescription Savings Club ("PSC").   Kmart required a ten dollar "enrollment fee" to join this program (Doc. 236, p. 16). Participants of the program received discounts on thirty, sixty, and ninety-day supplies of certain generic drugs on the PSC formulary (Doc. 207, p. 11).   They paid five, ten, and fifteen dollars for these prescriptions (*Id*.).   Participants were ultimately mailed a permanent ID card which could be shown at the counter to identify the individual as a PSC enrollee (*Id*. at 12).   In June 2011, the RMP and Generics Plus were eliminated. Kmart has operated only the PSC program from June 2011 to the present (*Id*.).

Medicaid is a cooperative program between the government and the states that provides health care benefits mainly to indigent and disabled individuals.   Medicaid is

funded in part by the relevant individual state and by the federal government. (Doc. 207, p. 13). To qualify for federal funding, state Medicaid programs must satisfy certain federal requirements (*Id*.). *See, e.g.* 42 U.S.C. § 1396a(1); 42 U.S.C. § 1396b. Once the Centers for Medicare and Medicaid Services ("CMS") determines that a state Medicaid program meets those requirements, the state becomes responsible for administering its own program (*Id*.). A pharmacy provider like Kmart submits claims for prescription drug reimbursement directly to state Medicaid programs (*Id*.).

Medicare is a federally funded and administered health insurance program available to certain eligible groups – primarily older and disabled persons - administered by the Department of Health and Human Services through CMS (*Id*. at 14). There are four major components to the Medicare program: Parts A, B, C, and D (*Id*.). Part D provides a voluntary prescription drug benefit program to eligible Medicare beneficiaries, funded both by the government and the beneficiaries themselves (*Id*.).

The Medicare Prescription Drug Benefit - Medicare Part D, which became effective on January 1, 2006 - gives beneficiaries otherwise eligible for Medicare the option of enrolling with private insurance plans that cover prescription drug benefits (*Id*. at 15). CMS, which administers Medicare and Medicaid, selects Prescription Drug Sponsors ("Plan Sponsors") to provide drug coverage to Part D beneficiaries (*Id*.). The Plan Sponsors participate in an annual competitive bidding process (*Id*.). The bids are used by CMS to establish a national benchmark per member/per month base amount that CMS will reimburse the Plan Sponsors (*Id*.). The amount a Plan Sponsor is paid by

CMS is not calculated based on actual prescriptions dispensed (*Id.*).

Part D Plan Sponsors provide at least a standard level of coverage through various established benefit stages dependent upon the amount of out-of-pocket drug spend (*Id.*).   When a certain out-of-pocket spend level is reached, the beneficiary enters the Coverage Gap stage or what has been termed the "donut hole." (*Id.*).   In this stage, the beneficiary is responsible for their own pharmacy expenses (*Id.*).   If the out-of-pocket costs of a beneficiary in the donut hole reach a certain dollar value, the beneficiary enters the "catastrophic coverage" stage under which the Plan Sponsor pays for additional pharmacy costs (*Id.*).

CMS pays Part D Plan Sponsors "interim payments . . . based on the Secretary's best estimate of amounts that will be payable after obtaining all of the information." (Doc. 236, p. 19).   42 U.S.C. § 1395w-115(d)(1).   To allow CMS to determine the monthly amount, the Plan Sponsors submit a bid in the year prior to the calendar year in which it will deliver Part D benefits (Doc. 207, p. 16).   CMS pays each Plan Sponsor advance monthly payments tied to the Plan Sponsor's standardized bid and other factors (*Id.*). CMS's monthly payments to Plan Sponsors cover three "subsidies" based on the Plan Sponsor's approved bids (*Id.*).   These subsidies are: (1) the "direct subsidy," which is calculated to cover the Plan Sponsor's cost of providing pre-donut hole pharmacy benefits; (2) the "reinsurance subsidy," to cover the government's share of drug costs for beneficiaries who receive "catastrophic coverage;" and (3) the "low-income cost sharing subsidy" ("LICS") to cover the government's portion of the cost-sharing payments for

certain low-income Medicare beneficiaries in the donut hole (*Id.* at 17).

At the end of a benefit year, CMS reconciles these advance monthly payments to the Plan Sponsors with the Plan Sponsor's actual costs (*Id.*). Following reconciliation, CMS reimburses a Plan Sponsor for a percentage of any excess claims for standard beneficiaries (*Id.*). CMS also reimburses a Plan Sponsor for a percentage of excess claims for other beneficiaries, if the excess cost exceeds a certain threshold amount (called a "risk corridor") (*Id.*).

Plan Sponsors are responsible for the administration and payment of individual prescription drug claims, but most contract with PBMs which enter into arrangements with the pharmacies that will actually fill prescriptions (*Id.* at 18). The PBMs then further subcontract with those individual pharmacies (*Id.*). Thus, unlike in the state Medicaid programs, a pharmacy does not submit a claim directly to the government, it submits a claim to the PBM (or Plan Sponsor, if there is no PBM) (*Id.*). When a pharmacy dispenses a prescription to a Medicare Part D beneficiary, it submits an electronic claim to the PBM (or Plan Sponsor) in accordance with the contract it has with the relevant PBM (or Plan Sponsor) (*Id.*). The pharmacy is then reimbursed for that prescription according to the contract (*Id.* at 19).

The PBM submits its own claim to the Plan Sponsor in accordance with its contract with the Plan Sponsor (*Id.*). It is then paid under that contract (*Id.*). CMS subsequently receives a Prescription Drug Record (PDE) from the Plan Sponsors (*Id.*). A PDE is an electronic document that includes at least thirty-seven fields of information

about a specific drug transaction (*Id*.).   The PDE includes the amount the Plan paid the person (or pharmacy) for the dispensed drug (*Id*.).   It does not identify the U&C price originally reported by the pharmacy (*Id*.).

This case has generated a lengthy procedural history, which is only briefly summarized here.   The case was originally filed in the Central District of California. *See United States ex rel. Garbe v. Kmart Corp.*, No. 08-cv-4669 (C.D. Cal. filed July 16, 2008). It was unsealed on September 2, 2010, while it was still pending in the Central District of California.   The case was then transferred to this Court on August 8, 2012 (*See* Doc. 1). The case was originally assigned to Judge William D. Stiehl, who recused on August 27, 2012 (Doc. 71).   The case was then reassigned to Judge Michael J. Reagan (*Id*.).   Judge Reagan assigned the case a Track C and set a final pretrial conference for December 6, 2013, and a firm trial date of December 16, 2013.   On November 17, 2012, Relator filed his Second Amended Complaint (Doc. 98).   On December 13, 2012, Kmart filed a Motion to Dismiss the Second Amended Complaint (Doc. 102), which Judge Reagan denied on September 18, 2013 (Doc. 118).   On May 20, 2014, the case was reassigned to the undersigned District Judge.

Numerous discovery disputes were resolved by Magistrate Judge Philip M. Frazier and Judge Reagan prior to reassignment.   On June 23, 2014, the undersigned held a Status Conference to address the state of the litigation.   On July 29, 2014, Kmart filed a Motion for Partial Summary Judgment Based on Claims in Other Than 90-Day Quantities (Doc. 203), a Motion for Partial Summary Judgment Based on Payers

Definitions of Usual and Customary Price (Doc. 204), a Motion for Partial Summary Judgment Based on Relators Pre-FERA Claims Relating to Medicare Part D (Doc. 205), a Motion for Partial Summary Judgment as to All Claims Submitted to Medicare Part D (Doc. 206), and a Motion to Exclude the Expert Testimony of Dale A. Chamberlain (Doc. 212).   On September 30, 2014, the undersigned District Judge held a hearing and heard oral argument on all five motions.   The motions are now ripe for ruling.

*Relevant Legal Standards*

### I.      Summary Judgment Standard of Review

The standard applied to summary judgment motions under Federal Rule of Civil

Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party.   Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial.…   A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations

omitted).   The Court neither weighs evidence nor resolves material factual issues, but

only determines whether, after adequate discovery, any such issues remain unresolved

because a reasonable fact finder could decide for either party.   *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### II.     *Daubert* Standard of Review

Screening evidence is a function which lies "squarely within the purview of the

trial judge."   *United States v. Beavers,* 756 F.3d 1044 (7th Cir. 2014), *quoting Lapsley v. Xtek,*

*Inc.*, 689 F.3d 802, 809 (7th Cir. 2012).   When the question is whether to admit or exclude

expert testimony, the trial judge's discretion is guided by Federal Rules of Evidence 702

and 703 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509

U.S. 579 (1993).

