**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.* *ex rel.* JAMES GARBE, | ) | |
| Plaintiffs, | ) | Cause No. 3:12-cv-00881-NJR-RJD |
| vs. | ) | |
| KMART CORPORATION, | ) | |
| Defendant. | ) | |

---

**RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSITY AND INCORPORATED MEMORANDUM OF LAW**

---

This is the first of a series of three motions for summary judgment that Relator has filed on the various issues of Kmart's liability. Relator has also filed a fourth motion seeking entry of final judgment on Kmart's submission of false claims to the Medicaid and Tricare programs. This court's 2014 summary judgment rulings, and the Seventh Circuit's affirmance of all but one aspect of those rulings on appeal, have significantly narrowed the remaining issues left to be resolved in the litigation. To simplify and shorten the trial scheduled for August, Relator seeks summary judgment on core liability issues about which there is no longer any genuine issue of disputed material fact.

This motion focuses on two elements of the false statement causes of action Relator has asserted under 31 U.S.C. § 3729(a)(1)(B): Kmart's submission of "claims" within the meaning of the False Claims Act and the falsity of Kmart's statements made in support of those claims. *First*, there is no genuine dispute that since 2004, Kmart has submitted tens of millions of pharmacy reimbursement requests to Medicare Part D, Medicaid, and Tricare, all of which are

federally-funded programs. Relator seeks summary judgment on this issue declaring that such payment requests are “claims” within the meaning of the False Claims Act.

*Second*, Relator seeks summary judgment on this issue declaring that with respect to each such claim Kmart submitted to Medicaid and Tricare, in support of which Kmart claimed a drug’s “usual and customary” price was higher than Kmart’s discount program price for that drug, Kmart’s representation of its “usual and customary” price was a “false statement” within the meaning of the Act. This conclusion is inescapable in view of this Court’s and the Seventh Circuit’s rulings.

*Third*, Relator seeks summary judgment on the number of those false claims Kmart submitted to 24 Medicaid programs (identified below) and Tricare. It is beyond any genuine dispute that Kmart submitted at least 700,832 such claims to Tricare, a number that Kmart’s own expert calculated and which thus constitutes an admission of Kmart. Similarly, under the Medicaid regulations of 24 states, the same expert calculated that Kmart had submitted 1,693,951 such claims to Medicaid.

*Finally*, Relator seeks summary judgment declaring that with respect to each claim Kmart submitted for payment by the Medicare Part D program pursuant to certain contracts (identified below), in support of which Kmart claimed a drug’s “usual and customary” price was higher than Kmart’s discount program price for that drug, Kmart’s representation of its “usual and customary” price was a “false statement” within the meaning of the Act. Here again, this conclusion is inescapable in view of this Court’s and the Seventh Circuit’s rulings.

## FACTUAL BACKGROUND

In 2004, Kmart began selling certain generic drugs to cash customers for $15, and sometimes even less. SOF ¶¶ 1-2.[1] Although purportedly limited to 90-day supplies for $15, Kmart pharmacies routinely prorated prices for 30-day and 60-day supplies, and would also frequently match or beat competitors' prices. SOF ¶¶ 35-38. In 2008, Kmart formalized these latter company-wide practices as corporate policy, selling 30-day and 60-day supplies for $5 and $10, respectively. SOF ¶ 2 n.2. Three years later, Kmart merged its Retail Maintenance Program (RMP) and Generics Plus program into a single program called the Prescription Savings Club (PSC). SOF ¶ 1. The program was renamed again in 2016 to the Pharmacy Savings Plus program. *Id*. Under each iteration of its program, Kmart sold generic drugs to the cash-paying public for $15, $10, $5 or less. SOF ¶ 2.This suit concerns whether the Government was entitled to that same bargain, a bargain Kmart did not give to the Government.

Federal, state, and private healthcare programs limit the amount they will bear towards the cost of prescription drugs to no more than a pharmacy's "usual and customary" (U&C) price, or cash price. SOF ¶ 31. For instance, Medicaid regulations expressly limit generic drug reimbursements to, in the aggregate, no more than a "Providers' usual and customary charges to the general public." 42 C.F.R. § 447.512(b). To satisfy this regulation, each state has enacted various statutes or regulations limiting the amount of reimbursement.[2] Private insurance companies, including those who administer federal programs such as Medicare Part D and Tricare, impose similar limitations. Doc. 218-9: Hayes Report at 3.

State and federal agencies and insurance companies effectuate these limitations by specifying the formula for pharmaceutical reimbursement; they do so either in contracts entered between the

[1] Citations to "SOF" refer to the master Statement of Material Facts filed concurrently with this motion.

