**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.* *ex rel.* JAMES GARBE,<br><br>Plaintiffs,<br><br>vs.<br><br>KMART CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Cause No. 3:12-cv-00881-NJR-RJD |

**RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCIENTER AND INCORPORATED MEMORANDUM OF LAW**

This is the third of a series of three motions for summary judgment that Relator has filed on the various issues of Kmart's liability. This motion focuses on the scienter element of the false statement causes of action Relator has asserted under 31 U.S.C. § 3729(a)(1)(B). Relator seeks a summary judgment on this issue declaring that Kmart made the false statements in support of its false claims (which are the subject of the first of the three summary judgment motions) "knowingly" within the meaning of the False Claims Act.

## ARGUMENT[1]

Relator alleges that Kmart violated the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, and its state-law counterparts by overbilling government programs and private insurers for prescription drug reimbursements. Since 2004, Kmart has operated various iterations of its generic drug program, which offers hundreds of generic drugs for as little as $5, $10, and $15 (or less) for a 30-day, 60-day, and 90-day supply, respectively, to any customer who pays in-full

[1] The same standard of review discussed in Relator's motion for summary judgment on the issue of false claims is applicable to the present motion. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015), and *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

without using insurance (*i.e.*, "cash-paying" or "self-paying" customers). SOF ¶¶ 1-2.[2] Under applicable federal and state laws, a pharmacy cannot seek reimbursements for prescription drugs in excess of its "usual and customary" (U&C) price, which is the amount a pharmacy charges the cash-paying public. SOF ¶¶ 31-32. Relator alleges that Kmart knowingly inflated its U&C prices on reimbursement forms submitted to third-party payors. In so doing, Relator claims that Kmart caused monetary damage to these payors by billing them significantly higher prices than the discount prices it charged cash-paying customers for the exact same prescription drugs.

## I. DELIBERATE IGNORANCE AND GROSS NEGLIGENCE SATISFY THE FALSE CLAIMS ACT'S SCIENTER ELEMENT.

The FCA imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the Government, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the Government. 31 U.S.C. § 3729(a)(1)(A)-(B). The statute expressly provides that "specific intent to defraud" is not required. 31 U.S.C. § 3729(b)(1)(B). Conversely, "[i]nnocent mistakes or negligence are not actionable under this section." *Hindo v. Univ. of Health Scis./The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995). "'[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false.' In short, the claim must be a lie." *Id.* at 613 (quoting *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991)); *accord U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011) (FCA "does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity").

[2] Citations to "SOF" refer to the master Statement of Material Facts filed concurrently with this motion.

Although the FCA uses the "seemingly straightforward word 'knowingly,' the statute's state of mind element is actually quite nuanced." *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013). The term "knowingly" is statutorily defined to mean (1) actual knowledge, (2) deliberate ignorance, or (3) reckless disregard of the truth or falsity of the information submitted. *U.S. ex rel. Liotine v. CDW Gov't, Inc.*, 2012 WL 2807040, at *8 (S.D. Ill. July 10, 2012) (citing 31 U.S.C. § 3729(b)(1)). Thus, while proof of actual knowledge is sufficient, it is not required because proof of either deliberate ignorance or reckless disregard also satisfies the FCA's scienter requirement. *King-Vassel*, 728 F.3d at 712.

Deliberate ignorance and reckless disregard differ slightly, as explained by one of the House sponsors in 1986 when Congress adopted the language:

> Subsection 3 of Section 3729(c) uses the term "reckless disregard of the truth or falsity of the information" which is no different than and has the same meaning as a gross negligence standard that has been applied in other cases. While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government. The Act is also intended not to permit artful defense counsel to require some form of intent as an essential ingredient of proof. This section is intended to reach the "ostrich-with-his-head-in-the-sand" problem where government contractors hide behind the fact they were not personally aware that such overcharges may have occurred. This is not a new standard but clarifies what has always been the standard of knowledge required.