"Rule 702 of the Federal Rules of Evidence establishes two general requirements

regarding expert testimony:   (1) the expert must be qualified, and (2) the subject matter

of the expert's testimony must consist of specialized knowledge that will be helpful or

essential to the trier of fact in deciding the case."   *Rasmusen v. White,* 970 F. Supp. 2d 807,

813 (N.D. Ill. 2013) (citing *United States v. Lanzotti,* 205 F.3d 951, 956 (7th Cir. 2000)).   In

determining the admissibility of expert testimony, a court must assess whether the

testimony is rooted sufficiently in the facts of the case so that it will assist the jury in

resolving a factual dispute.   *Id.* (citing *Daubert,* 509 U.S. at 591).   The party seeking to

offer expert testimony has the burden of establishing that the pertinent admissibility

requirements are met by a preponderance of the evidence.   *Id.* (citing *Dukes v. Illinois*

*Cen. R.R.,* 934 F. Supp. 939, 946 (N.D. Ill. 1996)).

## *Analysis*

### I.      The False Claims Act

The False Claims Act "prohibits the submission of false and fraudulent claims for

payment to the government."   *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 912

(7th Cir. 2009).   The *qui tam* provision of the False Claims Act permits, in certain

circumstances, suits by private parties on behalf of the United States against anyone

submitting a false claim to the government.   31 U.S.C. § 3730(b); *Hughes Aircraft Co. v.*

*U.S. ex rel. Schumer*, 520 U.S. 939, 941 (1997).

Under Subsection (a)(1) of the False Claims Act ("FCA"), a person is prohibited from "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1) (FCA pre-2009 Amendments).

Subsection (a)(2) prohibits a person from knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the government. 31 U.S.C. § 3729(a)(2) (FCA pre-2009 Amendments).   The three elements of this claim are: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (quoting *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)).

Subsection (a)(7) addresses so-called "reverse false claims."   31 U.S.C. § 3729(a)(7) (1986); 31 U.S.C. § 3729(a)(1)(G) (2009).   The reverse false claim subsection punishes material false statements made to conceal, avoid, or decrease an "obligation to pay or transmit money or property to the government."   *Id*. § 3729(a)(1)(G).[4]

---

[4] In a footnote and without citing to any case law, Kmart argues that it is entitled to summary judgment on all of Relator's claims brought under the subsection of the FCA addressing reverse false claims.   31 U.S.C. § 3729(a)(7) (1986); 31 U.S.C. § 3729(a)(1)(G)(2009).   Specifically, Kmart argues that "Relator has never identified—in the Second Amended Complaint, in response to Kmart's motion to dismiss, or in discovery responses – any obligation that Kmart had to pay or transmit money to CMS." (Doc. 204, p. 8, FN 5). Notably, however, the statute does not require that the statement impair **the defendant's** obligation; instead, it requires that the statement impair "**an** obligation to pay or transmit money or property to the

On May 20, 2009, the Fraud Enforcement and Recovery Act amended the substantive liability provisions of the False Claims Act, including the sections at issue in this case.  *See* Pub.L. No. 111-21, 123 Stat. 1617 (May 20, 2009).  Section 3729(a)(1)(A) (formerly Section 3729(a)(1)) imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Section 3729(a)(1)(B) (formerly Section 3729(a)(2)) now imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

Relator brings claims under *both* the pre-FERA (31 U.S.C. § 3729(a)(1), (a)(2), and (a)(7) (1986)), and post-FERA (31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2009)) versions of the Act.   The specific examples of the alleged fraud in the Second Amended Complaint span the time period of September 27, 2007 through May 2, 2008.   Relator contends in his Second Amended Complaint, however, that the United States "continues to pay the claims that would not be paid but for defendant's unlawful conduct" and "continues to be damaged" by such fraudulent practices (*See* Doc. 98).

---

government." 31 U.S.C. § 3729(a)(7) (emphasis added); 31 U.S.C. § 3729(a)(1)(G) (emphasis added); *U.S. ex. rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 172-173 (E.D. Penn. 2012); *see also United States v. The Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *15 (S.D. Ohio, Dec. 18, 2008) (refusing to narrow the language of § 3729(a)(7) speaking of "an obligation" to "the Defendant's independent obligation.").   Kmart's allegedly false reporting of U&C price would have caused, for example, the state Medicaid agencies to impair their obligations to the government.  *See Spay*, 913 F. Supp. 2d at 173.   The fact that Kmart may not have been in direct contractual privity with the government is not an automatic bar to § 3729(a)(7) liability.   *See Merch-Medco Managed Care*, 336 F. Supp. 2d 430, 444 (E.D. Penn. 2004); *see also United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128-29 (N.D. Okla. 1999) (finding that subsection (a)(7) allowed for indirect reverse false claims and holding that defendants' false statements to lessee may have caused lessee to understate its royalty obligation to the government). Thus, the Court is not convinced that Kmart is entitled to summary judgment on the reverse false claims.

II.    **Kmart's Motion for Partial Summary Judgment Based on Payer's Definitions of Usual and Customary Price (Doc. 204).**

Liability in this matter rests on whether Kmart submitted false claims to the government and other third-party payers by way of reporting a false Usual and Customary ("U&C") price.    More specifically, Kmart's False Claims Act liability potentially turns on the *definition* of the term "U&C price."    This definition is significant, because Relator asserts that Kmart reported inflated U&C prices and was reimbursed at a rate substantially higher than the price that it actually charged cash-paying customers.

The parties dispute the meaning of U&C price.    The Court notes that in Relator's Second Amended Complaint, he asserts that the U&C price is generally understood in the healthcare industry to be "the price that the pharmacy charges the cash-paying public for the same drug"    (Doc. 98, p. 43).    This is a definition to which Kmart would agree.    It seems that now, however, Relator believes the *sole* meaning of the term U&C price to be the NCPDP definition, which defines U&C as the "amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed" (Doc. 239, p. 5).    Kmart, on the other hand, asserts that the U&C price is not defined by the NCPDP, but only by the applicable statute, regulation, and/or contract with Kmart (Doc. 204, p. 16).[5]

The NCPDP is an American National Standards Institute (ANSI)-accredited

---

[5] Relator argued at the September 30 hearing that the definition of "usual and customary" price is a question of fact.    Kmart argued that the definition of "usual and customary" is a question of law.    The Court finds that resolution of this issue requires interpretation of the NCPDP and whether it was intended to be an authority on the definition of U&C price, and thus, it is a question of law for the Court to decide. *See Van Houten-Maynard v. ANR Pipeline Co.*, No. 89-C-0377, 1995 WL 311367, at *3 (N.D. Ill. May 19, 1995) ("It is well settled that decisions regarding questions, interpretation, and explanation of applicable law are the province of the Court.").

Standards Development Organization which works to create national standards for real-time, electronic exchange of healthcare information, primarily focusing on information exchange for prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services crucial to quality healthcare.[6] The Secretary of Health and Human Services has adopted a "Telecommunication Standard" of the NCPDP version 5, release 1, known as NCPDP 5.1 and, subsequently, version D, release 0, known as NCPDP D.0.   45 C.F.R. § 162.1102(a)(2).   Under these rules, pharmacies are required to use NCPDP 5.1 (from October 2003 to December 2011) or NCPDP Version D.0 (December 2011 to the present) for all claims submissions to all health plans, including all state Medicaid programs (Doc. 237, p. 1).   *See* 45 C.F.R. § § 162.1101(a), 160.103; *Thulin v. Shopko Stores Operating Co.*, LLC, No. 10-CV-196, 2013 WL 5946503, at *2 (W.D. Wis. Nov. 5, 2013) ("One of the provisions of [HIPAA] requires the [HHS] to 'adopt standards for transactions and data elements for such transactions to enable health information to be exchanged electronically' . . . Under these rules, pharmacies are required to use NCPDP 5.1 for all claims submission to all health plans, including all state Medicaid programs.").

Specifically, these standards provide for a common format and definition of specific data fields so that each party to a transaction can securely and efficiently communicate.   As Relator puts it, the NCPDP standards ensure that all of the computers involved in the sale of prescription drugs are "speaking the same language." (Doc. 239, p. 5, Doc. 218-5, p. 8, Doc. 252, p. 16).

---

[6] *See* NCPDP Website, www.ncpdp.org/About-Us.