[2] *See* Docs. 218-13 *and* 324-4 at 53-60 (summaries of each of the state Medicaid statutes addressing U&C pricing).

pharmacy benefit manager (PBM) that manages claims and the pharmacy, or in provider manuals that are incorporated into those contracts.[3] As a result, a pharmacy cannot bill any government program more than that pharmacy's usual and customary price for that drug. Doc. 218-6: Ayshford Dep. at 7:7-11 ("[A pharmacy] cannot bill any government healthcare program for more than the pharmacy's usual and customary prices."). However, when it sought reimbursements for drugs included in its discount drug programs, Kmart frequently claimed "usual and customary" prices that disregarded nearly all of Kmart's sales of those drugs—its discount program drug sales—and were instead far greater than what Kmart "usually" or "customarily" charged anyone. *See* Doc. 324-3: Hay Report at 10 ("the cash price charged to purchasers of these drugs was equal to or less than Kmart's RMP price for approximately 90% of all cash sales").

***The Electronic Pharmacy Reimbursement Process***

Pharmacies submit reimbursement requests for prescription drug sales electronically through a series of intermediaries. Doc. 218-5: Zander Dep. at 21:13-26:15. When a patient presents a prescription coverage identification card to a Kmart pharmacy, the pharmacist collects identifying information about the patient and her insurance plan. Doc. 237: Chamberlain Report at 6. That information, together with the prescription information (including quantity, cost, and the "usual and customary" charge) is transmitted by computer to an intermediary called a "switch" for transmittal to the payer. *Id.*

The switch routes the information to a PBM, which determines coverage and calculates the reimbursement amount. *Id.* The reimbursement is the lower of several amounts, typically a "submitted ingredient cost," "contracted ingredient cost," "submitted dispensing fee,"

[3] *See* Doc. 218-14 (summary of 1,000 contracts between Kmart and third-party payors expressly providing that Kmart could not seek reimbursement in an amount greater than its U&C price and defining that term to mean the cash price).

"contracted dispensing fee," or the pharmacy's "usual and customary" price. *Id*. at 7. A response to the claim is transmitted back to the pharmacy. *Id*. The entire exchange from submission to response takes no more than two to three seconds. *Id*. The processor/PBM later remits the reimbursement to the pharmacy. *Id*. This same electronic submission occurs when the payer is Medicaid or Medicare Part D. *Id*.

This process is governed by a standard protocol developed by the National Council for Prescription Drug Programs (NCPDP). *Id*. at 1-2. NCPDP standards provide for a common format and definition of specific data fields. *Id*. NCPDP standards define "usual and customary" to mean the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." Doc. 218-63 at 74. The information required to process each claim is specified by each payor in a "Payor Sheet." Relator collected more than 300 payor sheest that required the transmission of field 426-DQ, the "Usual and Customary Charge." Doc. 218-15.

***The Medicaid, Medicare, and Tricare Programs***

Medicaid provides "medical assistance on behalf of families with dependent children and of … individuals[] whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. Although the federal government ultimately foots much of the bill, the administration of the program is left to the states. In the case of prescription drugs, for instance, pharmacies pay pharmaceutical companies for drugs and then submit claims to the state Medicaid agency for reimbursement. 42 U.S.C. §§ 1396a(a)(23), (32). The federal government then reimburses the state. 42 U.S.C. § 1396-1; *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013).

Medicare Part D is a federally-funded health insurance program. *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 635 (7th Cir. 2016). The program provides insurance coverage, up to a

certain amount, for beneficiaries' prescription drug costs. *Id*. Plan Sponsors, private entities that compete for the opportunity to manage Part D beneficiaries' claim submissions and payment processes, administer the benefits. *Id*. Most Plan Sponsors subcontract with PBMs, which are other private entities that work directly with retail pharmacies to provide prescriptions to Part D beneficiaries. *Id*.

When a prescription is paid by Medicare Part D, summary data called a Prescription Drug Event (PDE) is transmitted from the Plan Sponsor to the Centers for Medicare & Medicaid Services (CMS). Doc. 281 at 9. When the usual and customary price of a drug is the lowest of the reimbursement limits, it will be reported on the PDE as the price paid (in field #27). MEDICARE PART D PDE DATA ELEMENTS (https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/downloads/PDEDataElements.pdf). CMS pays Plan Sponsors fixed monthly payments according to certain benchmarks. *Garbe*, 824 F.3d at 635. Part D Plan Sponsors who fail to submit required claims-level information contained in a PDE to CMS risk having to return monthly payments to CMS during reconciliation. 42 C.F.R. §§ 423.343(b), (c)(2) & (d)(2); 42 C.F.R. § 423.322.

The Department of Defense provides medical benefits to current and retired service members and their families through its Tricare health care program. Doc. 98: Compl. at 38 (¶¶ 119-20). It contracts with Express Scripts to administer its pharmacy benefits. Doc. 121: Kmart's Answer at 37 (¶ 120). The Government bears the full cost of retail prescriptions and Express Scripts acts as a fiscal intermediary. *See* Ex. 4: Tricare Contract at 84.

## STANDARD OF REVIEW

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

> Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim.