132 Cong. Rec. H9382–03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman). Deliberate ignorance "capture[s] the ostrich-like conduct which can occur in large corporations where corporate officers … insulate themselves from knowledge of false claims submitted by lower-level subordinates." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (quoting S. Rep. No. 99–345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272) (internal quotations omitted).

Reckless disregard, on the other hand, is extreme or gross negligence—"that is, those who failed 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'" *King-Vassel*, 728 F.3d at 713 (quoting S. Rep. No. 99–345, at 20, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5285 and *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997)).

> Federal Contractors, persons and entities doing business with the government must be made to understand that they have an affirmative obligation to ascertain the truthfulness of the claims they submit. No longer will Federal contractors be able to bury their heads in the sand to insulate themselves from the knowledge a prudent person should have before submitting a claim to the Government. Contractors who ignore or fail to inquire about red flags that should alert them to the fact that false claims are being submitted will be liable for those false claims.

132 Cong. Rec. H6482 (daily ed. Sept. 9, 1986) (statement of Rep. Berman) (*quoted in* Sylvia, C., *The False Claims Act: Fraud Against the Government* § 4:45). As Justice Holmes famously wrote: "Men must turn square corners when they deal with the Government." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (quoting *Rock Island, A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920)). To prove reckless disregard, a plaintiff "need only show that [the defendant] had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim … or that [the defendant] failed to make a reasonable and prudent inquiry into that possibility." *King-Vassel*, 728 F.3d at 713.

## II. THE EVIDENCE THAT KMART "KNOWINGLY" MISREPRESENTED ITS USUAL AND CUSTOMARY DRUG PRICES IS CONCLUSIVE.

### A. Kmart had actual knowledge that it was unlawful to seek reimbursements in excess of its "usual and customary" prices.

As its corporate management has testified, Kmart knew that it could not bill government programs more than its U&C prices. SOF ¶ 31; *see* Doc. 218-6: Ayshford Dep. 7:7-14 ("[A pharmacy] cannot bill any government program for more than its usual and customary prices."); Ex. 19: Purvis Dep. 108:9-17 (acknowledging that a pharmacy cannot "bill a federal government

healthcare program for more than the pharmacy's usual and customary prices"); Doc. 218-2: Weber Dep. 168:20-169:21 (stating that no third-party payor will reimburse a pharmacy in excess of its U&C prices).

### B. The evidence is one-sided that Kmart knew that none of its customers "usually" or "customarily" paid what Kmart claimed were its "usual and customary" prices.

Almost none of Kmart's customers ever paid the drug prices that Kmart claimed were its "usual and customary" drug prices. *See* Doc. 323-4: Hay Report at 3 ("The prices Kmart charged under its discount drug programs (or even lower prices) were the prices Kmart charged for the overwhelming majority (90%) of cash purchases of the drugs Kmart included on its discount drug formularies."). Kmart has never claimed in this litigation that it believed—even erroneously—that any segment of its customer base "usually" or "customarily" paid the drug prices that Kmart claimed were its "usual and customary" drug prices.

### C. Kmart does not argue that the drug prices it claimed were its "usual and customary" drug prices were "usual and customary" in some idiosyncratic legal sense.

Kmart has pointedly eschewed an advice-of-counsel defense throughout proceedings in this case. SOF ¶ 30.[3] It is therefore too late in the day for Kmart to claim belatedly that it relied on advice of counsel in support of the prices it claimed as its "usual and customary" drug prices. Indeed, Kmart has successfully resisted discovery in this case based on its representations to the Court that it is not relying on an advice-of-counsel defense. *See supra* n.2.

---

[3] At the same time, Kmart has inconsistently stated that "the only person(s)" providing advice as to whether its practice of seeking reimbursements in amounts greater than its RMP prices complied with applicable laws "was its legal counsel." *See* Ex. 16: Kmart's Resp. to Interrog. 20. Nevertheless Kmart has not raised a defense of good faith or an advice-of-counsel defense. In a May 20, 2014 letter to Magistrate Judge Frazier, Kmart's counsel stated that it "does not intend at this time to affirmatively elicit any testimony at trial that Kmart relied on legal advice with regard to the implementation of the generic drug discount programs at issue in this matter," though purporting to reserve the right to do so at a later date. Ex. 17; *see also* Ex. 18: Kmart's June 17, 2014 Supp. Rule 26(a)(1) Disclosures (stating again that "Kmart does not currently intend to rely on an advice of counsel defense").