The NCPDP standards clearly define U&C charge under the heading "2.7.5 Usual and Customary Charge (426-DQ) Definition." *Telecommunication Version 5 Questions, Answers and Editorial Updates* at 39 (Nov. 2010).  As stated previously, the NCPDP defines U&C to mean: "Amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." *Id.*  The explanatory materials explain that "[t]he Usual and Customary Charge (426-DQ) represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash paying customer." *Id.*

Plaintiff's expert Dale Chamberlain served on the National Council for Prescription Drug Programs in Scottsdale, Arizona, and recommended creation of the field 426DQ, which is the U&C field (Defendant's Hearing Exhibit 1, Chamberlain Deposition, p. 98-100).  Chamberlain states in his report that "[s]ince HIPAA requires the use of the NCPDP standard for pharmacy claim submissions, the NCPDP standard and its associated implementation guide must be followed without deviation." (Doc. 237, p. 7).  He further states that the U&C charge is "strictly defined by the NCPDP," and use of the U&C field for any other purpose would be considered a "violation of the standard." (*Id.*).  When asked about the definition of U&C price, Chamberlain stated in his deposition that "cash price to the general public" is within the spirit of what the NCPDP is getting at (Defendant's Exhibit 1, Chamberlain Deposition, p. 87).

Kmart argues that the NCPDP does not control the definition of U&C price, citing

the testimony of Dorothy DeAngelis.   Dorothy DeAngelis is a Senior Managing Director with FTI Consulting who specializes in assisting clients with regulatory compliance matters and is familiar with NCPDP standards (Doc. 207-1).   DeAngelis explains in her declaration that the "definitions merely explain the format for how a pharmacy claim should be submitted . . . NCPDP definitions are not mandatory . . . ." (Doc. 207-1, p. 5). She points out that the NCPDP makes clear that "third-party specifications and trading partner agreements may require specific values for adjudication of claims."   (Doc. 207-1, p. 5; Doc. 210-25, p. 3, 6).   *See* NCPDP Telecommunication Version 5 Questions, Answers and Editorial Updates, No. 20.17 Usual and Customary Charge (426-DQ) at 224 (Nov.                        2010),                        available                        at: http://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf.

The Court agrees.   The information set forth by the NCPDP leads the Court to believe that the NCPDP definition of U&C price is not meant to be "mandatory," but to instead explain the format for how a pharmacy claim should be submitted.   The Implementation Guide makes clear that the NCPDP intended to leave it up to the trading partners (the payer and provider) to determine whether or not the U&C field would even be used (Doc. 210-25, p. 6).   *See* NCPDP Telecommunication Standard Implementation Guide v. D.0 (August 2010), p. 121.   The NCPDP Telecommunication Version 5 Questions, Answers and Editorial Updates state that "third party payer specifications may require specific values for adjudication."   *See* NCPDP Telecommunication Version 5 Questions, Answers and Editorial Updates, No. 20.17

Usual and Customary Charge (426-DQ) at 224 (Nov. 2010), available at http://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf.

Further, the Court notes that the standard across the pharmacy industry for U&C price falls in line with this NCPDP definition.   The Academy of Managed Care Pharmacy (AMCP) - a professional association that includes health systems and PDMs - defines "U&C" price as **"[t]he price for a given drug or service that a pharmacy would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the pharmacy**." (Doc. 98, p. 43-44).   Several reports by the Government Accountability Office on "U&C" price trends in drug pricing, issued from August 2005 through February 20011, define the "U&C" price as "**the price an individual without prescription drug coverage would pay at a retail pharmacy**." (Doc. 98, p. 44) *citing* GAO Report, "Prescription Drugs: Trends in Usual and Customary Prices for Commonly Used Drugs," February 10, 2011.

Adam Zakin, former Director of Pharmacy Operations, testified in his deposition that "**[u]sual and customary is the pricing that we would bill for somebody just simply walking off the street without having any insurance or any plan, primary or secondary or other…it could be called the cash price, too . . . .**" (Doc. 218-7, p. 47). Robbert Ayshford, Director of Pharmacy Administration, testified in his deposition that the U&C price "**is the price that the patient would pay at the counter with no insurance plan, so it's the full retail price of the medication**." (Doc. 218-6, p. 8). Timothy Weber, currently the Vice President of Pharmacy for Fruth (and a former Kmart

employee), testified that U&C price means "**the retail price we charge to a customer with no plan, insurance or discount**" (Doc. 218-2, p. 27).   Mistee Budrovic, who is in charge of the PDX system, testified that the U&C price is "**the price that would be charged if a customer had no third-party payer that we were billing**" (Doc. 218-3, p. 19).   Brian Wehneman, Director of Pharmacy Audit for Humana, testified that the U&C price generally represents the "**cash price for the prescription being submitted**." (Doc. 218-4, p. 5).   Mark Doerr, Kmart's employee, testified that U&C price means "**cash price**." (Doc. 218-1, p. 54).   Kmart's expert, Jayson Dukes, who routinely advises clients on a variety of governmental regulatory compliance issues, "**cash price offered to the 'general public' for a particular drug and quantity**." (Doc. 207-2, p. 4).   Elizabeth Zander, Director of Managed Care Services for Kmart, "**the usual and customary charge is what a member of the general public would be charged if they walked up to the counter and didn't have any insurance**." (Doc. 218-5, p. 16).   Thus, the Court finds that U&C price is generally referred to within the industry as the "**cash price to the general public,**" which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed.   This definition falls in line with the NCPDP definition.

Notably, however, individual payers may further define U&C price specifically in their statutes or regulations or in their payer sheets, electronic prescription claim instructions, or contracts (Doc. 207-2, p. 3-4, Doc. 239, p. 2, Doc. 204, p. 16, Doc. 204-3, Doc. 204-7, Doc. 98, p. 45).   For example, with respect to government programs, such as

Medicare Part D, Tricare, and OWCP, U&C is defined by the relevant contract and/or payer sheet of the PBMs or administrators handling the claims processing for those programs (Doc. 212, p. 5).   With respect to state Medicaid programs, U&C is defined by statute or regulation (*Id*.).   Relator has provided the Court with a list of each state Medicaid statute defining U&C price, demonstrating how they differ among the statutes (Doc. 218-13), as well as a list of 1,000 contracts between Kmart and third party payers (which either expressly provide that Kmart could not seek reimbursement in an amount greater than its U&C price or define that term to mean cash price) (Doc. 218-14).   Many of the definitions provided by state Medicaid statutes include additional qualifiers, for example, the terms "for similar prescriptions" or "for the same or similar service." Other times these statutes will specifically define "general public" or include specific exclusions such as "discount prices to specified customers."

It would be nonsensical to find that these definitions would not control the specific contracts or agreements with these specific payers.   As explained above, the NCPDP intended to leave it up to the trading partners (the payer and provider) to determine whether or not the U&C field would even be used.   As Chamberlain testified in his deposition,

> NCPDP will not get in the middle of a State law.   I mean, we do offer advice to states to try to avoid things like confusion, but in almost every situation that I'm aware of where there has been a definition and State regulation about usual and customary, even though the wording may not be exactly the same, it generally refers to a cash price.

(Defendant's Exhibit 1, Chamberlain Deposition, p. 85-86).   The NCPDP simply defines

the field in which the U&C price should go (*Id.*).   Ultimately, the Court holds that the NCPDP definition (which reflects the industry standard)[7] of "cash price to the general public" controls, unless further defined by an individual state statute or relevant contract and/or payer sheet.[8]

Kmart argues that it is entitled to partial summary judgment on Counts I-XXXII because Relator has failed to meet his burden to demonstrate that the relevant payer's definition of U&C price specifically encompassed the enrollment-based discount program that Kmart operated at the specific time that it allegedly submitted incorrect U&C prices.   The main premise of Kmart's argument is that the "industry definition of U&C price is the cash price *offered to the general public*." (Doc. 204, p. 9).   Thus, Kmart argues that the enrollment requirement for its discount programs took these discount programs out of the purview of U&C price, since they were not offered to the "general public."   Kmart essentially argues that the customers who participated in these generic discount programs were members of a private club or group and thus not part of the "general public."

---

[7] Both parties have effectively conceded that the NCPDP definition of U&C price was in line with or reflected the industry standard.   (*See* Doc. 204, p. 16, Doc. 239, p. 5).

[8] Kmart requests that the Court take judicial notice of NCPDP standards (including the Data Dictionary, Q&A, and Payer Sheet) as they have been incorporated into the Federal Register or into the Implementation Guide by reference.   45 C.F.R. § 162.920.   The Court grants this request.   Rule 201 of the Federal Rules of Evidence allows a court to take judicial notice of adjudicative facts, *i.e.* the facts of a particular case.   FED. R. EVID. 201(a).   Facts that may be judicially noticed are those not subject to reasonable dispute because they are either generally known within a trial court's territorial jurisdiction or can be readily determined from sources whose accuracy cannot be reasonably questioned.   *Id.* at 201(b).   Where a party requests judicial notice and supplies the necessary information, a court must take judicial notice.   *Id.* at 201(c)(2).   The Court notes that the parties do not dispute the authenticity of these documents.   Because these documents contain adjudicative facts and are "not subject to reasonable dispute" because the source's "accuracy cannot be reasonably questioned," the Court takes judicial notice of these documents.