*Id*. The Rules also "explicitly allow for '[p]artial [s]ummary [j]udgment' and require parties to 'identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.'" *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original). "At the summary-judgment stage, the court can properly narrow the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist." *Id*. (emphasis in original).

## ARGUMENT

To prevail under the False Claims Act, "a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011). In this case, liability will attach if Relator shows that Kmart knowingly, in deliberate ignorance, or with reckless disregard, submitted a reimbursement claim to a government-funded program in which Kmart overstated its usual and customary price, thereby inflating the reimbursement amount Kmart received from the program.

There is no genuine dispute that Kmart's representations of its usual and customary prices, which Kmart made in support of its reimbursement claims, were false. The Seventh Circuit rejected Kmart's legal justification for its practices and set the standard under which its

submissions are to be judged: "Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." *Garbe*, 824 F.3d at 645. It is not only undisputed, but Kmart admits that it did not report its discount prices as its usual and customary prices; it therefore follows inexorably that Kmart falsely overstated its U&C prices.

## I. KMART MADE MILLIONS OF REIMBURSEMENT REQUESTS THAT ARE "CLAIMS" WITHIN THE MEANING OF THE FALSE CLAIMS ACT.

"The submission of a claim is … the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). It is beyond any genuine dispute that Kmart made tens of millions of reimbursement requests from the Medicare, Medicaid, and Tricare programs and that those requests constitute "claims" within the meaning of the False Claims Act. A "claim" includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (citing 31 U.S.C. § 3729(b)(2)(A)). "FCA liability attaches to any false claim to any entity—public or private—implementing a government program or a program using government funds." *Garbe*, 824 F.3d at 638. Obviously, the Medicare, Medicaid, and Tricare programs at issue here are government programs using government funds. *See id*. at 639 ("There is little doubt that much of the money paid to Kmart under Medicare Part D came from government coffers."); *King-Vassel*, 728 F.3d at 711 ("claims submitted to state Medicaid agencies are considered claims presented to the federal government and may serve as the basis for FCA liability").

Since 2004, Kmart has submitted tens of millions of claims for payment by the Government or payment with Government funds. In discovery, Kmart produced the transaction records for

those tens of millions of claims, records reviewed by one of Relator's experts, Dr. Joel Hay. *See* Doc. 324-3 (Hay Report). Relator is entitled to summary judgment on the issue that these tens of millions of reimbursement requests are "claims" within the meaning of the False Claims Act.

## II. TENS OF MILLIONS OF KMART'S CLAIMS FOR PAYMENT WERE FALSE.

There can also be no legitimate dispute that Kmart's claims for payment were false. Kmart routinely overstated its "usual and customary" prices. Dr. Hay, a pharmaceutical economics professor at the University of Southern California, analyzed Kmart's sales and reimbursement data going back to 2004. Doc. 324-3: Hay Report at 3-4. He first examined the actual amounts paid by customers who purchased drugs from Kmart without using any insurance benefits and calculated various averages of those prices. *Id*. at 3, 10-11. Next, he identified each instance in which Kmart reported a U&C price to a governmental program[4] that exceeded those averages or the amount charged under Kmart's discount program, and then calculated the difference between the amount paid by those without insurance and the amount Kmart received in reimbursements for the same drugs. *Id*. As the Seventh Circuit noted, "Dr. Hay's work revealed that Kmart charged nearly all its cash customers 'discount program' prices," "used significantly higher prices" when submitting claims for reimbursement, and "was thus reimbursed at a much higher level." *Garbe*, 824 F.3d at 636-37. Dr. Hay found that "Kmart overstated its Usual & Customary price more than 20.7 million times to Government Health Plans and as a result of its overstatement received more than $125 million in excess reimbursements from the government and private payers represented in this case." Doc. 324-3: Hay Report at 3.

Relator also retained Susan Hayes, a pharmacy industry auditor who, based on her experience in the industry and her review of more than 1,000 of Kmart's contracts with third

[4] Both Dr. Hay and Mr. Dukes identified government payors using a third-party payor list maintained by Kmart. Doc. 324-3: Hay Report at 9; Doc. 324-4: Dukes Report at 62-63.

party payors, opined that Kmart's U&C pricing should have taken into account Kmart's generic drug program prices. Doc. 218-9: Hayes Report at 15. Kmart's transaction data reveals, however, that Kmart instead reported much higher prices and was reimbursed at a rate substantially higher than the prices it charged cash-paying customers. Doc. 324-3: Hay Report at 3.

Kmart's failure to use its discount program's prices as its U&C prices means that it overstated its prices in connection with millions of claims Kmart submitted to government programs. Throughout this litigation, Kmart has not only not disputed Relator's core allegation that the usual and customary prices Kmart reported did not include its discount drug prices—it has conceded that allegation, defending the practice on the grounds that Kmart was not required to include its discount prices in the computation of its U&C prices. This, Kmart reasoned, was because its discount prices were offered to a select group of people or a "club"—not to the general public. The Seventh Circuit flatly rejected that argument.