Moreover, there is no evidence to support an advice-of-counsel defense. Mark Doerr, a former Vice President at Kmart who was the highest-ranking pharmacy employee from 2005 to 2008, testified that the employees responsible for the administration of Kmart's generic drug program would typically consult Kmart's legal department to ensure that the program was in compliance with state and federal laws. Doc. 218-1: Doerr Dep. at 217:3-220:22. But Kmart has produced no evidence that it consulted legal counsel prior to the implementation of the Kmart Maintenance Program (KMP) in 2004. SOF ¶ 29. Notably, Brian Wehneman, who initially conceived the KMP, testified that he never presented his idea for a generic drug program to anyone in Kmart's legal department.[4] Doc. 218-4: Wehneman Dep. at 70:18-71:4. Additionally, Kmart's privilege log does not contain a single entry prior to the launch of the KMP in September 2004. *See* Ex. 27: Kmart's June 11, 2014 Updated Comprehensive Privilege Log.

Kmart recognized from the outset, however, that its discount prices were directly relevant to its U&C prices. For example, Mr. Wehneman (the architect of the KMP) prepared a presentation shortly before the KMP was launched in 2004 in which he recognized "issues involving U&C": "If we fill these scripts under "CASH" then our U&C for third party payers could be affected." Ex. 15: KM-GAR-021-0000402 at 9.

**D. Kmart knew that its discount prices were its "usual and customary" prices.**

A Kmart pharmacist emailed Jennifer Speares, a District Manager for Kmart pharmacies, pointing out that "Sooner or later the true insurance companies that we have contracts with … will start paying us based on our … program prices, since that is really our usual and customary prices." Doc. 218-29: KM-YAR-043-001441. Ms. Spears replied, "We know :)". *Id.*; *see also*

[4] *See also* Doc. 218-4: Wehneman Dep. at 76:16-77:23, 83:10-15, 113:24-114:21 (Brian Wehneman, a former Generic Category Manager, stated that he did not consult legal counsel when the KMP was being renamed as the RMP); Doc. 218-2: Weber Dep. at 161:16-162:11, 173:18-174:24 (Timothy Weber, a former Generic Pharmaceutical Category Manager, stated that he never consulted legal counsel about the meaning of U&C price or whether it was lawful to charge third-party payers more than the RMP price).

Doc. 218-28: KM-GAR-004-0003254 ("[W]e are advertising our [RMP] price on our website. The advertised price now becomes our U&C.").

**E. Kmart had many reasons to inquire whether its reimbursement requests exceeded its "usual and customary" prices.**

With respect to reimbursements under Medicare Part D, the Centers for Medicare & Medicaid Services (CMS) considers year-round discount prices like those offered under Kmart's generic drug program to be a pharmacy's U&C prices. SOF ¶ 41. Specifically, the CMS Medicare Prescription Drug Benefit Manual—citing Walmart's generic drug program as an example[5]—states:

> [W]here a pharmacy offers a lower price to its customers throughout a benefit year, this … is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse [the pharmacy] on the basis of this price.

Doc. 106-2: CMS Manual, ch. 14, § 50.4.2, at 19 n.1. Kmart was fully aware of CMS's position, having received and circulated this very language. *See*, *e.g.*, Ex. 21: KM-GAR-018-0001846 (email from a CMS employee to Dale Purvis, Kmart's Director of Third Party Administration, copying § 50.4.2 of the CMS Manual into the message and expressly telling Mr. Purvis to "See the footnote" containing the language above); Ex. 22: KM-GAR-005-0001968 (email from Dale Purvis forwarding this language to other key members of Kmart's pharmacy team).[6] Michigan Medicaid also made inquiries of Kmart regarding whether it should receive the benefit of the generic drug program's discount prices. *See infra* at 11 n.10.