Black's Law Dictionary defines "public" as "[t]he people of a country or community as a whole," "involving an entire community," and "open or available for all to use, share, or enjoy."   BLACK'S LAW DICTIONARY 1422 (10th ed. 2014).   Kmart emphasizes that, in the early iterations of the discount program (KMP and RMP), the enrollment process involved completion of a written form and, in the later iteration (PSC), the form was completed and submitted through an online portal (Doc. 204, p. 9). Thus, Kmart argues that the requirement of "opting in" to the program took these customers outside of the "general public."   Moreover, Kmart emphasizes that in July 2009, customers were also required to pay an annual ten dollar fee to enroll.

Case law has distinguished private clubs from the general public.   In *Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C.*, 397 F.2d 96 (4th Cir. 1968), the Fourth Circuit found that, although the YMCA had some characteristics of a private club (*i.e.* an application for membership, a membership committee, dues between $30-$100, and a membership card), it lacked the genuine selectivity necessary to be a private club, because it was open to everyone, and the YMCA held itself out to all members of the community.   *Id*. at 101.   In *Zanganeh v. Hymes*, 844 F. Supp. 1087 (D. Md. 1994), the District of Maryland found that, although prospective members were required to complete a membership application and pay a yearly fee, there was no private club, because the club was not selective in its membership (the only factor considered in admitting "members" was based on the capacity of the building).   *Id*. at 1090.   As the Northern District pointed out in *Welsh v. Boy Scouts of America*, 742 F. Supp. 1413, 1425

(N.D. Ill. 1990), in determining whether an organization is a private club, the most significant factor is the "selectivity of the organization in admitting new members."

Here, in light of the relevant case law, the Court finds that the members of Kmart's generic discount programs are part of the "general public" (as opposed to a private group or club) because of the open eligibility of the programs, *i.e. anyone* is eligible to join the program.   (Doc. 218-51, p. 1, Doc. 218-52, p. 1, Doc. 218-2, p. 27, Doc. 218-6, p. 4, Doc. 218-49).   This is not to say that participating in Kmart's discount program did not take these customers outside of the "general public," as defined by an individual state statute or relevant contract.   For example, as Kmart argues and the Court addresses below, the Nevada Medicaid Statute specifically defines "general public," and this definition may be different from the general definition that the Court applies above.   The Court finds that specific definition of "general public," as it further defines the term U&C price and as provided in the Nevada Medicaid Statute, would obviously control.

Kmart next argues that, at a minimum, it is entitled to summary judgment with respect to claims and statements submitted to the following three Medicaid programs: Minnesota, Nevada, and Alabama.[9]   Specifically, Kmart argues that these three states exclude discount prices given to certain segments of a pharmacy's customers from their U&C definitions.

In Minnesota, the U&C price is defined as:

---

[9] Kmart requests that the Court take judicial notice of the Nevada Medicaid Services Manual and the Alabama Medicaid Glossary of Terms.   For the reasons stated in footnote 8 above, the Court grants this request.

> "Usual and customary," when used to refer to a fee billed by a provider, means the charge of the provider to the type of payer, other than recipients or persons eligible for payment on a sliding fee schedule, that constitutes the largest share of the provider's business.   For purposes of this subpart, "payer" means a third party or persons who pay for health service by cash, check, or charge account.

(Doc. 204-4, Doc. 218-13, p. 3).   Minn. R. 9505.0175 (subpt. 49) (2005), *available at* https://www.revisor.mn.gov/rules/?id+9505.0175.

Kmart argues that its pharmacy data demonstrates that only fifteen percent of Kmart's prescription volume nationwide is for cash-paying customers and only fourteen percent of Kmart's prescription volume in Minnesota is for cash-paying customers. Thus, Kmart argues that cash payers do not constitute the largest share of Kmart's prescription volume nationally or in Minnesota.  Relator, however, argues that the definition refers to the largest share of Kmart's cash business, not its entire business as a whole.   Relator asserts that it is evident that the definition is referring to the provider's cash business because the succeeding sentence states that "for purposes of this subpart, 'payer' means a third party or persons who pay for health service by cash, check, or charge account."   Thus, according to Relator, the definition is essentially referring to the charge to the type of *cash* payer that constitutes the largest share of Kmart's business. The Court agrees and finds that it is clear that the Minnesota statute is referring to the type of *cash* payer that constitutes the largest share of the provider's business, <u>not</u> the type of payer *in general* that constitutes the largest share of the provider's business. Here, the type of cash payer that constitutes the largest share of Kmart's business are the

cash payers who participated in Kmart's generic drug programs, which represented the

majority[10] of Kmart's cash business (Doc. 239, p. 10; Doc. 204-7, p. 8-9; Doc. 218-11, p.

8-9, Doc. 250-2, p. 79-80).   Thus, Kmart is not entitled to summary judgment as to claims

and statements submitted to the Minnesota Medicaid program.

       Nevada's Medicaid statute prohibits a provider's "usual charge" from being more

than what the pharmacy charges the "general public." (Doc. 204-5, p. 4, 8, Doc. 218-13, p.

3).   *See* Nevada Division of Health Care Financing & Policy, Medicaid Services Manual

Section 1202.33; *See also* Nevada Division of Health Care Financing and Policy, Medicaid

Services   Manual,   Section   1202.29   (April   21,   2005),   *available   at*

http://dhcfp.nv.gov/MSM/Archives/CH1200/Ch%201200%20Final%204-21-05.pdf.

Nevada defines "general public" as follows:

> The patient group accounting for the largest number of
> non-Medicaid prescriptions from a pharmacy.   This
> excludes patients who purchase or receive prescriptions
> through third party payers such as Blue Cross, Aetna, PAID,
> PCS, etc.   If a pharmacy discounts prices to specified
> customers (*e.g.* 10% discount to senior citizens), these lower
> prices should be excluded from usual and customary
> calculations unless they represent more than 50% of the
> store's prescription volume.

*Id*. at 4, § 1202.11.   *See also* Nevada Division of Health Care Financing and Policy,

Medicaid   Services   Manual,   Section   1202.10   (April   21,   2005),   *available   at*

---

[10] Joel Hay originally stated in his report that Kmart's generic drug program represented approximately
ninety-nine percent of Kmart's cash sales of program drugs (Doc. 204-7, p. 8-9; Doc. 218-11, p. 8-9).   At the
September 30 hearing, Kmart raised the issue that Hay had discovered errors in his logic and had to rerun
the numbers.   Hay clarified in his deposition (taken on September 22, 2014) that he had found a minor
error upon review and, at most, it limited or reduced his calculation by ten percent (Doc. 250-2, p. 79-80).
Thus, even if this figure is eighty-nine percent as opposed to the original ninety-nine percent, the figure
still represents the majority of Kmart's cash business.

http://dhcfp.nv.gov/MSM/Archives/CH1200/Ch%201200%20Final%204-21-05.pdf.

As explained above, according to Joel Hay, Kmart's generic discount program sales constituted the largest number of non-Medicaid prescriptions, excluding third-party payers such as Blue Cross, Aetna, PAID, PCS, etc.   Kmart argues that its discount program sales are excluded from this definition because they are discount prices to specified customers (*i.e.* enrollees in the program), and the program prices at no time comprised fifty percent of any store's prescription volume.   Thus, Kmart argues that this definition excludes Kmart's discount program prices as a matter of law.

The Court, however, does not find that Kmart's discount programs can be excluded under Nevada's definition of "general public."   The definition states that "[i]f a pharmacy discounts prices to specified customers, (*e.g.* 10% discount to senior citizens) these lower prices should be excluded from usual and customary calculations . . . ."   Here, Kmart does not discount prices to *specified* customers.   Instead, Kmart discounts prices - through its generic drug programs - to *any* person, so long as they fill out a form to participate.   This is far different from the example set forth in Nevada's definition that illustrates what it means to discount a price to a specified customer, such as senior citizens.   Kmart's generic drug programs simply do not require this sort of selectivity.   Thus, Kmart is not entitled to summary judgment as to claims and statements submitted to the Nevada Medicaid program.

Alabama's Medicaid statute states that pharmacies are required to charge "less than the usual and customary rates paid by consumers not covered by a third party plan

for the same or similar services."   Ala. Code § 34-23-115.   As Kmart points out, the Alabama Glossary of Terms defines U&C price as the "[a]mount which a provider usually and most frequently charges patients for a specific service in normal medical circumstances."   (Doc. 204-6, p. 15).   Ala. Medicaid Glossary of Terms, April 2005, available at:

http://www.medicaid.state.al.us/documents/Billing/5-G_Manuals/5G-2_Provider.Manual.April.2005/Apr05-Glossary.pdf.