> Allowing Kmart to insulate high "usual and customary" prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The "usual and customary" price requirement should not be frustrated by so flimsy a device as Kmart's "discount programs." Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart "discount" prices at issue represented the "usual and customary" charges for the drugs.

*Garbe*, 824 F.3d at 645. The Seventh Circuit also affirmed this Court's grant of summary judgment to Relator on the "general public" issue, concluding that "[n]o special consideration prevents this question from being resolved." *Id.* It inescapably follows as a matter of law that Kmart's usual and customary prices necessarily include its generic drug program prices, and the inflated prices Kmart represented as its usual and customary prices were false.

As the Seventh Circuit observed, Dr. Hay's analysis "revealed that Kmart charged nearly all its cash customers 'discount program' prices," "used significantly higher prices" when submitting claims for reimbursement, and "was thus reimbursed at a much higher level." *Garbe*, 824 F.3d at 636-37. In fact, Dr. Hay's analysis of Kmart's transaction data reveals that Kmart charged 90% of cash-paying customers the discount prices. Doc. 324-3: Hay Report at 3, 10. Dr. Hay concluded that Kmart overstated its usual and customary prices more than 20.7 million times, resulting in more than $125 million in excess reimbursements. *Id*. at 3.

Kmart's expert, Jayson Dukes, confirms these facts. Doc. 324-4: Dukes Report at ¶¶ 1-2. Mr. Dukes analyzed Dr. Hay's report, purporting to "recreate" Dr. Hay's work which Dukes then discounts for various reasons.[5] Doc. 324-4: Dukes Report at ¶¶ 71-79; Ex. 24: Dukes Dep. 5:24-6:23. Mr. Dukes's analysis confirms that Kmart systematically submitted false Medicaid claims under every state law he examined. Doc. 324-4: Dukes Report at 53-60 (chart summarizing application of each States' U&C definition). Even after discounting Dr. Hay's analysis, Mr. Dukes found that Kmart *only* overstated its U&C price 10 million times for Medicare Part D claims, 2.9 million times for Medicaid claims, and 700,382 times for Tricare claims. *Id*. at ¶ 79. Mr. Dukes's statements qualify as admissions of a party opponent and are therefore admissible against Kmart. *Clanton v. United States*, 2017 WL 1013088, at *12 (S.D. Ill. Mar. 14, 2017) (collecting cases holding that an expert's report and testimony in a case is an admission against the party that retained him).

The evidence in this case does not "present[] a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rather, "it is so one-

[5] Neither Relator nor Dr. Hay agree with Mr. Dukes's criticisms of Dr. Hay's work.

sided that one party must prevail as a matter of law." *Id*. at 252. The Court should grant Relator's motion for partial summary judgment.

**A. Kmart admits that it submitted false claims to the Medicaid program in every State where Kmart did business.**

Mr. Dukes believes the Seventh Circuit's holding that "the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs"[6] was limited to the Medicaid programs of 21 states who define "usual and customary" as the price offered to the "general public." Doc. 324-4: Dukes Report at ¶ 90. Colorado, for example, requires that the usual and customary charge be the "reimbursement amount the provider charges the general public to pay for a drug." Doc. 218-13. There can be no doubt that the Seventh Circuit's holding controls in such states. Indeed, Mr. Dukes admits it does: "In 21 states, [Alabama, Colorado, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Missouri, North Carolina, Ohio, Oregon (2006-2011), South Carolina, Tennessee, Utah, Virginia, Wisconsin, and Wyoming] the U&C charge is based upon the charge to the 'general public' … the Court found that the members of Kmart's Discount Programs are part of the 'general public' and therefore the prices extended to these members would be considered prices charged to the 'general public'. … Including claims from September 2004 through December 2014, I calculate $9.9M in damages for these states." Dukes Report at ¶ 90. Mr. Dukes's accompanying chart shows these states total 1,633,994 claims. Dukes Exhibit F. Relator requests the Court to enter summary judgment with respect those 1,633,994 false claims.

Mr. Dukes also found that Kmart had overstated its U&C prices in the other concerned states. Mr. Dukes examined the regulations and opined on what method he believed should be used to calculate the usual and customary price "based upon the state's Medicaid definition." Ex. 24:

---

[6] *Garbe*, 824 F.3d at 645.

Dukes Dep. 137:6-25. For each state he analyzed, Mr. Dukes concluded that Kmart often submitted claims that contained an inflated usual and customary price. *See* Doc. 324-4: Dukes Report at 69-72. *See* Appendix.

For example, Mr. Dukes testified that Texas defines U&C as "the price the provider most frequently charges the general public for the same drug." Dukes Exhibit D. Mr. Dukes examined Kmart's claims and found: "If I analyze claims from March 2006 through December 2014, I identify 15,796 Texas Medicaid claims where Kmart's Discount Program price, if found to be given or advertised to the general public, would have been reported as the U&C. These claims would have resulted in a potential overpayment of $131,930." Dukes Report at ¶ 97.