Despite these red flags, however, Kmart never made any effort to determine whether the

[5] Kmart's generic drug program was similar to Walmart's program in that both companies offered cash-paying customers set discount prices throughout the year on hundreds of generic drugs. *See* Doc. 218-26: KM-GAR-011-0000668 ("[O]ur RMP … is like Walmart's … generic plan."); Doc. 218-27: Yarberry006545 ("RMP follows the Walmart-Target $4 model."). But unlike Kmart, Walmart submitted its program prices as its U&C prices when seeking reimbursements from Medicare, Medicaid, and other third-party payors. SOF ¶ 40.

[6] *See also* Doc 218-6: Ayshford Dep. 11:12-12:8 (acknowledging that Kmart was required to follow the CMS Medicare Prescription Drug Benefit Manual).

amounts it claimed as its" usual and customary" prices were, in fact, its "usual and customary" prices. Instead, Kmart recklessly disregarded the legal meaning of "usual and customary" in preference to its goal of maximizing profits. SOF ¶ 52.[7] And the evidence shows that Kmart's programs were, indeed, profitable. *See*, *e.g.*, Doc. 218-50: KM-OIG-04-0003563 ("Rough calculations show that if we lowered our U&C to match competitor programs, it would cost approx $1MM in margin per week.").

**F. Kmart's attempts to keep its generic drug program's discount prices at "arms length" from its "usual and customary" prices establish Kmart's knowledge that its discount prices could constitute its "usual and customary" prices.**

In 2006, Kmart changed the name of its generic drug program from the "Kmart Maintenance Program" to the "Retail Maintenance Program"—eliminating *Kmart* from the name—in order to place a "firewall" between the program and Kmart's U&C pricing. SOF ¶ 44. Internal Kmart documents explain that this was an effort to keep Kmart's discount prices at "arms length" from its U&C prices so as to increase Kmart's reimbursements from Medicare, Medicaid, and other third-party payors.[8] *Id.*; *see* Doc. 218-32: KM-OIG-13-0000242 ("[W]e are re-setting the program, including renaming it to RMP, to put it at a long a possible arms length from our U&C pricing."). As Kmart recognized: "If we fill these scripts under 'CASH' then our U&C for third party payers could be affected." Ex. 15: KM-GAR-021-0000402 at 9.

Kmart attempted to keep its program pricing at "arms length" from its U&C pricing in three significant ways. First, before 2008, Kmart purportedly limited its generic drug program to 90-

---

[7] *See*, *e.g.*, Doc. 218-46: KM-GAR-027-0002441 ("Our Cash (U&C) prices have been set at a level that maximizes our reimbursement from our third party payors."); Doc. 218-47: KM-GAR-004-0005471 at 1 ("[I]t is financially beneficial to maintain the Usual and Customary price higher than reimbursement rates."); Doc. 218-20: KM-YAR-044-008157 at 8159 ("[W]e have the increased U&C to drive as much profit as possible out of [third-party] programs.").

[8] Kmart's actions were not the result of some rogue employee either. In 2008, for example, the legality of how Kmart submitted its U&C price was discussed in a Board meeting, which included Chairman Eddie Lampert. SOF ¶ 64; *see* Doc. 218-61: KM-OIG-04-0004252 (presentation prepared for this Board meeting).

day supplies of prescription drugs, which Kmart thought would insulate its alleged U&C prices for prescriptions of other durations, like 30-day and 60-day prescriptions. SOF ¶ 34. In practice, however, Kmart's generic drug program was not limited to 90-day supplies; Kmart routinely prorated the program's $15 cost for a 90-day supply to $10 for a 60-day supply or $5 for a 30-day supply in an attempt to appease customers and remain competitive. SOF ¶ 35. Kmart also frequently overrode the program's $15 price in order to match or beat the price of competitors like Walmart and Target. SOF ¶¶ 36-37.[9] In fact, it was Kmart's *policy* to match or beat competitors' prices (like Walmart's 30-day supply for $4). SOF ¶ 38. As John Crupie, a District Manager for Kmart's pharmacies, explained in an email to Senior Vice President Robin Michel:

> We keep our original price higher (Usual and customary price) because if we do, we can then bill the insurance for a higher price when it is covered for the patient. We then price match in order to get the other percent of customers into the pharmacy (creates loyalty) so we can then sale them the drugs when they need them at our regular price. It is a bait and switch scheme---bait them with the price match to get their business, then sale them the other prescriptions at what their insurance will reimburse us as they are put on more meds.

Doc. 218-21: KM-GAR-036-0001527 at 4.

Second, Kmart purportedly required customers to "enroll in" (or "opt in" to) its generic drug program. Enrollment, however, was a sham. *Anyone* was eligible to participate in Kmart's generic drug programs; Kmart has produced no evidence of anyone having ever been denied participation in these programs. SOF ¶¶ 54-55. And to enroll, customers were simply asked to provide the same standard demographic information that a pharmacist would have obtained from any new customer. SOF ¶ 56. Indeed, Timothy Weber, a former Generic Pharmaceutical Category Manager at Kmart, testified that there is no difference between asking customers if

---

[9] *See also* Doc. 218-21: KM-GAR-036-0001527 at 4 (noting that overrides are "like running a super coupon all the time … and making a profit at the same time"); Doc. 218-20: KM-YAR-044-008157 at 8161 ("Price matching is a tool we have to offset [our] high U&C pricing."); Doc. 218-22: KM-GAR-042-0000387 (stating that price matching was "out of control" because "most price matches were bogus- not being verified- or being done just out of habit").

they want to enroll in Kmart's generic drug program and asking if they would prefer to pay a lower price. Doc. 218-2: Weber Dep. 107:24-108:7.

Third, as part of what Kmart by 2009 dubbed its Prescription Savings Club (PSC), Kmart started charging an "enrollment fee" in an effort to prevent its discount PSC prices from being considered its U&C prices. SOF ¶¶ 60. At one time, the fee was only $5, but Kmart decided that was not enough. SOF ¶ 61; *see* Doc. 218-56: KM-GAR-042-0002348 at 1 ("[I]f we only charged $5 the PSC price would quickly become our U and C"). Since then, the fee has been $10. SOF ¶ 62. Dain Rusk, Vice President and General Manager of Kmart's pharmacy operations, thought that "a $10 enrollment fee … effectively creates a legal shield that enables Kmart Pharmacy to offer discounted pricing on select drugs without causing a negative impact on Third Party reimbursement." Doc. 218-57: KM-GAR-041-0002052 at 1. Not only is there no legal basis for this reasoning, the evidence shows that, "in essence, it d[id] not cost anything to join" the PSC. Doc. 218-59: KM-GAR-004-0000927 at 6. This is because customers were typically given a $10 gift card in return for "enrolling," thus resulting in a net zero cost to the customer. SOF ¶ 63; *see* Doc. 218-60: KM-YAR-004-001760 ("[A]t the end of the day, this program is free.").

**G. Kmart's lies about its generic drug program are evidence of guilty knowledge.**

"It is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt." *United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975); *see also DeVore v. United States*, 368 F.2d 396, 397 (9th Cir. 1966) ("False exculpatory statements evidence a consciousness of guilt and are probative of unlawful intent.").

When asked about the relationship between Kmart's "usual and customary" prices and its discount prices, Kmart lied. For example, Caremark advised Kmart in an email that its discount RMP prices "should be passed on to us as your U & C." Doc. 218-39: KM-OIG-18-0000514. In

response to such reminders and inquiries, Kmart would falsely claim that its RMP program was "secondary insurance" run by a PBM (Agelity), who managed the RMP formulary (*i.e.*, list of drugs) and determined eligibility for the program. SOF ¶ 46; *see* Doc. 218-16: KM-OIG-18-0000353 at 355 ("[I]n effect, RMP is an Agelity program."). Such claims were entirely untrue.