Kmart argues that this definition is conspicuously *not* limited to cash paying customers.   Thus, Kmart argues that because Kmart's discount program prices did not comprise more than fifty percent of its prescription volume nationwide or in Alabama, the discount prices are not those "most frequently" charged.   The Court disagrees.

First of all, the statute references cash-paying customers when it specifically excludes transactions with third-party payers.   Ala. Code § 34-23-115.   Second, as Relator points out, in *United States v. Bruno's, Inc.*, 54 F. Supp. 2d 1252, 1257 (M.D. Ala. 1999), the Middle District of Alabama found that, in the context of Alabama's Medicaid regulations, the usual and customary charge to the "'general public' refers to customers paying the prevailing retail price, and does not include those covered by third-party payers . . . ."   The cash payers who participated in Kmart's generic drug programs represented a majority of Kmart's cash business, and thus paid the discount prices that were "most frequently" charged to cash payers.   Accordingly, Kmart is not entitled to summary judgment as to claims and statements submitted to the Alabama Medicaid

program.

III.    **Kmart's Motion to Exclude the Expert Testimony of Dale A. Chamberlain (Doc. 212)**

Kmart seeks to exclude the expert testimony of Relator's expert Dale A. Chamberlain.   Specifically, Kmart argues that Chamberlain's report (1) is devoid of any opinion, (2) that his testimony consists of general information that would be obvious to the lay person, and (3) that his opinion regarding the NCPDP standard is an inadmissible legal conclusion.   Kmart conceded at the September 30th hearing that it does not contest Chamberlain's qualifications (*See* Doc. 252, p. 9), but rather Kmart is seeking to exclude Chamberlain's testimony as a whole on the basis that it will not assist the jury and only serve to confuse them.

Kmart first argues that Chamberlain's testimony that the NCPDP definition of U&C price controls is an impermissible legal conclusion that would only serve to confuse the jury.   Expert testimony as to legal conclusions that will determine the outcome of the case is, of course, inadmissible.   *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003); *see also United States v. Caputo,* 382 F. Supp. 2d 1045, 1049 (N.D. Ill. 2005) ("An expert witness cannot offer an opinion on what the law requires or permits because the judge, not the witnesses, instructs the jury about the relevant law.").   This issue of whether the NCPDP definition of U&C price controls has already been decided by the Court.   Thus, this argument is now moot.

Chamberlain also plans to testify regarding the pharmacy claims adjudication process.   Chamberlain specifically discusses this process at pages 4-7 of his Report (Doc. 237, p. 4-7).   Chamberlain stated in his deposition that his "intention is only to explain

how claims are submitted by a pharmacy, how they are paid by a payer in general, and what rules have to be followed in order to prevent cases of fraudulent activity." (Defendant's Hearing Exhibit 1, Chamberlain Deposition, p. 20).   Kmart asserts that this discussion of the claims adjudication process is unsubstantiated, merely duplicative of fact witness testimony, and something that does not take an expert to explain (Doc. 212, p. 9).

Expert testimony is admissible only if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," FED. R. EVID. 702, and to assist with "technical issues that laypeople would have difficulty resolving on their own," *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013).   While it is true that a "trial court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension . . . . [an expert] must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.   *Ancho v. Pantek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (internal citations and quotation marks omitted).

Chamberlain is an expert in the technical aspects of the prescription reimbursement process.   As set forth in his Report, he served eight years as Vice President and Chief Technology Officer for Express Scripts (Doc. 237, p. 12).   He also served nine years as Express Script's Director of Information Technology Systems where he led the teams that developed its reimbursement processes (Doc. 237, p. 13).   He is

obviously knowledgeable regarding the adjudication process.

The fraud alleged by Relator is complex.   It is apparent from the evidence that the adjudication process is not straightforward and involves a series of intermediaries (Doc. 218-5, p. 6, Doc. 207-3, p. 2-4, Doc. 207, p. 2-4).   It involves a technical process that is not typically known to a layperson.   Thus, the Court finds that Chamberlain's testimony regarding the adjudication process is relevant and will assist the jury in understanding and determining facts that are in issue.   To the extent that Kmart is concerned that Chamberlain will attempt to confuse the jury by focusing on the relationship solely between the pharmacy and the PBM, the Court is confident that defense counsel will be able to use traditional means at trial (such as cross examination and presentation of Kmart's own experts and witnesses) to rectify what they perceive as deficiencies in Chamberlain's testimony.   Accordingly, the Court denies Kmart's Motion to Exclude Chamberlain's testimony.

### IV.   Kmart's Motion for Partial Summary Judgment Based on Claims in Other Than Ninety-Day Quantities (Doc. 203)

Kmart argues that it is entitled to partial summary judgment on Relator's claims for prescriptions dispensed in anything other than a ninety-day supply during the time when its programs were strictly limited to ninety-day supplies.   Kmart asserts that it is undisputed that two of its discount programs, the Kmart Maintenance Program ("KMP") and the Retail Maintenance Program ("RMP"), were strictly limited to ninety-day supplies (Doc. 203, p. 3-4).[11]   Relator's claims are grounded on the assertion

---

[11] Kmart asserts that once Kmart implemented its Generics Plus program in June 2008, *then* Kmart offered

that prices offered through Kmart's generic drug programs should have been included in calculating the U&C price, and because Kmart did not consider sales under its generic drug discount programs when calculating its U&C price, Kmart substantially overcharged the government and other third-party payers.   Thus, Kmart argues that there is absolutely no basis for Relator to argue that prices ***not offered*** through Kmart's discount programs for quantities ***not available*** through the programs could constitute the U&C price (Doc. 203, p. 7-8).

Here, there is obviously a disputed issue of fact as to whether the KMP and RMP programs were strictly limited to ninety-day quantities (*See* Doc. 240, p. 1).   Kmart's employees, Brian Wehneman and Timothy Weber, testified in their depositions that the purpose of the KMP program was initially to combat mail order programs, which dispensed ninety-day supplies.   (Doc. 207-11, p. 6, Doc. 207-11, p. 9-10).   Thus, Kmart asserts that the earlier iterations of the generic drug programs (KMP and RMP) were for ninety-day quantities only (Doc. 207-11, p. 11-12, Doc. 203, p. 1-2).

Relator, however, asserts that this is false, as Kmart's pharmacists would routinely prorate the program's fifteen dollar cost for a ninety-day supply down to ten dollars for a sixty-day supply or five dollars for a thirty-day supply, in attempt to keep customers happy and to remain competitive.   In support, Relator cites to expert Joel Hay's report, which states that although these programs were intended to be limited to a list of several hundred generic drugs for a ninety-day supply, the transaction data show

---

discount pricing on some thirty and sixty day supplies at five dollars or ten dollars, respectively (Doc. 209, p. 5).

"that Kmart pharmacies routinely prorated prices for 30-day and 60-day supplies (at $5 and $10)." (Doc. 218-11, p. 7).   Relator also cites to the deposition testimony of Kmart employee Timothy Weber, in which Weber stated that he knew "that some [Kmart] pharmacies prorated or tried to prorate RMP pricing." (Doc. 218-2, p. 38).

Relator also cites to expert Joel Hay's report to assert that pharmacists would also routinely override the program's fifteen dollar price in order to match or beat the price of competitors like Walmart or Target (*See* Doc. 218-11, p. 7).   Adam Zakin, who was a former district manager of Kmart, testified at his deposition that in some cases there was "price matching" or "price beating" (Doc. 218-7, p. 16).   Timothy Weber testified that "some pharmacies would price override a 30-day supply to $5" and so forth in order to compete with other pharmacies such as "Walmart in particular" (Doc. 218-2, p. 38). Further, Brian Wehneman testified that Kmart had, at some point "some sort of price matching policy that . . . came and went." (Doc. 218-4, p. 34).   Robbert Ayshford, the former Director of Pharmacy Administration for Sears Holding Company, also testified that Kmart had a price match policy (Doc. 218-6, p. 50).   Relator also cites to a Kmart document that reads that "price matching" is no longer an option for the PSC program, indicating that in the past "most price matches were bogus - not being verified - or being done just out of habit; matching is out of control." (Doc. 218-22, p. 1).

Kmart concedes that this price-matching and proration happened but argues that these were "isolated instances" that were in violation of Kmart's policy (*See* Doc. 203, p. 4, 6).   In these situations, Kmart alleges that it informed pharmacists that proration

downwards was against Kmart policy (Doc. 203, p. 6).   Kmart cites to various e-mails sent by Timothy Weber, which instructed employees/managers to tell pharmacists not to override an RMP co-pay (Doc. 207-18, p. 2, 4).