Mr. Dukes admitted that New York defines U&C as "the price which a pharmacy charges to the general public." Dukes Exhibit D. Mr. Dukes examined Kmart's Texas Medicaid claims and found "If I analyze claims from March 2006 through December 2014, I identify 43,574 New York Medicaid claims where Kmart's Discount Program price should have been reported as the U&C, resulting in a potential overpayment of $256,397." Dukes Report at ¶ 102.

Mr. Dukes opined that the New Jersey statute defines U&C as "the actual charge made to the majority (51 percent) of the total patient population served by the individual pharmacy." Dukes Exhibit D. Applying that definition he found: "If I analyze claims from March 2006 through December 2014, I identify 587 New Jersey Medicaid claims where Kmart's Discount Program price should have been reported as the U&C, resulting in a potential overpayment of $12,166." Dukes Report at ¶ 107.

The end result is the same no matter the state. Several states required Kmart to submit the lowest price paid for a drug (whether through a discount program or otherwise). For example, after 2009, California defined usual and customary as "the lower of the following: (1) the lowest

price reimbursed by other third-party payers in California …; (2) the lowest price routinely offered to any segment of the general public." *See* Dukes Exhibit D. Other states following this method include Georgia, Louisiana, Massachusetts, and New Hampshire. *Id.* There can be no doubt that Kmart misrepresented the usual and customary price in these states because by failing to include its generic program prices it certainly was not submitting the lowest price that it charged.

Other states required Kmart to examine its cash payers to determine its usual and customary price for a drug. Nevada, for instance, mandates that a provider "not charge Medicaid more than the general public … defined as the patient group accounting for the largest number of non-Medicaid prescriptions from a pharmacy." *See* Dukes Exhibit D. The Court previously held that this statute included Kmart's generic drug program prices. Doc. 281 at 28 (examining Nevada's statute). There is no doubt that Kmart failed to do so when submitting its usual and customary prices, which resulted in false claims. *See* Ex. 24: Dukes Dep. at 210 ("in the majority of instances … Kmart's discount program price had the largest number of transactions."). States with similar statutes as Nevada include Mississippi, Montana, New Mexico, New York, Oklahoma, and Texas. *See* Dukes Exhibit D.

Another group of states required Kmart to examine both cash payers and third-party payers when submitting its usual and customary price. For example, Minnesota requires a provider to submit "the charge of the provider to the type of payer … that constitutes the largest share of the provider's business," including "a third party or persons who pay for health service by cash, check, or charge account." *See* Dukes Exhibit D. As with Nevada, the Court previously held that the discount program pricing must be accounted for: "it is clear that the Minnesota statute is referring to the type of *cash* payer that constitutes the largest share of the provider's business, not

the type of payer *in general* that constitutes the largest share of the provider's business. Here the type of cash payer that constitutes the largest share of Kmart's business are the cash payers who participated in Kmart's generic drug programs." Doc. 281 at 26-27. There can again be no doubt that Kmart failed to submit its usual and customary price in this fashion, so it submitted false claims in these states. Other states with similar statutes include New Jersey, South Dakota, and Florida. *See* Dukes Exhibit D. "[T]he meaning of a regulation is a question of law for the court, not of fact for the jury." *Urso v. United States*, 72 F.3d 59, 60 (7th Cir. 1995). And the meaning of these statutes is clear: Kmart was required to submit its generic program prices as its U&C price. There are no disputed facts about Kmart's submission of these false claims and thus nothing left for a jury to decide. The Court should grant summary judgment to Relator.

**B. There is no genuine dispute that Kmart submitted false claims to Tricare.**

There is no genuine dispute that Kmart also submitted hundreds of thousands of false claims to Tricare. Tricare is the Defense Department's health care program for uniformed members of the armed services and their families. SOF ¶ 15. Express Scripts, a pharmacy benefit manager, administers Tricare's pharmacy benefits. *Id.*

Like other third-party payors and PBMs, Express Scripts's provider manual dictates that all claims submitted by the retail pharmacies include the pharmacy's usual and customary price:

> All claims submitted must include the Network Provider's Usual and Customary Retail Price, including all "loss leaders", frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price, including any applicable discounts offered to attract customers, on the applicable date of fill.

Ex. 7: Express Scripts Network Provider Manual (2010) at 10.

Despite the clear guidance in Express Scripts's provider manual, Kmart did not submit its discount program prices as its usual and customary prices, meaning that Kmart misrepresented

its U&C prices when it submitted reimbursement claims to Tricare. Kmart's contracts with Express Scripts confirm that it was required to submit its discount prices as its usual and customary prices. Until 2010, the contract between Kmart and Express Scripts defined the usual and customary price as "the usual and customary retail price of the pharmacy dispensing the prescription most commonly charged to the general public." Ex. 5: 1994 Kmart-Express Scripts Contract at 2.