The RMP was not secondary insurance or any other kind of insurance. SOF ¶ 47. Kmart did not register the RMP with the insurance departments in each state where Kmart operated pharmacies. *Id*. Nor did the RMP have any premiums, splitting of costs, or shifting of risks between an insurer and an insured. *Id*. Mark Doerr, a former Vice President at Kmart, even testified that describing Kmart's generic drug program as insurance would have been a misrepresentation. Doc. 218-1: Doerr Dep. 358:12-359:10.

Moreover, the RMP was not an Agelity program; it was always a Kmart program. SOF ¶ 48; Doc. 218-2: Weber Dep. 125:23-126:19. Contrary to what Kmart told others,[10] it was Kmart, not Agelity, who managed the RMP formulary. *Id*. Similarly, it was Kmart, not Agelity, who created the RMP formulary, decided which drugs went on the formulary, and determined the price points for drugs on the formulary. *Id*. And it was Kmart, not Agelity, that determined who was eligible for coverage. SOF ¶ 49. The contract between Kmart and Agelity even stated that Kmart would provide Agelity with a list of the drugs to be included on the formulary "created, maintained, and managed" by Kmart, and that the RMP would be available to "any individual … whom [Kmart] identifies as being eligible for coverage." *See* Doc. 218-43: KM-OIG-18-0000670 to 673. Ultimately, the only function Agelity served was to double-check that a Kmart pharmacist did

[10] *See* Doc. 218-42: KM-OIG-05-0001388 (email exchange wherein Robbert Ayshford, Kmart's Director of Pharmacy Administration, responds to an inquiry from Michigan Medicaid by writing that Agelity uses its "own proprietary system" to determine drug eligibility, so Kmart will have to coordinate with Agelity before providing Michigan with a complete list of Kmart's discounted drugs); *but see* Doc. 218-6: Ayshford Dep. 219:16-222:1 (admitting that there is "nothing unique" or proprietary about Agelity's "adjudication process") *and* 214:2-216:13 (failing to explain why Kmart would have had to coordinate with Agelity, since it was Kmart who provided Agelity with the complete list of discounted drugs in the first place).

not make a mistake in processing a specific transaction. SOF ¶ 50. And even then, Kmart reserved the power to override Agelity's decisions, and did so frequently.[11] *Id*. In fact, Robert Duggan, the President and CEO of Agelity, testified that Kmart's generic drug program was "unique" because it was "the only one" Agelity served where "a pharmacy defined" how the discount program ran instead of Agelity. Ex. 23: Duggan Dep. 8:9-16, 81:2-12; *see also* Ex. 19: Purvis Dep. 37:11-21 (acknowledging that Kmart had the "final word on anything that happened with the RMP program" because "it was a Kmart program").

## CONCLUSION

For the foregoing reasons, Relator asks the Court to rule that Kmart acted with the requisite knowledge and grant Relator summary judgment on this issue.

[11] *See also* Doc. 218-4: Wehneman Dep. 142:8-144:10 (acknowledging the likelihood that Kmart overrode Agelity upwards of 20,000 times per month); Doc. 218-44: KM-OIG-01-0001990 at 1991 ("With the amount of overrides we have, it sounds like we are abusing the programs intent …. 20+ % overrides tells me the program is out of control.").

Respectfully submitted,

**KOREIN TILLERY LLC**

Dated: April 24, 2017

/s *Robert L. King*

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
rking@koreintillery.com
azigler@koreintillery.com

George A. Zelcs
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com

**PHILLIPS & COHEN LLP**

Erika A. Kelton
2000 Massachusetts Ave. NW, Suite 100
Washington, DC 20036
Telephone: (202) 833-4567
Facsimile: (202) 833-1815
ekelton@phillipsandcohen.com

Larry P. Zoglin
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
lpz@pcsf.com

*Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users.

**KOREIN TILLERY LLC**

/s *Robert L. King*
Robert L. King
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
rking@koreintillery.com