Kmart's expert Jayson Dukes states in his declaration that "based on [his] review of the transaction data, [he] determined that over the relevant time period, "price match/price beat" claims were less than five percent of prescription claims." (Doc. 207-2, p. 3).   He further states that "in several years, 'price match/price beat' claims comprised less than one percent of total volume" and "[o]verrides were less than five percent of the total prescription claims." (Doc. 207-2, p. 3).

On the other hand, Relator's expert Joel Hay opines, based on the same transaction data, that Kmart "routinely" prorated prices as well as "routinely"  engaged in price-beating or price matching competitor's prices (Doc. 218-11, p. 7).   Specifically, Hay testified in his September 2014 deposition that there was a typical pattern of price matching and proration that he repeatedly observed in the data (Doc. 250-2, p. 171).   He states in his declaration (attached to Relator's Response to Kmart's Supplemental Brief) that there were "approximately 3.7 million cash transactions of program formulary drugs prior to June 2008" and "approximately 1.3 million of those transactions involved sales of less than 90-day supplies at prices lower than $15."   (Doc. 250-1, p. 1).   Hay states that "of the 1.3 million transactions before June 2008, over 700,000 involved sales of the 30-day supplies at $5 or less, including over 280,000 sales at $3.89 (price beats), over 220,000 sales at $4 (price match) and almost 140,000 sales at $5 (proration)." (Doc.

250-1, p. 2).   There is clearly a dispute of fact as to whether Kmart's KMP and RMP

programs (which were in effect prior to June 2008) were strictly limited to ninety-day

quantities.   Therefore, the Court must deny summary judgment as there is an issue of

fact which must be determined by the trier of fact.

As to Kmart's argument that U&C price is tied to quantity, the Court finds this to

be the case where individual payers include this notion in their definition of U&C price.

For example, as Kmart points out, the Arkansas Medicaid statute defines U&C price as

"the price that is charged for 90% of the prescriptions for private pay customers *for the*

*same product and quantity*."   Arkansas Medicaid, Provider Manual § 251.100, Rev. Oct.

13, 2003.[12]   The Massachusetts Medicaid Statute defines U&C price as "the lowest price

that a Provider charge[s] or accept[s] from any [payer] for the *same quantity of a drug* on

the *same date of service*...."   *See* 114.3 Mass. Code Regs. § 31.02 (emphasis added).[13]

This argument, however, is irrelevant for purposes of this motion because there is a

genuine issue of material fact as to whether Kmart's discount programs were strictly

limited to 90-day quantities.

### V.   Kmart's Motion for Partial Summary Judgment Based on Pre-FERA Claims Relating to Medicare Part D (Doc. 205) & Kmart's Motion for Partial Summary Judgment on All Claims Submitted to Medicare Part D (Doc. 206)

Kmart argues that it is entitled to partial summary judgment on the pre-FERA

---

[12] Available at https://www.medicaid.state.ar.us.InternetSolution/Provider/docs/pharmacy.aspx.

[13] Kmart asks the Court in a footnote to take judicial notice of the state Medicaid program documents that Kmart attaches at Exhibits B-D (Docs. 203-2, 203-3 and 203-4).   The Court grants this request.   Because these state Medicaid program documents contain adjudicative facts and are "not subject to reasonable dispute" because the source's "accuracy cannot be reasonably questioned," the Court takes judicial notice of these documents.   *See* footnote 8, above.

claims because, under the pre-FERA version of the False Claims Act, Kmart did not "present" any claims to CMS (pursuant to Section 3729(a)(1)) or make any statements in order "to get" CMS to pay or approve a claim (pursuant to Section 3729(a)(2)), as was required pre-FERA.

### A.  The FERA Amendments and This Lawsuit

The first issue that the Court must address is whether the pre-FERA (31 U.S.C. § 3729(a)(1), (a)(2), and (a)(7) (1986)), or post-FERA (31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2009)) versions of the Act apply to the alleged false claims in this lawsuit.

Congress made the amendments to Section 3729(a)(2) retroactive to June 7, 2008. Fraud Enforcement and Recovery Act of 2009 (FERA), PL 111-21, May 20, 2009, 123 Stat 1617.   However, there is no similar provision for Section 3729(a)(1)(A).   *See Goldberg v. Rush University Medical Center,* 929 F. Supp. 2d 807, FN 10 (N.D. Ill. 2013) ("[t]he amendments to the Act were not retroactive except for the new 31 U.S.C. § 3729(a)(1)(B), which replaces the previous 31 U.S.C. § 3729(a)(2) and applies to all FCA suits that were pending on June 7, 2008"); *U.S. ex rel. Wildhirt v. AARS Forever, Inc.,* No. 09-C-1215, 2011 WL 1303390, at *7, FN * (N.D. Ill. April 6, 2011) ("[b]ecause only the amendment to 31 U.S.C. § 3729(a)(2) (now § 3729(a)(1)(B)) is retroactive . . . ."); *U.S. ex rel. Buth v. Pharmerica Corp.,* No. 09-C-0720, 2014 WL 4355342, at *4 (E.D. Wis. Sept. 3, 2014); *see also U.S. ex rel. Loughren v. Unum*, 613 F.3d 300, 306, n. 7 (1st Cir. 2010).   The Amendment to Section 3729(a)(1) took effect on May 20, 2009 and "appl[ies] to conduct on or after the date of enactment."   FERA, PL 111-21, May 20, 2009, 123 Stat 1617.   Thus, the Court finds that,

as to Section 3729(a)(1), the pre-FERA version of the Act governs claims for payment that were presented to the government prior to May 20, 2009, and the post-FERA version of the Act governs alleged fraudulent claims for payment that were submitted subsequent to May 20, 2009.

As stated above, Congress made the amendments to Section 3729(a)(2) retroactive to June 7, 2008.   FRAUD ENFORCEMENT AND RECOVERY ACT OF 2009 (FERA), PL 111-21, May 20, 2009, 123 Stat 1617.   As Judge Reagan pointed out in his Order denying Kmart's Motion to Dismiss, there is a split of authority as to whether the word "claims" refers to the alleged false claims at issue in the litigation, or whether "claims" refers to the case or cause of action under the False Claims Act.   *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n. 3 (11th Cir. 2009) (construing FERA's "claims" language to mean the alleged false claims submitted to the government for payment); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011) (indicating that "claim" means a demand for payment); *cf United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010) (applying FERA § 4(f)(1) to case pending as of June 7, 2008); *United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895 n. 3 (N.D. Ill. 2009) (same).   The Seventh Circuit has recognized in a footnote that "the amendment to section 3729(a)(1)(B) [now section 3729(a)(2)] . . . applies to *cases*, such as this, that were pending on or after June 7, 2008." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n. 2 (7th Cir. 2011) (emphasis added).   While the Court recognizes that this is dicta and is not binding precedent (*see*

*United States ex rel. Hudalla v. Walosh Constr. Co.*, 834 F. Supp. 2d 816, 828-29 (N.D. Ill. 2011)), the Court follows suit and finds that "claims" refer to *cases* that were pending on or after June 7, 2008.   Since this case was pending on or after June 7, 2008 (it was filed on July 16, 2008 in the Central District of California), the Court will apply the FERA amendments to subsection 3729(a)(2) to the alleged false claims, which imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   Section 3729(a)(1)(B).

Thus, the Court ultimately finds that, as to Section 3729(a)(1), the pre-FERA version of the Act governs claims for payment that were presented to the government prior to May 20, 2009, and the post-FERA version of the Act governs alleged fraudulent claims for payment that were submitted subsequent to May 20, 2009.   As to Section 3729(a)(2), the Court finds that the post-FERA version of the Act governs all of the alleged false claims due to its retroactivity.

### B. Kmart's Argument that Relator's claim fails under the Section 3729(a)(1) and (a)(2) (Pre-FERA) Presentment and "Paid or Approved by the Government" Requirements

Kmart argues that, under Pre-FERA Section 3729(a)(1), Relator's claims fail for lack of presentment.   Specifically, Kmart argues that Relator cannot satisfy the presentment element of his pre-FERA allegations under 31 U.S.C. § 3729(a)(1) because (1) false claims for payment were not presented to CMS, and (2) the reimbursement structure of the Medicare Part D program insulates CMS from the administration and payment of individual prescription drug claims.   The particular false claim being

alleged here is Kmart's misrepresentation of the U&C price.   Kmart emphasizes that the U&C price is never submitted directly to CMS, nor is it on the PDE submitted by the Plan Sponsor.   Further, Kmart explains that the structure of the Medicare Part D program insulates CMS from the administration and payment of individual prescription drug claims.   For example, CMS enters into contracts with Plan Sponsors under which Plan Sponsors (or their subcontractors, the PBMs) pay and approve individual claims.   The Plan Sponsors receive fixed monthly payments from CMS and the PBMs are paid in accordance with their contracts.   These fixed amounts are not dependent on the value of any individual claim paid by the Plan Sponsor.