In March 2010, Kmart and Express Scripts signed a new contract that again required Kmart to report its discount prices as its usual and customary prices on reimbursement claim forms. The contract defined "the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication …, ***including*** any '$4 generic programs' or similar ***discount programs offered on a corporate-wide, routine basis***, but shall exclude a Pharmacy's competitor's matched price discounts, rewards programs, and cash discount networks." Ex. 6: 2010 Kmart-Express Scripts Contract, ESI0000000026 at 2-3 (emphases added). This definition unambiguously requires Kmart to include its program prices as its usual and customary prices.

Relator's expert identified 845,280 transactions (through mid-2016) containing such misrepresentations to Tricare. Mr. Dukes opined that Kmart only submitted 700,382 false claims (through 2014) to the Tricare program. Doc. 324-4: Dukes Report at 22. Accordingly, there is no genuine dispute that Kmart failed to report its discount prices as its U&C prices when seeking reimbursements from Tricare, so there is no genuine dispute that Kmart submitted at least 700,382 false claims to Tricare. Summary judgment should be granted in favor of Relator and the United States on these Tricare claims.

**C. There is no genuine dispute that Kmart submitted false claims to Medicare Part D.**

There can likewise be no doubt that Kmart submitted millions of false claims to the Medicare Part D program. Relator has submitted a summary of 1,000 contracts between Kmart and third-party payors either expressly providing that Kmart could not seek reimbursements in an amount greater than its U&C price or defining that term to mean the cash price. *See* Doc. 218-14.

As discussed in the report of Relator's expert Susan Hayes, three of the largest PBMs are Express Scripts, Medco Health Solutions, and Caremark. Doc. 218-9: Hayes Report at 11. Express Scripts is the PBM for the Tricare program discussed above. Caremark is a leader in Medicaid claims and has a significant government clientele. Other large PBMs include Catalyst and Prime Therapeutics (which is the PBM for approximately half of the Blue Cross and Blue Shield plans in the United States). *Id*. Kmart's contracts with these PBMs leave no doubt that its generic drug program prices were considered its U&C prices.

***Express Scripts***. Kmart's violation of the Express Scripts contract is discussed in the previous section. However, that contract governs far more than just Tricare. Dr. Hay found that Kmart reported a usual and customary price higher than its generic program prices to Express Scripts (ESI) governmental plans in addition to Tricare 616,245 times resulting in $5,065,187.49 overcharges.

***Medco.*** Medco incorporated its Pharmacy Services Manual into its agreements with Kmart. *See* Ex. 8: KM-GAR-036-0001242 *and* Ex. 9: KM-GAR-017-0001184 ("Pharmacy agrees to participate … in accordance with the terms set forth in this Schedule, the Pharmacy Network Agreement, and the Pharmacy Services Manual (collectively, the 'Agreement')."). Medco's Pharmacy Services Manual required Kmart to submit its "usual and customary" price, which represents the lowest net price a cash patient would have paid on the day the prescription was dispensed inclusive of all applicable discounts. Ex. 10: 2007-2008 Medco Pharmacy Services

Manual at 70. There is no legitimate dispute that Kmart falsely reported its U&C price to Medco. Dr. Hay found that Kmart reported a U&C price higher than its generic drug program prices to Medco governmental plans (PAI) 148,031 times resulting in $1,210,328.03 overcharges.

***Caremark.*** In early agreements, Caremark defined "usual and customary" price as "the price charged by Pharmacy to the general public at the time of dispensing, including the dispensing fee and any advertised or sale prices, discounts, coupons or other deductions." Ex. 11: 2004 Caremark-Medicare Agreement at 1. Later, in its Provider Manual, which is "incorporated into the Provider Agreement" and must be adhered to (Ex. 12: Yarberry006537 at 4), Caremark defines "usual and customary" as "the lowest price Provider would charge to a particular customer if such customer were paying cash…. This price must include any applicable discounts offered to attract customers." *Id.* at 171. There is no legitimate dispute that Kmart falsely reported its U&C price to Caremark. Dr. Hay found that Kmart reported a U&C price higher than its generic drug program prices to Caremark (NPP) governmental plans 529,030 times resulting in $3,568,535.96 overcharges.

***Catalyst Rx*** defined "usual and customary" price as "the price at which a Pharmacy Service is available for sale to the public at the individual Network Pharmacy providing said Pharmacy Service." Ex. 13: 2009 Catalyst Rx Pharmacy Provider Agreement at 3. There is no legitimate dispute that Kmart falsely reported its U&C price to Catalyst. Dr. Hay found that Kmart reported a U&C price higher than its generic drug program prices to Catalyst (CPB) governmental plans 83,071 times resulting in $350,955.57 overcharges.