Section 3729(a)(1) imposes liability on one who "knowingly presents, or causes to be presented, *to an officer or employee of the United States Government* . . . a false or fraudulent claim for payment or approval.   31 U.S.C. § 3729(a)(1)(2000) (emphasis added).   Numerous federal courts have determined that Medicare carriers contracting with the United States Department of Health and Human Services operate under the direction of a federal officer.   *See Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 488 (7th Cir. 1990) (the Seventh Circuit rejected the plaintiff's argument that Aetna did "not serve as an 'officer or employee' of the United States"); *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1002 (8th Cir. 1998) ("as a Medicare carrier, Mutual [of Omaha Insurance Company] is an officer or employee of the United States"); *see also Group Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 493 (2d Cir. 1986). Judge Reagan, in ruling on the Motion to Dismiss in this case, found that presentment

was stated on the face of the Second Amended Complaint because "[m]edicare carriers are considered agents of the United States for the purposes of the FCA."  *U.S. ex. rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 986 (S.D. Ill. 2013) (quoting *United States v. Aguillon*, 628 F. Supp. 2d 542, 547 (D. Del. 2009)).

Kmart distinguishes these cases, however, on the basis that carriers or "fiscal intermediaries" only act on behalf of CMS *in the Medicare Part A and Part B context*. Kmart argued at the hearing that Medicare Part A and Part B are "fee-for-service" programs, whereas Medicare Part D is a "risk-based" program where payments are based on annual bids submitted by the Plan Sponsors.[14]  Due to the reimbursement structure of Medicare Part D, Kmart argues that PBMs and Plan Sponsors simply cannot be considered officers of the government.

Kmart cites to no authority for this proposition, and there does not appear to be any authority that has spoken on this precise issue of whether, in the Medicare Part D context, Plan Sponsors and PBMs are officers or agents of the government.   The Seventh Circuit provided some guidance on this issue in *Bodimetric Health Servs., Inc. v. Aetna Life & Casualty*, 903 F.2d 480, 488 (7th Cir. 1990).   In *Bodimetric*, a diversity-based tort claim was brought by a health-care provider against a private insurer acting as a Medicare Part B fiscal intermediary.   Specifically, the case involved Section 405(h)[15] of the Social

---

[14]  Kmart explains that fee-for-service programs generally involve the direct submission of claims to a state agency that are partially reimbursed by the federal government.   A "risk-based" program like Medicare Part D is based on a private market model where annual bids are submitted by Plan Sponsors.

[15]  That provision reads as follows: "The findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to the hearing.   No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.   No action against the United States, the Commissioner

Security Act, which bars federal jurisdiction over actions against the United States, the Secretary, or any officer of employee thereof.   *Bodimetric*, 903 F.2d 483.   Section 405(h) is essentially an administrative requirement.   It serves to ensure that disputes under Medicare are resolved within the administrative process.   *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000) ("[T]he bar of § 405(h) . . . demands the 'channeling' of virtually all legal attacks through the agency [and] assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statute without possibly premature interference by different individual courts . . . .").

One of the issues in *Bodimetric* was whether the provider's action against the fiscal intermediary constituted an action brought against an "officer or employee" of the government under Section 405(h).   *Id*. at 487.   The Court found that the plaintiff's claims against the private fiscal intermediary were subject to the exhaustion requirement and plaintiff "may not circumvent the terms of section 405(h) simply because a private entity [the defendant] serves a public function."   *Id*. at 488.   Thus, the Court reads the *Bodimetric* decision to hold, *inter alia*, that a private entity who "serve[s] a public function" in the administration of the Medicare program, is "an 'officer or employee' of the United States" within the meaning of 42 U.S.C. § 405(h).   *Id*. at 487-488.   Notably, courts have also held that 405(h) applies to actions against otherwise private entities that contract with CMS under Medicare Part D.   *See Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 191, FN2 (S.D. N.Y. 2012) (citing *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th

of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."   42 U.S.C. § 405(h).

Cir. 2010)).

Thus, the Court is persuaded that the PBMs and Plan Sponsors in the Medicare Part D context are officers and agents of the United States under the False Claims Act, just as they are for purposes of Section 405(h).   Plan Sponsors and PBMs are private entities that have contracted with the government (in the case of Plan Sponsors) and subcontracted with a government contractor (in the case of PBMs).   They serve public functions in the administration of the Medicare Part D program and thus act as officers or employees of the government.

The Court does not find *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492-93 (D.C. Cir. 2004), to be instructive here.   Kmart analogizes to *Totten* to argue that, just as Amtrak in *Totten* was not "the government," the PBMs that sub-contract with Plan Sponsors are not the government.   (Doc. 235, p. 9).

The relator in *Totten* alleged that two companies delivered defective rail cars to Amtrak.[16]   *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 490 (D.C. Cir. 2004).   In submitting invoices to Amtrak for payment, the relator argued that these companies presented false claims to an officer or employee of the government pursuant to Section 3729(a)(1).   *Id*.   More specifically, the relator argued that Amtrak was the government because it "was a mixed-ownership government corporation prior to December 1997 and

---

[16] In May 20, 2009, Congress amended the FCA through the passage of FERA in order to "clarify and correct erroneous interpretations of the law that were decided in" *Allison Engine* and *Totten*.   Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1625 (2009); S. Rep. 111-10, 10, 2009 U.S.C.C.A.N. 430, 438.   As stated above, it made the amendments to Section 3729(a)(1) apply to conduct on or after May 20, 2009 (and made the amendments to Section 3729(a)(2) retroactive to June 7, 2008).   Thus, the Court finds that *Totten* is still good law as to Section 3729(a)(1) for pre-FERA conduct that occurred *before* May 20, 2009.

the government has continued to hold all of Amtrak's preferred stock, and has provided sizable subsidies to Amtrak . . . ."  *Id.* at 491.  The District of Columbia Circuit disagreed, holding that a claim presented to Amtrak for payment was not presented to an officer or employee of the government.  *Id.* at 502.  Thus, relying on *Totten*, Kmart argues that the claims at issue were not presented to the government.

The Court finds *Totten* to be inapposite to this case.  First of all, a majority of courts have refused to extend the holding in *Totten* to the Medicaid/Medicare context.  *See U.S. ex rel. Nichols v. Omni H.C., Inc.*, No. 02-cv-66, 2008 WL 906425, at * 3 (M.D. Ga. March 31, 2008) (the Court rejected Defendant's reliance on *Totten* to argue "submission of a claim to the agency that administers the Medicaid program on behalf of the State of Georgia is not sufficient for liability to attach under § 3729(a)(1)"); *United States of America v. Cathedral Rock Corp.*, No. 03-cv-1090-HEA, 2007 WL 4270784, at *3 (E.D. Mo. Nov. 30, 2007) ("Defendants . . . relying on *Totten* . . . argue that Plaintiff cannot state a claim under the mechanism set up for the payment of Medicaid claims . . . [h]owever, claims for reimbursement under the Medicare and Medicaid programs are not the same. . . ."); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02-C-6074, 2005 WL 2667207, at *1 (N.D. Ill. Oct. 17, 2005) ("Medicaid, which is based upon a comprehensive funding and reimbursement structure between the state and federal governments, is different from the federal funding mechanism for Amtrak, a government-sponsored private enterprise.").

Further, the *Totten* court found that presentment was not made to the federal

government because these claims were submitted to and paid by Amtrak alone, which received prior funding through a generalized federal subsidy.   *Id.* at 491-92; *see also U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, No. 02-C-6074, 2005 WL 2667207, at *2 (N.D. Ill. Oct. 17, 2005).   Amtrak was not an intermediary; it had autonomy to pay whatever claims it liked without government involvement.   This is obviously different from claims for reimbursement under the Medicare Part D program.   *Tyson* at *2 ("Indeed, several courts have highlighted the substantial role played by the federal government in its funding and enforcement of Medicare and Medicaid programs, and have found frauds upon such programs to fail squarely within the protections of the FCA.").   The PBMs or Plan Sponsors are intermediaries; they do not have the same sort of independence as Amtrak did in *Totten*.   The fixed monthly amount that the government pays to the Plan Sponsors is paid to them for disbursement purposes only, so that the money may pay for Medicare Part D prescription drugs.   Medicare Part D is based upon a comprehensive funding and reimbursement structure between the federal government and insurance companies, and it is different from the federal funding mechanism for Amtrak contracts. Thus, the Court sees no basis for extending the *Totten* holding to Medicare Part D claims. Because Relator can show that claims for payment were presented to the PBMs and Plan Sponsors (who the Court finds to be agents and officers of the United States for purposes of the False Claims Act), the Court declines to grant summary judgment for lack of presentment pursuant to Section 3729(a)(1).