***Prime Therapeutics*** defined "usual and customary" price as the "lowest price Pharmacy would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed. This includes any applicable discounts

including, but not limited to, senior discounts, frequent shopper discounts, and other special discounts offered to attract customers." Ex. 14: 2005 Prime Therapeutics Pharmacy Participation Agreement at 13. There is no legitimate dispute that Kmart falsely reported its U&C to Prime Therapeutics. Dr. Hay found that Kmart reported a U&C price higher than its generic drug program prices to Prime Therapeutics (PTA) governmental plans 488,288 times resulting in $5,201,043.96 overcharges.

Kmart's sole defense to these claims was rejected by the Seventh Circuit when it found that Kmart's generic programs were offered to the general public. Kmart's own expert, after making several specious deductions, finds that Kmart's "usual and customary" price was overstated for Medicare Part D plans 10,153,859 times (through 2014), resulting in an overpayment of $71,420,506. Doc. 324-4: Dukes Report at 22.

## CONCLUSION

Kmart's own expert established that Kmart systematically submitted millions of false claims. For this and all of the foregoing reasons, the Court should grant Relator's motion for partial summary judgment on falsity.

Respectfully submitted,

**KOREIN TILLERY LLC**

Dated: April 24, 2017

/s *Aaron M. Zigler*
Stephen M. Tillery
Aaron M. Zigler
Robert L. King
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
azigler@koreintillery.com
rking@koreintillery.com

George A. Zelcs
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com

**PHILLIPS & COHEN LLP**

Erika A. Kelton
2000 Massachusetts Ave. NW, Suite 100
Washington, DC 20036
Telephone: (202) 833-4567
Facsimile: (202) 833-1815
ekelton@phillipsandcohen.com

Larry P. Zoglin
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
lpz@pcsf.com

*Counsel for Relator*

## APPENDIX

| State | Admission by Mr. Dukes that Discount Program Pricing Should Have Been Used as Usual and Customary Price | State Regulation According to Mr. Dukes (*see* Doc. 324-4, at 53–60) |
|---|---|---|
| Alabama | Dukes Tr. at 138: testifying that Alabama is a "general public state," so discount price should be used. | Medicaid reimbursement for covered multiple source drugs will not exceed the lowest of the … Provider's Usual and Customary Charge to the general public for the drug. |
| Arizona | Dukes Tr. at 141–43: Arizona is a "managed Medicaid state," so it is a general public state. | (Managed Care Organization governed by contract.) |
| Arkansas | Dukes Tr. at 143: Arkansas is a general public state, so discount price should be used. | Amount a pharmacy bills [must] be consistent with the pharmacy's usual and customary charge to the general public…. <br><br> Amounts billed to the Medicaid Program must be adjusted to reflect temporary or promotional discounts or price reductions irrespective of coupon or card presentation…. |
| California | Dukes Tr. at 143: California was a general public state until 2009, so discount price should have been used. | 2006-7/27/2009: The price charged to the program shall not exceed that charged to the general public. |
| Colorado | Dukes Tr. at 144: Colorado is a general public state, so discount price should be used. | The reimbursement amount the provider charges the general public to pay for a drug. |
| Delaware | Dukes Tr. at 144: Delaware is a general public state, so discount price should be used. | The usual and customary (U&C) charge to the general public for the prescription. U&C is defined as the lower of: amount charged to a cash paying customer; amount charged to customers enrolled in the provider's discount program… |
| Hawaii | Dukes Tr. at 147: Delaware is a general public state, so discount | The provider's usual and customary charge to the general public. |

| | | |
|---|---|---|
| | price should be used. | |
| Idaho | Dukes Tr. at 147: Idaho includes advertised specials in its definition, so the discount program price should be used. | A pharmacy's billed charges are not to exceed the usual and customary charges defined as the lowest charge by the provider to the general public for the same service including advertised specials. |
| Indiana | Dukes Tr. at 147–48: Indiana requires that the discount program price be used. | Providers must bill the program for covered services with only the provider's usual and customary charge to the general public, including any special pricing (for example, $4 generic programs)… |
| Illinois | Dukes Tr. at 147: Illinois is a general public state, so discount program price should be used. | "Current usual and customary retail price" means the price that a pharmacy charges to a non-third-party-payor. |
| Iowa | Dukes Tr. at 148: Iowa is a general public state, so discount program price should be used. | The fee that the provider typically charges the general public for the product or service. |
| Kansas | Dukes Tr. at 148: Kansas is a general public state, so discount program price should be used. | Pharmaceutical items covered by the program are reimbursed at the lesser of the provider's usual and customary (U&C) or gross amount due (GAD) amount or the state's reimbursement methodology plus a professional fee. |
| Kentucky | Dukes Tr. at 148: Kentucky is a general public state, so discount program price should be used. | The usual and customary billed charge. |
| Maine | Dukes Tr. at 149: Maine is a general public state, so discount program price should be used. | The reimbursement amount the general public is requested to pay for the goods or services provided. |
| Maryland | Dukes Tr. at 149: Maryland is a general public state, so discount program price should be used. | The pharmacy provider shall charge the Program the provider's usual and customary charge to the general public for similar prescriptions. |