Kmart also argues in its Motion for Summary Judgment that Relator does not

satisfy the pre-FERA requirements of 31 U.S.C. § 3729(a)(2).   Because the Court

previously found that the post-FERA version of the Act governs all of the alleged false

claims due to its retroactivity, this argument is now moot.

### C.  Kmart's Argument that Relator's Claims Fail for Lack of Materiality

Kmart argues that Relator's claims fail for lack of materiality.   Under the

pre-FERA version of the Act, 31 U.S.C. § 3729(a)(1) and (a)(2), and under the post-FERA

version of the Act, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B), Relator must be able to prove

that the alleged false FCA claims were "material."   *See, e.g., United States v. Rogan*, 517

F.3d 449, 452 (7th Cir. 2008) (discussing the pre-FERA FCA); *Yannacopoulos*, 652 F.3d at

828 (discussing the post-FERA FCA).

Kmart argues that Relator's claims fail for lack of materiality because Kmart's

U&C prices were not material to CMS's payment of federal dollars.   More specifically,

Kmart argues that there is no evidence that Kmart's U&C prices could influence Plan

Sponsors' prospective bids or the amount of CMS's monthly payments.   On the other

hand, Relator argues that Kmart's price representations are material to the amount of

money that was paid to Kmart and that these overcharges are paradigmatic false claims.

"[T]he term 'material' means the 'natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property.'"   31 U.S.C. § 3729(b)(4).

The Fifth Circuit has expounded on this definition explaining that, for False Claims Act

purposes, materiality requires "only that the false or fraudulent statements either

(1) make the government prone to a particular impression, thereby producing some sort

of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants."   *U.S. ex. rel. Longhi v. United States,* 575 F.3d 458, 470 (5th Cir. 2009).

The Court finds that Relator has satisfied the materiality requirement.   The Court understands that the amount of money that CMS pays to the program is fixed, as the contracts between CMS and the Plan Sponsors provide for a monthly flat-rate reimbursement to the Plan Sponsors.   CMS only provides additional payments in a few narrow situations, as explained above in the Court's summary of relevant facts (*i.e.* the Medicare beneficiary receives catastrophic coverage, was a recipient of LICS and reached the "donut hole," or was enrolled in a Part D plan that received a direct subsidy reconciliation reimbursement for that benefit year).   Thus, the Court agrees with Kmart that CMS would have paid the Plan Sponsor the same amount of money had Kmart not committed the alleged fraud.   However, the government (acting through the PBMs and Plan Sponsors) would not have paid *Kmart* the same amount of money.   If the PBM would not have distributed this extra money to Kmart, it would have gone back to the Plan Sponsor.   Thus, the false claim that was allegedly submitted was material because it gave the "particular impression" that Kmart was entitled to more money than it should have been entitled, thereby producing an "effect," *i.e.* Kmart receiving more government Medicare Part D funds than it was entitled to receive.   The allegedly inflated U&C price had the "ability to effect the government's actions" when it caused the PBMs and Plan Sponsors to pay Kmart more than Kmart was entitled to receive.

The Court should note that at the September 30 hearing, the parties made much about the recent *Pharmerica* decision. *U.S. ex rel. Buth v. Pharmerica Corp.*, No. 09-C-0720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014). *PharMerica* involved an FCA claim, whereby the government alleged that the defendant's pharmacies dispensed Schedule II drugs to residents of long-term care facilities without a valid prescription. *Id*. at 8. Specifically, it was asserted that the defendant (1) made or caused to be made false or fraudulent PDEs that inaccurately reflected these drugs as covered Part D drugs, (2) represented that the drugs were dispensed on a valid prescription, and (3) inaccurately or incompletely identified the prescriber of the drug and the prescriber's instructions. *Id*. at *3. The defendant moved to dismiss the Complaint pursuant to Rule 12(b)(6), for failure to state a claim, and Rule 9(b), for failing to state with particularity the circumstances constituting the alleged fraud. *Id*. The court denied the motion to dismiss, finding that the United States adequately pled a false claim in alleging that the defendant caused the Plan Sponsor (who relied upon the defendant's electronic claim) to inaccurately represent to CMS in the PDE record that the drugs were reimbursable covered Part D drugs. *Id*. at *5. The court also found that the PDE was the "the claim upon which CMS makes payment" and "by pleading [the reconciliation] process and reliance on the actual costs, the United States has satisfied any requirement that the false statement be material to the claim and have a tendency to influence the government's action by inflating the amount of payment." *Id*. at *5, 7.

The *Pharmerica* case has been subject to much debate between the parties, but it is

not binding on this Court.   Further, *Pharmerica* is factually different from this case because, in *Pharmerica*, the <u>PDE</u> was the false claim for payment.   Here, that is not the case.   When Kmart submitted an alleged false claim for payment, it happened at the lower level of the Medicare Part D structure.   Precisely, this alleged fraud occurred when Kmart submitted its electronic claim for payment to the PBM (or, occasionally, the Plan Sponsor depending on the arrangement) that referenced an allegedly false U&C price.   After this, the claim entered what Relator likes to refer to as a "black box" that ultimately reached CMS by way of a PDE that was submitted by the Plan Sponsor.   The false claim <u>was not on the PDE</u>; the PDE does not even mention U&C price.

As explained above, however, this does not mean that these claims were not material, as they still affected the Medicare Part D system as a whole.   Kmart received more money that it was entitled to get.   Kmart diverted funds to itself that should have gone back into the federal program.   These alleged false claims were undeniably paid with government funds (Medicare Part D funds).   Kmart's diversion of federal funds to itself from a federal program was material, as it resulted in Kmart receiving more government funds than it should have.

Thus, proof of the PDE records is unnecessary to show materiality.   The alleged false claims were submitted to the government (via the PBMs and Plan Sponsors) and paid with government funds.   Relator has traced these losses, transaction-by-transaction, for all alleged overcharges that Kmart submitted to Medicare Part D (*See* Doc. 204-7, Expert Joel Hay Report).   Expert Joel Hay describes in his report

that he calculated Kmart's U&C prices based on the actual amounts Kmart charged to customers who purchased drugs from Kmart without using any insurance benefits, and he identifies each instance in which Kmart reported an overstated amount and calculated the difference (Doc. 204-7, p. 2). Thus, Kmart is not entitled to summary judgment as to the Medicare Part D claims.

## Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Kmart's Motion for Partial Summary Judgment Based on Payers' Definitions of Usual & Customary Price (Doc. 204). The motion is granted to the extent that it requests that the Court resolve the legal questions involving the definition of U&C price and whether participating in Kmart's discount programs took customers outside of the "general public," but is denied on all other grounds. The Court **DENIES** Kmart's Motion to Exclude the Proffered Expert Testimony of Dale A. Chamberlain (Doc. 212), **DENIES** Kmart's Motion for Partial Summary Judgment Based on Claims in Other Than 90-Day Quantities (Doc. 202), **DENIES** Kmart's Motion for Partial Summary Judgment Based on Pre-FERA Claims Relating to Medicare Part D (Doc. 205), and **DENIES** Kmart's Motion for Partial Summary Judgment Based on All Claims Submitted to Medicare Part D (Doc. 206).

Further, the Court finds that this Order involves controlling questions of law as to which there is substantial ground for difference of opinion and immediate appeal from the Order may materially advance the ultimate termination of the litigation (*See* Doc.

280).   The three specific questions that the Court believes meets the criteria for interlocutory review by the Seventh Circuit are the following:

> (1)   whether the retroactivity amendments to 31 U.S.C. § 3729(a)(2) [now 31 U.S.C. § 3729(a)(1)(B)] in the Fraud Enforcement and Recovery Act apply to all *cases* "pending on or after June 7, 2008";
>
> (2)   whether Medicare Part D Pharmacy Benefit Managers and Plan Sponsors are "officers or employees of the United States" for purposes of the FCA; and
>
> (3)   whether Relator has satisfied the materiality requirement under the FCA for his Medicare Part D claims.

The Court **STAYS** this matter until the Court of Appeals for the Seventh Circuit resolves such appeal, including exercising its own discretion in deciding whether it will grant Kmart permission to appeal the interlocutory order certified by this Court.   *See* 28 U.S.C. § 1292(b).

**IT IS SO ORDERED.**

**DATED:**   January 12, 2015

s/ Nancy J. Rosenstengel_____
NANCY J. ROSENSTENGEL
United States District Judge