| | | |
|---|---|---|
| Michigan | Dukes Tr. at 150: Michigan is a general public state, so discount program price should be used. | A pharmacy's charge to the general public…. The U&C charge must reflect all advertised discounts, special promotions, or other programs initiated to reduce prices for product costs available to the general public or to a special population. |
| Missouri | Dukes Tr. at 165: Missouri is a general public state, so discount program price should be used. | [R]eimbursement for pharmacy claims is determined by applying the following methodology. Payment is made at the lower of the … Usual and customary charge |
| Nebraska | Dukes Tr. at 167: discount program price should be used. | Pricing: Any loss leader prices, shelf prices, sale prices, cash only prices, coupon certificates, newspaper or brochure ad prices, that are in effect …shall be considered the pharmacy's usual and customary charge to the general public. |
| North Carolina | Dukes Tr. at 180: North Carolina is a general public state, so discount program price should be used. | Reimbursement for multiple source and other drugs shall not exceed the lowest of … The provider's usual and customary charge to the general public. |
| North Dakota | Dukes Tr. at 180: In North Dakota discount program price should be used. | Per CMS regulations, actual payment remains the lower of ... The usual and customary charge to the general public.<br><br>Always bill your usual and customary charge to the general public for each prescription. All discounts are to be reduced from the usual and customary charges before billing Medicaid. |
| Ohio | Dukes Tr. at 180: Ohio is a general public state, so discount program price should be used. | Providers are expected to submit their usual and customary charge (the amount charged to the general public) on all claims…. |
| Oregon | Dukes Tr. at 181–82: Oregon was a general public state from 2006 to 2011. Even from 2012 through 2016, the discount price should be used. | 2006-2011: The amount an individual without prescription drug coverage would pay at a retail pharmacy.<br><br>2012-2016: A pharmacy's charge to the general public that reflects all advertised savings, discounts, special promotions, or other programs including membership based discounts, initiated to reduce prices for product costs available to the general public, a special population, or an inclusive category |

| | | |
|---|---|---|
| | | of customers. |
| Pennsylvania | Dukes Tr. at 182: In Pennsylvania discount program price should be used. | The pharmacy's lowest net charge an MA recipient would pay for a prescription as a non-Medicaid patient …including applicable discounts,… including generic drug discount and savings programs. |
| South Carolina | Dukes Tr. at 182: South Carolina is a general public state, so discount program price should be used. | Providers may not charge Medicaid any more for services to a beneficiary than they would customarily charge the general public. Providers should bill their usual and customary charges and not the Medicaid reimbursement rate. |
| Tennessee | Dukes Tr. at 183: Tennessee is a general public state, so discount program price should be used. | The provider's usual and customary charge to the general public for that service. |
| Utah | Dukes Tr. at 185: In Utah discount program price should be used. | Pharmacies must submit their lowest usual and customary charges to Medicaid, including promotional rates such as $4.00 generics, if they are offered to the general public. |
| Vermont | Dukes Tr. at 185: In Vermont discount program price should be used. | This usual and customary charge is the amount that the provider bills to insured and self-pay persons for the same service. If the provider has more than one charge for a service, the lowest charge will be reported to Vermont Medicaid, except, if the charge has been reduced on an individual basis |
| Virginia | Dukes Tr. at 185: Virginia is a general public state, so discount program price should be used. | The provider's usual and customary charge to the public, as identified by the claim. |
| Washington | Dukes Tr. at 185–86: Washington is a general public state, so discount program price should be used. | The agency's total reimbursement for a prescription drug must not exceed the lowest of ... The provider's usual and customary charge to the non-medicaid population .... If the pharmacy provider offers a discount, rebate, promotion or other incentive…the provider must similarly reduce its charge to the agency…. |
| West Virginia | Dukes Tr. at 186: West Virginia is a general public state, so discount | Amount providers charge the general public for services or supplies. |

| | | |
|---|---|---|
| | program price should be used. | |
| Wisconsin | Dukes Tr. at 186: Wisconsin is a general public state, so discount program price should be used. | The provider's charge for providing the same service to persons not entitled to the program's benefits. For providers using a sliding fee scale, the usual and customary charge is the median of the individual provider's charge for the service when provided to non-program patients. For providers who have not established usual and customary charges, the charge should be reasonably related to the provider's cost for providing the service. |
| Wyoming | Dukes Tr. at 186: Wyoming is a general public state, so discount program price should be used. | The provider's charge to the general public for the same or similar services. |

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users.

**KOREIN TILLERY LLC**

/s *Aaron M. Zigler*
Aaron M. Zigler
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
azigler@koreintillery.com