UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, and DOE STATES 1-18, ex rel. JAMES GARBE, | Case No. 3:12-cv-00881-NJR-RJD |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | |
| KMART CORPORATION, | |
| Defendant. | |

**THIRD AMENDED COMPLAINT**

Plaintiff-relator James Garbe, through his attorneys Phillips & Cohen LLP, on behalf of the United States of America, the States of California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and Doe States 1-18 (collectively "the States"), for his Complaint against defendant Kmart Corporation ("defendant" or "Kmart"), alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. NATURE OF THE ACTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America and the States arising from false and/or fraudulent statements, records, and claims made and caused to be made by defendant and/or its agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., and the false claims acts and insurance fraud prevention acts of the States set forth below.

2. Kmart operates pharmacies in stores in all 50 states, Puerto Rico and the Virgin Islands, with the exception of Alaska, Connecticut, North Dakota and Vermont. This Complaint concerns Kmart's ongoing and nationwide fraud scheme against the Medicare Part D, Medicaid, Tricare, state and federal Workmen's Compensation, and other state and federal prescription drug benefit programs. Under the applicable federal and state laws, a pharmacy cannot charge these programs a higher price for prescription drugs than the "usual and customary" price that the pharmacy charges the cash-paying public. As alleged below, Kmart violated these laws by maintaining a dual and opportunistic pricing scheme for generic drugs, which allowed Kmart to claim and receive reimbursement from governmental prescription drug programs in excess of its "usual and customary" prices.

3. Kmart's generic drug pricing program is at the center of its fraud scheme. The "Retail Maintenance Program," also known as the "90 Day Generics Program" and by other names (collectively, "RMP"), allows cash-paying customers to purchase more than 300 widely-prescribed generic drugs for $5, $10 and $15 (or less) for 30, 60 and 90 day prescriptions, respectively. ("Cash paying customer," also known as "self-paying customer," refers to customers who pay for the drugs themselves – whether by cash, credit card or check – without using insurance.) Kmart has offered the RMP program to cash-paying customers since

approximately 2005.

4. Kmart's RMP formulary includes some of the most commonly used generics for cardiovascular, diabetes, pain, psychiatric illnesses, gastrointestinal disorders and other common ailments. RMP prices apply only to prescription generics listed on the formulary.

5. Kmart's RMP program is not a special, limited or a one-time offer. Any pharmacy patron is eligible to participate in the program, and the company encourages its pharmacists to utilize the program to attract all customers.

6. Kmart's $5, $10 and $15 (or lower) prices for 30, 60 and 90 day prescriptions represent the company's "usual and customary" prices to the cash-paying public for listed generics. The company does not limit the eligibility for, or duration of the availability of, RMP prices other than to require cash payment.

7. Kmart's generic pricing program is a boon for consumers. However, despite the limitations of numerous federal and state pharmacy benefit programs on prescription drug reimbursements to amounts no greater than the "usual and customary" prices to the cash-paying public, Kmart knowingly fails to report the RMP price – its true "usual and customary" price – on claims for reimbursement submitted to those government programs. Instead, Kmart submits reimbursement claims for generic prescriptions seeking amounts that are often many multiples of these "usual and customary" charges.

8. The practices alleged in this Complaint defraud every insurer – both public and private – that reimburses pharmacy drugs using a charge-based formula that limits reimbursement to no greater than the pharmacy's usual and customary charge to the cash-paying public (hereafter, the "usual and customary charge" or "usual and customary price"). Federal and state health care programs that use such charge-based formulas to reimburse prescription

drugs include Medicaid (which subsidizes the purchase of more prescription drugs than any other program in the United States), Tricare, the Public Health Services program, federal and state workers' compensation programs, and many other programs.

9. The Medicare Part D program is also affected by Kmart's fraudulent scheme. As discussed in further detail below at ¶¶ 99-101 and 106, the federal government provides prescription drug benefits to Medicare Part D beneficiaries through contracts with private insurance plans (known as "Plans" or "Plan Sponsors"). Section 1156 of the Social Security Act requires that with respect to medical services and supplies (including drugs) for which the federal government pays, all providers – including pharmacies such as Kmart – must provide those items "economically." 42 U.S.C. § 1320c-5(a)(1). Every time Kmart submits a claim to a Plan in which it seeks reimbursement for a prescription at a price that is substantially inflated over the price it charges self-paying customers for the exact same drug, it violates its duty to provide the prescription economically.

10. In accordance with Section 1156, a specific federal regulation also prohibits Kmart from charging the federal government for drugs provided to Medicare beneficiaries at prices higher than the prices it charges self-paying customers for the same drugs. Under 42 C.F.R. § 423.124(a), pharmacies may only charge "out-of-network" Part D beneficiaries their "usual and customary" price for prescription drugs. *See also* Medicare Part D Prescription Drug Benefit Manual (hereafter, the "Medicare Manual"), Ch. 5, Section 10.2; 42 C.F.R. 423.124(a) (same).

11. As opposed to out-of-network pharmacies, "in-network" pharmacies typically negotiate with Plans for the prices they will charge for prescription drugs provided to Plans' beneficiaries. Because Section 1156 requires those pharmacies to provide the drugs

"economically," the negotiated prices in-network pharmacies charge Plans generally cannot exceed the usual and customary prices the pharmacies charge customers who self-pay. Further, if a pharmacy offers a price to its cash customers throughout the year that is even lower than the price it has negotiated with a Plan, that lower price is then considered the usual and customary price, and the Plan reimburses the pharmacy on the basis of that lower price, even if the Plan's contract with the pharmacy would allow for a higher price. *See* Medicare Manual at Ch. 14, Section 50.4.2, n.1. The Medicare Manual specifically cites Wal-Mart's $4 generic plan, which is similar in all material respects to Kmart's RMP program. "This means that both the [Part D] Plan and the beneficiary are benefiting from the Wal-Mart 'usual and customary' price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year[.]"

12. Medicare Part D also requires that pharmacies that dispense drugs covered by Part D must advise beneficiaries of any price differential between the price of the drug to the enrollee and the price of the lowest-priced equivalent generic available at the pharmacy. Medicare Modernization Act § 1860D-4 (k)(1), 42 U.S.C. 1395w-104(k)(1). A Part D beneficiary's purchase at a lower cash price must be reported as the "true out of pocket cost" for that purchase, rather than a higher negotiated price.

13. The Medicare Part D program and its beneficiaries suffer damage from Kmart's fraudulent practices in several different ways. *See* ¶¶ 110-116 below. For example, because the "donut hole" in Part D coverage (the amount between $2,250 and $3,600 in prescription drug costs for which beneficiaries receive no coverage[1]) is determined by the amount of prescription

[1] The coverage limits listed in this Complaint were in effect in 2008. Pursuant to 42 C.F.R. § 423.104(d)(5)(iv), the coverage limits change each year.

drug reimbursements, beneficiaries who purchase generics included in Kmart's RMP program are pushed to – and through – the donut hole much more rapidly than they should be. For example, a Part D beneficiary who is charged $40 by Kmart for a 90-day generic prescription that is only $15 under the RMP program, arrives at the $2,250 donut hole threshold more quickly than if Kmart properly charged its true "usual and customary" price ($15). As a result of the company's inflated prices, Part D recipients are forced to carry the full cost burden of their prescription drugs much earlier (and to a greater extent) than they otherwise would.

14. Kmart's overcharging of Medicare Part D beneficiaries also causes direct damage to the federal government, because once a beneficiary reaches the upper end of the donut hole, the federal government then pays nearly 100% of his remaining drug costs that year (known as "catastrophic costs"). 42 C.F.R. § 423.104(d). Thus, Kmart's overcharging causes the federal government to pay nearly 100% of those beneficiaries' drug costs earlier than it otherwise would, and it also pays a higher price for each post-donut hole bill than it otherwise would. Paragraphs 113 to 116 below discuss additional ways in which Kmart's inflated generics pricing damages the federal government.

15. Every fraudulently inflated pharmacy bill or claim for payment knowingly submitted to a charge-based, government prescription drug program violates the Federal False Claims Act ("FCA") and the FCA's state-law counterparts.

16. The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without

fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

17. The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government; knowingly makes, uses, or causes to be made or used false records and statements to induce the United States to pay or approve false and fraudulent claims; or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal government.

18. The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. Pub. L. No. 111-21, 123 Stat. 1617 (2009). For pending cases like the instant case, the prior statute applies to claims arising before May 20, 2009, and the new statutory provisions apply to claims arising after that date, except in one instance. Congress decided that 31 USC § 3729 (a)(l) (B), which revised the former section designated as 31 USC § 3729 (a)(2), "shall take effect as if enacted on June 7, 2008, and shall apply to all claims . . . that are pending on or after that date." 4(f) of FERA, 123 Stat. at 1625 (see note following 31 USC § 3729).

19. The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the

defendant during that time) to enable the United States (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action.

20. As set forth below, defendant's actions alleged in this Complaint also constitute violations of the California False Claims Act, Cal. Govt Code §12650 et seq.; the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871 et seq.; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, et seq.; the Delaware False Claims and False Reporting Act, 6 Del. C. §1201 et seq.; the Florida False Claims Act, Fla. Stat. Ann. §68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/1-8; the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92; the Indiana False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.5 et seq.; the Iowa Medicaid False Claims Act, §685.1 et seq.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §437 et. seq; the Maryland False Health Claims Act, Md. HEALTH-GENERAL Code Ann. § 2-601 et seq.; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §400.601 et seq.; the Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq. (effective July 1, 2010); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§357.010 et seq.; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §167:61 et seq.; the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 et seq.; the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 27-14-1 et seq. and N.M. Stat. Ann. §44-9-1 et seq.; the New York False Claims Act, N.Y. State Fin. §187 et seq.; the North Carolina False Claims Act, NC Gen. Stat. § 1-605 et seq.; the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053

et seq.; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 et seq.; the Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§4-18-101 et seq. and 71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§8.01-216.1 et seq.; the Washington State Medicaid Fraud False Claims Act, Rev. Code Wash. (ARCW) § 74.09C.010 et seq.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat §20.931 et seq.

21. Based on these provisions, qui tam plaintiff and relator James Garbe seeks to recover all available damages, civil penalties, and other relief for federal and state violations alleged herein, in every jurisdiction to which defendant's misconduct has extended.

## II. INTRODUCTION

22. Residents of the United States spend billions of dollars each year on prescription drugs. A large share of the cost of these drugs is paid by the federal and state governments through a variety of health care programs. Expenditures for prescription drugs have far outpaced other health care costs, and are the fastest growing cost of health plans funded by the state and federal governments.

23. Congress and the States have enacted laws designed to control these soaring costs. Of particular relevance to this Complaint are provisions of the law (1) that prohibit excessive charging of the government for prescription drugs and (2) that impose limitations on the reimbursement rates paid for these drugs by government health care programs. With regard to the former, statutes and regulations prohibit a provider of drugs (including a pharmacy) from billing a federal or state health care program substantially in excess of the provider's usual charge to the public for these drugs.

24. With regard to restrictions on reimbursement rates, statutes, regulations, and health care provider agreements limit the maximum amount payable by federal or state health care programs for prescription drugs. Although each program's reimbursement formula differs somewhat, many programs place the following cap on payments for pharmacy drugs: the payment may not exceed the cash price that the pharmacy charges the general public for the drug. This maximum price is variously expressed as the pharmacy's "usual price," the pharmacy's "usual and customary price," the pharmacy's "price to the general public," or similar phrase; but the meaning in each instance is clear: the pharmacy cannot charge the general cash-paying public one price and be reimbursed by the government at a higher price.

25. This Complaint alleges that Kmart circumvented these laws by fraudulently seeking reimbursement for generic prescription drugs at amounts that were substantially more than the company's "usual and customary" charges.

## III. PARTIES

### A. The Plaintiffs

26. Plaintiff/relator James Garbe ("Relator") is a resident of Ohio. Mr. Garbe holds professional pharmacist licenses in Ohio and Michigan, and has more than 40 years of pharmacy experience. He was employed by Kmart from May 2007 until October 2010. While employed by Kmart, he worked as a pharmacist at Kmart stores in Toledo and Defiance, Ohio and in Adrian, Michigan. The governmental plaintiffs in this lawsuit are the United States and the States of California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and Doe States 1-18.

27. Plaintiffs Doe States 1-18 consist of the States that subsequent to the filing of this complaint enact false claims act statutes that permit *qui tam* lawsuits, including but not limited to the States of Alabama, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, West Virginia, and Wyoming.

**B. The Defendant**

28. Defendant Kmart Corporation is a Michigan corporation with corporate headquarters in Troy, Michigan. Kmart Corporation is a subsidiary of Sears Holdings Corporation, which is headquartered in Hoffman Estates, Illinois. Kmart operates discount retail stores, many of which offer pharmacy services. Kmart pharmacies are located in 46 states (there are no locations in Alaska, Connecticut, Vermont and North Dakota), Puerto Rico and the Virgin Islands. Kmart also owns and operates the AmeriKind Pharmacy Network PBM. Kmart Corporation's pharmacy operations are primarily run out of Sears Holding Corporation's Hoffman Estates location.

## IV. JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. In addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in Counts II, IV through IX, and XI through XXXII of this Complaint. Jurisdiction over the state law claims asserted in Counts III and X is based on this Court's supplemental jurisdiction. Under 31 U.S.C. §3730(e), and under the comparable provisions of the state statutes listed in ¶ 20 above, there has been no statutorily relevant public disclosure of

the "allegations or transactions" in this Complaint.

30. Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as the defendant is found in, has or had an agent or agents, has or had contacts, and transacts or transacted business in this judicial District.

## V. PAYMENT FOR PRESCRIPTION DRUGS UNDER GOVERNMENT HEALTH CARE PROGRAMS

31. Because of the significant impact of prescription drug costs on the federal and state treasuries, the federal and state governments have implemented a number of measures to contain drug costs payable by government health care programs. Of particular relevance to this Complaint are two types of cost-containment measures: (1) prohibitions against excessive charges, and (2) limitations on the maximum reimbursement payment by federal and state health care programs.

### A. The Excessive Charges Exclusion Authority

32. By statute, the Secretary of Health and Human Services ("HHS") is authorized to exclude from participation in any federal health care program any provider or supplier that engages in certain prohibited practices when billing Medicare or Medicaid for goods or services. Among the practices that justify exclusion of the provider are charging the government "for items or services furnished substantially in excess of such [provider's] usual charges." 42 U.S.C. § 1320a-7(b)(6). Excessive charging is treated on a par with charging the government for goods or services that are not medically necessary, which also justifies exclusion from any federal health care program. *See id.*

33. The exclusion for excessive charging is intended to protect the Medicare and Medicaid programs – and the taxpayers – from medical providers and suppliers that charge the Medicare or Medicaid programs substantially more than they charge the general public. This

exclusion is consistent with the mandate of section 1156 of the Social Security Act, which requires that all providers of medical services and supplies paid for by the federal government, including pharmacies that provide drugs paid for by the federal government, must provide those items "economically." 42 U.S.C. §1320c-5(a)(1). A pharmacy that charges the government a price for prescription drugs that is substantially higher than the pharmacy's price to the general public does not provide the drugs "economically" to the government.

34. In addition to the general prohibition on excessive charges discussed above, various federal and state laws, as well as federal and state health care provider agreements and private contracts, limit the maximum reimbursement rate that different health care programs will pay for covered drugs. Although the reimbursement formula varies depending upon the program, most programs place the following cap on reimbursement payments for pharmacy drugs: government reimbursement may not exceed the pharmacy's "usual and customary" price for the drugs. This cap on the reimbursement amount is sometimes expressed by other phrases, such as the pharmacy's "usual price," the pharmacy's "price to the general public," or other similar phrase. In this Complaint the phrases "usual and customary price" "usual price," "usual and customary charge," and "price to the general public" will be used interchangeably.

35. Examples of programs that cap drug reimbursement at the pharmacy's usual and customary price are the Medicaid program, the Medicare Part D program, Tricare, the Public Health Services Program, and federal and state workers' compensation programs, among others. These programs are discussed below.

**B. Limitations On Prescription Drug Reimbursement Under Medicaid and Other State Government Health Care Programs**

**1. Medicaid Limits On Prescription Drug Reimbursement**

36. Medicaid is a public assistance program providing for payment of medical

expenses for the poor and disabled. Medicaid reimburses the purchase of more prescription drugs than any other program in the United States. Most prescription drugs reimbursed by Medicaid are dispensed by pharmacies.

37. Funding for Medicaid is shared between the federal and state governments. The federal Medicaid program is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HFCA"). Each state administers its own Medicaid program, although the federal Medicaid statute sets forth the minimum requirements that each state must follow to qualify for federal funding.

38. Reimbursement for prescription drugs under the Medicaid program is available for "covered outpatient drugs." 42 U.S.C. §§1396b(i)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." 42 U.S.C. §1396r-8(k)(3). Medicaid's minimum requirements for prescription drug reimbursements are set forth below.

### a. General Medicaid Drug Reimbursement Methodology

39. Each state Medicaid agency is required to submit a State Plan to CMS describing its payment methodology for covered drugs. States do not, however, have free reign to determine the prices at which they will reimburse pharmacies through Medicaid; federal regulations set specific limits on reimbursement rates. There are several different calculations that can form the basis for a reimbursement limit, including:

- Federal Upper Limit ("FUL"), which is a specific limit that CMS sets for certain multiple-source drugs (generic drugs and their brand-name counterparts);
- Maximum Allowable Cost ("MAC"), which is a specific limit a state may set and use instead of the FUL;

- Estimated Acquisition Cost ("EAC"), which is often based upon the drug's average wholesale price ("AWP") discounted by a certain percentage or the drug's Wholesale Acquisition Cost ("WAC") plus a certain percentage; and
- Usual and Customary charge to the cash-paying public.

40. When a drug is subject to a FUL or a MAC, that is the maximum price at which a pharmacy can be reimbursed for that drug. 42 C.F.R. § 447.512(a) (formerly 42 C.F.R. § 447.331). For generic drugs that are not subject to a specific FUL, the federal regulations require that reimbursement may not exceed, in the aggregate, the lower of (1) the pharmacies' usual and customary charge for the drugs, or (2) the pharmacies' EAC for the drugs. 42 C.F.R. § 512(b).

41. In summary, states use a variety of drug reimbursement methods. In most cases, states reimburse for prescription drugs at the lesser of usual and customary price, EAC, FUL, or MAC.

42. Importantly, however, as shown in the state statutes set forth below at ¶¶ 46 to 92, Medicaid reimbursement for prescription drugs cannot lawfully exceed the pharmacy's usual and customary charge for those drugs. The billing practices alleged in this Complaint fraudulently inflate pharmacy bills above the pharmacies' usual and customary charge. Kmart's practices defraud governmental programs when a prescription drug's usual and customary charge is lower than the alternatives set forth in the state's reimbursement formula. In those instances, if a pharmacy fraudulently inflates its usual and customary price, the governmental program is caused to reimburse the pharmacy's bills at rates higher than the pharmacy is lawfully entitled to receive.

43. In addition, the billing practices alleged in this Complaint defraud State Medicaid programs by charging a dispensing fee that Kmart was not entitled to charge. As shown in the

state Medicaid statutes set forth below at paragraphs 46 to 92, the prescription drug reimbursement methodologies utilized by most States permit a pharmacy to charge a dispensing fee when the reimbursement is based on one of the defined amounts (e.g., FUL, AWP, EAC, MAC, etc.) but *not* when reimbursement is based on the usual and customary price. The usual and customary price is deemed to be inclusive of the dispensing fee. Thus, in circumstances where Kmart should have been reimbursed based on its usual and customary price but Kmart caused a State Medicaid program to reimburse Kmart based on one of the defined amounts, Kmart caused the program to pay Kmart a dispensing fee to which it was not entitled.

**b. State Medicaid Reimbursement Methodologies**

44. Every state's Medicaid drug reimbursement methodology provides for reimbursement of the ingredient cost of the drug and, in certain circumstances, a dispensing fee. The list below describes the methodology for reimbursing the ingredient cost and dispensing fee in those states that include "usual and customary" charges as part of their reimbursement methodology. The dispensing fee is typically in the range of three to five dollars per transaction, and is not specified below.

45. For ease of reference, the abbreviations used in this section are repeated here:

Average Wholesale Price: AWP

Federal Upper Limit (as defined by CMS): FUL

Maximum Allowable Cost (as defined by the State): MAC

Estimated Acquisition Cost (as defined by the State): EAC

Wholesale Acquisition Cost: WAC

**(1). Alabama Medicaid**

46. Reimbursement for covered multiple source drugs shall not exceed the lowest of:

(1) FUL (as established and published by CMS) plus a reasonable dispensing fee;

(2) Alabama EAC (defined as the Average Acquisition Cost (AAC) of the drug or, in cases where no AAC is available, the WAC + 9.2%) plus a dispensing fee;

(3) Provider's usual and customary charge to the general public for the drug; or

(4) State MAC plus a dispensing fee.

Ala. Admin. Code r. 560-X-16-.06.

**(2). Arizona Medicaid**

47. Reimbursement for multiple source drugs shall not exceed the lowest of:

(1) State MAC plus a dispensing fee;

(2) AWP minus 16% plus a dispensing fee; or

(3) Provider's usual and customary charge.

**(3). Arkansas Medicaid**

48. Reimbursement for covered multiple source drugs shall not exceed the lowest of:

(1) FUL or MAC, plus a dispensing fee;

(2) Provider's usual and customary charge; or

(3) EAC plus a dispensing fee.

016-06-035 Ark. Code R. § 251.000.

**(4). California Medicaid (Medi-Cal)**

49. Reimbursement for any legend (i.e., prescription) drug is the lowest of:

(1) California MAC plus a dispensing fee minus 10 cents;

(2) FUL plus a dispensing fee minus 10 cents;

(3) EAC (defined as AWP minus 17%) plus a dispensing fee minus 10 cents; or

(4) Charge to the general public minus 10 cents.

Medi-Cal Pharmacy Provider Manual: Reimbursement.

**(5). Colorado Medicaid**

50. Reimbursement for a prescription drug is made at the lesser of the provider's usual and customary charge or the allowed ingredient cost plus a dispensing fee. 10 Colo. Code Regs. § 2505-10.

**(6). Delaware Medicaid**

51. Reimbursement for covered drugs is the lowest of:

(1) AWP minus 14.5% plus a dispensing fee;

(2) The usual and customary charge, as billed by the provider;

(3) FUL plus a dispensing fee;

(4) Delaware MAC plus a dispensing fee; or

(5) EAC plus a dispensing fee.

Delaware Medical Assistance Program Pharmacy Provider Policy Manual, section 4.1.4.

**(7). Florida Medicaid**

52. Medicaid reimbursement for prescribed drugs is the lowest of:

(1) EAC (defined as the lesser of AWP minus 16.4% or WAC plus 4.75%) plus a dispensing fee;

(2) FUL plus a dispensing fee;

(3) Florida MAC plus a dispensing fee; or

(4) The amount billed by the pharmacy which cannot exceed the pharmacy's usual and customary charge for the prescription (inclusive of any dispensing fee).

Fla. Admin. Code 59G-4.251(1).

**(8). Georgia Medicaid**

53. Reimbursement for covered multiple source drugs shall not exceed the lowest of:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) EAC plus a dispensing fee; or

(4) Provider's usual and customary charge.

Georgia Department of Community Health Division of Medical Assistance, Policies and Procedures for Pharmacy Services, Part II, Chapter 1000, Section 1001.

**(9). Hawaii Medicaid**

54. Multiple-source drugs are reimbursed at the lowest of:

(1) Billed charge;

(2) Provider's usual and customary charge to the general public;

(3) EAC (defined as AWP minus 10.5%) plus a dispensing fee;

(4) FUL plus a dispensing fee; or

(5) State MAC plus a dispensing fee.

Hawaii Medicaid Provider Manual, Chapter 19, section 19.1.8.

**(10). Idaho Medicaid**

55. Reimbursement is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) EAC plus a dispensing fee; or

(4) The usual and customary charge.

Idaho Admin. Code r. 16.03.09.665.

**(11). Illinois Medicaid**

56. Reimbursement for multiple-source drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) AWP-25% plus a dispensing fee; or

(4) The usual and customary charge.

Illinois Department of Healthcare and Family Services Handbook for Providers of Pharmacy Services, Chapter P-200.

**(12). Indiana Medicaid**

57. Reimbursement for covered legend drugs is the lowest of the following:

(1) EAC (for brand name drugs, 84% of the AWP; for generic drugs 80% of the AWP) plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) Provider's usual and customary charge, as of the date of dispensing (inclusive of any dispensing fee).

405 Ind. Admin. Code 5-24-2(a); Indiana Health Coverage Programs Provider Manual, Chapter 9: IHCP Pharmacy Services Benefit, p. 9-21.

**(13). Iowa Medicaid**

58. Reimbursement for generic drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) EAC plus a dispensing fee; or

(3) The usual and customary charge.

Iowa Admin. Code r. 441-79.1(8).

**(14). Kansas Medicaid**

59. Reimbursement for prescription drugs is made at the lesser of the following:

(1) State reimbursement methodology (FUL, SMAC, or EAC) plus a dispensing fee;

(2) Gross amount due plus a dispensing fee; or

(3) The usual and customary charge plus a dispensing fee.

Kansas Medical Assistance Program Provider Manual: Pharmacy, section 8400.

**(15). Kentucky Medicaid**

60. Reimbursement for prescription drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) AWP-14% for generics, plus a dispensing fee;

(4) The usual and customary charge; or

(5) Gross amount due.

Kentucky Medicaid Pharmacy Provider Manual, section 6.1.

**(16). Louisiana Medicaid**

61. Reimbursement for covered drugs is the lowest of:

(1) AWP-13.5% for independent pharmacies/AWP-15% for chain pharmacies plus a dispensing fee;

(2) FUL plus a dispensing fee;

(3) State MAC plus a dispensing fee; or

(4) The usual and customary price.

Louisiana Medicaid Program Provider Manual, Chapter 37, section 37.6.1.

**(17). Maine Medicaid**

62. Reimbursement to retail pharmacies for multiple-source generic drugs is made at the lesser of the following:

(1) AWP minus 13% plus a dispensing fee;

(2) FUL unless the Department meets the FUL in aggregate;

(3) State MAC plus a dispensing fee;

(4) WAC plus 4.4% plus a dispensing fee; or

(5) The usual and customary charge.

MaineCare Benefits Manual, Chapter II, section 80.09-1.

**(18). Maryland Medicaid**

63. Reimbursement for multiple-source drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) EAC plus a dispensing fee; or

(4) The usual and customary charge.

Md. Code Regs. 10.09.03.07(I)(1).

**(19). Massachusetts Medicaid**

64. Payment rate for multiple-source drugs is the lowest of:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) EAC plus a dispensing fee; or

(4) The usual and customary charge.

65. Payment for drugs for which a FUL or MAC has not been established, single-source drugs and non-legend drugs is the lowest of:

(1) EAC plus a dispensing fee; or

(2) The usual and customary charge.

114.3 Mass. Code Regs. 31.04.

**(20). Michigan Medicaid**

66. Reimbursement is the lower of:

(1) Usual & Customary Charge;

(2) AWP minus discounts plus a dispensing fee;

(3) State MAC plus a dispensing fee;

(4) WAC markup plus a dispensing fee; or

(5) Provider's charge.

Michigan Department of Community Health Medicaid Provider Manual Pharmacy Chapter, section 13.

**(21). Minnesota Medicaid**

67. Reimbursement for prescription drugs is made at the lesser of the following:

(1) Specialty Pharmaceutical Reimbursement rate plus a dispensing fee;

(2) MAC plus a dispensing fee;

(3) Estimated actual acquisition cost (WAC + 2%) plus a dispensing fee; or

(4) The usual and customary charge.

Minnesota Health Care Programs Provider Manual, Pharmacy Services Chapter.

**(22). Mississippi Medicaid**

68. Reimbursement for multiple-source generic prescription drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) AWP–25% plus a dispensing fee; or

(4) Usual and customary charge.

Mississippi Division of Medicaid Provider Policy Manual, Section 31.04.

**(23). Missouri Medicaid**

69. Reimbursement for prescription drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) WAC+10% plus a dispensing fee;

(3) State MAC plus a dispensing fee; or

(4) The usual and customary charge.

Missouri HealthNet Pharmacy Provider Manual, Section 12.2.

**(24). Montana Medicaid**

70. Pharmaceuticals are reimbursed at the lesser of the following:

(1) EAC plus a dispensing fee;

(2) FUL plus a dispensing fee;

(3) State MAC plus a dispensing fee; or

(4) The usual and customary charge.

Mont. Admin. R. 37.86.1105(1).

**(25). Nebraska Medicaid**

71. Reimbursement for prescription drugs is made at the lesser of the following:

(1) Product cost (FUL, State MAC, or EAC) plus a dispensing fee; or

(2) The usual and customary charge.

471 Neb. Admin. Code § 16-005.04A.

**(26). Nevada Medicaid**

72. Legend drugs are reimbursed at the lowest of:

(1) FUL plus a dispensing fee;

(2) EAC (defined by Nevada Medicaid as AWP less 15%) plus a dispensing fee; or

(3) The pharmacy's usual charge to the general public.

**(27). New Hampshire Medicaid**

73. Pharmaceuticals are reimbursed at the lesser of the following:

(1) AWP minus 16% plus a dispensing fee;

(2) WAC plus .8% plus a dispensing fee;

(3) Usual and customary charge to the general public;

(4) State MAC plus a dispensing fee; or

(5) FUL plus a dispensing fee.

N.H. Code Admin. R. He-W 570.14(a).

**(28). New Jersey Medicaid**

74. In most instances, pharmaceuticals are reimbursed at the provider's usual and customary charge or advertised charge (inclusive of the cost of the medication and the dispensing fee). N.J. Admin. Code § 10:51-1.5(c).

**(29). New Mexico Medicaid**

75. Reimbursement is made at the lesser of the following:

(1) Provider's usual and customary charge;

(2) State MAC plus a dispensing fee;

(3) FUL plus a dispensing fee; or

(4) EAC plus a dispensing fee.

N.M. Code R. § 8.324.4.16.

**(30). New York Medicaid**

76. Reimbursement for drugs dispensed by pharmacies is the lowest of:

(1) FUL plus a dispensing fee;

(2) EAC plus a dispensing fee; or

(3) Usual and customary price charged to the general public plus a dispensing fee.

N.Y. Comp. Codes R. & Regs. tit. 18, § 505.3.

**(31). North Carolina Medicaid**

77. Reimbursement for prescription drugs shall not exceed the lesser of:

(1) Cost on file;

(2) North Carolina estimated acquisition cost;

(3) Enhanced specialty discount, if applicable;

(4) State MAC or FUL; or

(5) Provider's usual and customary charge.

North Carolina Division of Medical Assistance Outpatient Pharmacy Medicaid and Health Choice Clinical Coverage Policy 9, attachment A, section B.

**(32). Ohio Medicaid**

78. For most drugs, reimbursement is made at the lesser of the following:

(1) Provider's billed charge, i.e., the usual and customary charge; or

(2) MAC plus a dispensing fee; or

(3) EAC plus a dispensing fee.

Ohio Admin. Code 5101:3-9-05.

**(33). Oklahoma Medicaid**

79. Reimbursement for prescription drugs is made at the lesser of the following:

(1) The usual and customary charge to the general public; or

(2) The lower of EAC, FUL or Oklahoma MAC, plus a dispensing fee.

Okla. Admin. Code § 317:30-5-78(d).

**(34). Oregon Medicaid**

80. Reimbursement for generic drugs is made at the lesser of the following:

(1) Provider's usual and customary charge;

(2) FUL plus a dispensing fee; or

(3) EAC (defined as Average Actual Acquisition Cost or, if unavailable, WAC) plus a dispensing fee.

Or. Admin. R. 410-121-0155.

**(35). Pennsylvania Medicaid**

81. Reimbursement for legend and non-legend drugs is made at the lowest of:

(1) EAC plus a dispensing fee;

(2) The usual and customary charge to the general public; or

(3) Pennsylvania MAC plus a dispensing fee.

55 Pa. Code § 1121.55.

**(35). Rhode Island Medicaid**

82. Reimbursement is made at the lesser of the following:

(1) Provider's usual and customary charge; or

(2) State MAC plus a dispensing fee.

Code of Rhode Island Rules 15-040-004(XI), (XIV), and (XVIII).

**(36). South Carolina Medicaid**

83. Pharmaceuticals are reimbursed at the lesser of the following:

(1) WAC plus 0.8% plus a dispensing fee;

(2) Usual and customary charge to the general public;

(3) State MAC plus a dispensing fee; or

(4) FUL minus 10% plus a dispensing fee.

South Carolina Healthy Connections (Medicaid) Provider Manual: Pharmacy Services, p. 2-45.

**(37). South Dakota Medicaid**

84. Pharmaceuticals are reimbursed at the lesser of the following:

(1) EAC plus a dispensing fee;

(2) The usual and customary charge;

(3) FUL plus a dispensing fee; or

(4) State MAC plus a dispensing fee.

S.D. Admin. R.67:16:14:06.

**(38). Tennessee Medicaid**

85. Reimbursement is made at the lesser of the following:

(1) The provider's usual and customary charge to the general public;

(2) AWP minus 13% plus a dispensing fee;

(3) FUL plus a dispensing fee;

(4) Gross amount due; or

(5) State MAC plus a dispensing fee.

For multi-source generic drugs, the TennCare pharmacy program uses a MAC pricing system. TennCare Pharmacy Manual, section 5.2.

**(39). Texas Medicaid**

86. For legend drugs, reimbursement is made at the lesser of the following:

(1) The usual and customary price charged the general public; or

(2) EAC plus a dispensing fee.

1 Tex. Admin. Code § 355.8541.

**(40). Utah Medicaid**

87. Pharmacy reimbursement is the lesser of:

(1) FUL plus a dispensing fee;

(2) State MAC, if applicable, plus a dispensing fee;

(3) Ingredient Cost Submitted plus a dispensing fee;

(4) EAC plus a dispensing fee; or

(5) Submitted charge (defined as the "lowest usual and customary charges to Medicaid, including promotional rates such as $4.00 generics, if they are offered to the general public.")

Utah Medical Assistance Program State Plan, attachment 4.19-B, section S; Utah Medicaid Provider Manual: Pharmacy Services, section 2.

**(41). Virginia Medicaid**

88. Reimbursement for multiple-source drugs is made at the lesser of the following:

(1) FUL plus a dispensing fee;

(2) State MAC plus a dispensing fee;

(3) AWP-10.25% plus a dispensing fee; or

(4) The usual and customary price plus a dispensing fee.

Virginia Pharmacy Manual, Chapter IV (Payment Methodology).

**(42). Washington Medicaid**

89. Pharmaceuticals are reimbursed at the lesser of the following:

(1) EAC plus a dispensing fee;

(2) Actual Acquisition Cost for §340(b) drugs plus a dispensing fee;

(3) Automated maximum allowable cost plus a dispensing fee;

(4) The usual and customary charge to the non-Medicaid population;

(5) State MAC plus a dispensing fee; or

(6) FUL plus a dispensing fee.

Wash. Admin. Code § 182-530-7000.

**(43). West Virginia Medicaid**

90. Generic pharmaceuticals are reimbursed at the lesser of the following:

(1) EAC (AWP-30%) plus a dispensing fee;

(2) The usual and customary charge to the general public;

(3) State MAC plus a dispensing fee;

(4) Medicaid AWP established by the Federal Office of the Inspector General, plus a dispensing fee; or

(5) FUL plus a dispensing fee.

West Virginia Medicaid Provider Manual, Chapter 518 (Pharmacy Services).

**(44). Wisconsin Medicaid**

91. Reimbursement for legend drugs is made under one of the following formulas:

(a) at the lesser of:

(1) WAC plus a dispensing fee; or

(2) Usual and customary price;

or (b) at the lesser of:

(1) State MAC plus a dispensing fee; or

(2) Usual and customary price.

Wisconsin Medicaid Pharmacy Provider Online Handbook, topic #1351.

**(45). Wyoming Medicaid**

92. Reimbursement for multiple source drugs is the lower of:

(1) Cost of the drug plus a dispensing fee; or

(2) The usual and customary charge.

048-130-010 Wyo. Code R. § 16.

**c. Payment of Medicaid Claims**

93. There are two basic types of Medicaid plans. The predominant type is fee for

service ("FFS"), in which the State Medicaid program reimburses the provider for each item or service provided to an individual covered by Medicaid (a Medicaid "beneficiary"). The other Medicaid service model is a Managed Care Organization ("MCO"), where the State Medicaid program pays an MCO a per capita fee in exchange for providing all-inclusive care to beneficiaries.

94. To facilitate the State's timely payment of provider claims under the FFS model, Congress authorized CMS to make federal funds available to States at the beginning of each quarter based on each State's estimate of the likely total amount of Medicaid claims for that quarter. 42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(d)(3) & (4); *see also* 42 C.F.R. § 430.30(a) & (b). CMS makes the funds available to the State through a commercial bank and the Federal Reserve continuing line of credit. A State may draw on these funds only after the State receives each provider's claim for services rendered, and then only in an amount equal to the portion of that claim that the federal government will reimburse (the "federal share"). *See* 42 C.F.R. § 430.30(d)(3). The State pays the balance of the claim not covered by the federal share.

95. The States were obligated to follow the law and the above-described procedure when Kmart submitted Medicaid FFS claims to the State Medicaid programs. Thus, when Kmart submitted an inflated Medicaid FFS claim to a State Medicaid program, this was the equivalent of submitting the claim simultaneously to the State as well as to the United States, since the States act as agents for the United States in reimbursing Medicaid claims. Moreover, when Kmart submitted a FFS claim to a State Medicaid program, Kmart caused the State to present the Medicaid claim to the federal government for payment of the federal share.

96. When Kmart submitted an inflated Medicaid claim to a Medicaid MCO, the inflated claims increased the Medicaid MCO's costs. MCOs pass some or all of these costs onto

the States. For example, based on increased costs in one year, the MCOs charge the States a higher capitation rate the following year. When the States' costs increase, the federal share of the States' costs increases.

### 2. Other State Pharmacy Benefit Programs

97. Many states offer additional prescription drug assistance to eligible groups, with similar "usual and customary" price limitations on drug reimbursements. These programs include, but are not limited to:

a. Florida Silver SaveRx Program;

b. Michigan Elder Prescription Insurance Coverage Program;

c. Montana Prescription Drug Expansion and Drug Plus Programs;

d. Rhode Island Pharmacy Prescription Drug Discount Program for the Uninsured; and

e. New Jersey Kid Care Program.

## C. Limitations On Prescription Drug Reimbursement Under Medicare Part D

98. Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease. The Medicare program is administered through CMS.

99. The Medicare Prescription Drug Improvement and Modernization Act of 2003 added prescription drug benefits to the Medicare program under Part D. Medicare Part D was implemented in January 2006. Since that date, the Medicare Program has provided subsidized drug coverage for all Medicare Part D enrollees (also known as "beneficiaries" or "members").

100. The United States Government each year pays approximately 75 to 80 percent of the cost of providing covered drugs to Medicare Part D enrollees. The United States does not

pay pharmacies directly for providing covered drugs to enrollees. Rather, the United States pays Part D Plan Sponsors, who reimburse pharmacies either directly or through contractors known as pharmacy benefit managers ("PBMs") that act on Plan Sponsors' behalf. Inflated costs in the Medicare Part D program, therefore, are borne primarily by the federal Treasury.

101. Plan Sponsors typically are private insurance companies. PBMs typically administer plan operations on behalf of Plan Sponsors, including the payment of claims to pharmacies and the submission of cost data to the government.

102. Reimbursement to pharmacies for purchases of generic prescription drugs by Medicare Part D beneficiaries is also governed by the contract negotiated between the pharmacy and the Part D Plan Sponsor (or PBM acting on the Plan Sponsor's behalf), subject to certain limitations on reimbursement imposed by federal laws and rules.

103. Many of the contracts under which Kmart received Part D reimbursements from PBMs or Plan Sponsors during the time period covered by this Complaint provided that Kmart would receive the lesser of (1) Kmart's usual and customary charge for the drug, or (2) various other defined amounts listed in the contract.

104. The relationship between a Plan Sponsor and its PBM is governed by contract between those entities. Many PBM-Plan Sponsor contracts permit the PBM to pass through a pharmacy's charges to the Plan Sponsor. In those circumstances, Kmart's charges to the PBM for drugs dispensed to Medicare Part D beneficiaries were passed through to the Plan Sponsors.

105. In addition to the obligations imposed by contract, federal law and rules impose additional limitations on the amount a pharmacy can charge a Plan Sponsor (or PBM acting on its behalf) for a drug dispensed to a Part D beneficiary. *See* ¶¶ 9-12, 32-35 above.

**1. United States Government Payments to Plan Sponsors**

**a. Background**

106. Medicare payments to Part D Plans are based on bids submitted by Plan Sponsors to the United States government, through CMS. The bids set forth the plan's projected annual costs to provide Part D benefits that year, and are subject to negotiation between the Plan Sponsor and CMS. Once a bid is accepted and a contract awarded to a Plan Sponsor, CMS makes interim or "prospective" payments called Direct Subsidy payments to each Plan Sponsor each month throughout the coverage year based on the Plan's projected costs.

107. As a condition of payment of the Direct Subsidy payments, CMS requires that no later than 30 days after the date of service or the date of payment of each Part D claim, whichever is later, a Plan Sponsor or a PBM acting on the Plan's behalf must electronically transmit to CMS, through the Drug Data Processing System, a Prescription Drug Event ("PDE") record that is comprised of some, but not all, of the fields and information contained in the pharmacies' claim form. PDE records include the enrollee's name, the drug prescribed, and the amounts paid by the Plan and the enrollee.

108. In addition, after the close of a plan's fiscal year, the Plan Sponsor, or the PBM on behalf of the Plan Sponsor, must submit to CMS a Direct and Indirect Remuneration ("DIR") Report. The DIR Report discloses any money or other remuneration the Plan received from the PBM or others (such as drug manufacturers) which is attributable to covered drugs dispensed to Plan enrollees; such remuneration effectively reduces the amounts the Plan paid for the drugs.

109. After the close of a Plan's fiscal year, CMS uses the accumulated PDE records, along with the DIR Report, to determine the costs the Plan incurred in providing covered drugs to Plan enrollees. Those final cost figures are then used to determine whether the United States Government owes the Plan additional money, beyond the interim payments previously made, for

providing covered drugs to Part D enrollees during the preceding fiscal year, or whether the Plan owes the government money.

**b. Part D Payments Affected by Kmart's Inflated Drug Claims**

110. Kmart's submission of a Medicare Part D claim for reimbursement to a Plan D Sponsor or PBM acting on behalf of a Plan Sponsor is the equivalent of submitting the claim to the United States, since Plan D Sponsors and their PBMs act as the agents of the United States in reimbursing Part D claims with federal funds. In addition, when Kmart submitted a claim to a Plan D Sponsor (or PBM acting on behalf of the Plan Sponsor), Kmart caused the submission of claims to the United States (CMS) in the form of PDE records.

111. The billing practices of Kmart alleged in this Complaint foreseeably caused financial injury to the United States in connection with the Medicare Part D payment process in the following regards:

112. *First*, a Medicare beneficiary who reaches the "donut hole" in a coverage year must pay 100% of any additional drug costs up to the upper limit of the donut hole; once he reaches the upper limit, the federal government then pays nearly 100% of his remaining drug costs for the year. 42 C.F.R. § 423.104(d). In such circumstances, Kmart's inflated bills caused the government to pay claims it otherwise would not in two ways: (1) they caused beneficiaries to reach the end of the donut hole – and thus caused the government to start paying for post-donut hole coverage – earlier than they would if the bills were not inflated, which increased the number of prescriptions that the government had to pay in that year, and (2) they increased the cost of each post-donut hole bill that the government paid.

113. *Second*, under the Low-Income Cost-Sharing Subsidy program, the federal government begins paying nearly 100% of prescription drug costs for certain low-income

Medicare beneficiaries even earlier – once they reach the start of the donut hole. 42 C.F.R. § 423.329(a)(3),(d); 42 C.F.R. § 423.782. Kmart's inflated claims caused the government to pay these beneficiaries' costs earlier than it otherwise would, and they also increased the cost of each post-threshold bill.

114. *Third*, under the government's risk-sharing subsidy program, if a Plan Sponsor exceeds its expected annual aggregate pharmacy costs by a certain percentage, CMS must subsidize part of the excess; if the Plan is below its expected aggregate costs by a certain percentage, it must reimburse CMS. 42 C.F.R. §§ 423.315(e), 423.336. Kmart's inflated claims therefore caused the government to pay a portion of these inflated charges (or to lose reimbursement to which it is entitled).

115. *Fourth*, under the government's reinsurance subsidy program, if any individual beneficiary's annual pharmacy costs exceed expectations by a certain percentage, the government must also subsidize part of the excess. 42 C.F.R. §§ 423.329(c), 423.315(c). Kmart's inflated claims caused the Plans to get the government to pay a portion of these charges as well.

116. *Fifth*, the government bases its contracts with Plan Sponsors on a national bid. 42 C.F.R. § 423.279. When Plan Sponsors submitted inflated PDEs reflecting Kmart's inflated billings, those amounts were factored into the next year's bid and caused the government to pay an inflated fee in that coming year.

### 2. Certification of Truth and Accuracy of Part D Claims

117. In the PDE records required to be submitted to CMS, *see* ¶ 107 above, each Plan Sponsor (or the sponsor's PBM if the PBM submitted PDE records to CMS on the Sponsor's behalf) is required to certify to CMS based on its best knowledge, information, and belief that the

PDE records are "accurate, complete and truthful." 42 C.F.R. § 423.505(k)(3); Medicare Manual, ch. 9, section 80.1, p.67. The Plan Sponsors and PBMs that reimbursed Kmart for RMP drugs sold to Medicare Part D beneficiaries were legally obligated to submit to CMS the required certifications. Kmart's conduct alleged in this Complaint caused Plan Sponsors (and the Sponsor's PBMs) to falsely certify that the PDE records for RMP drugs submitted to CMS were accurate, complete and truthful.

118. The federal regulations governing the Medicare Part D program define a pharmacy that provides prescription drugs as a "downstream entity." *See* 42 C.F.R. § 423.501. The regulations require every contract between a Part D Plan (or PBM) and a downstream entity (such as Kmart) to specify that the downstream entity "must comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(v). When Kmart submitted inflated claims for reimbursement for RMP drugs to Plans and PBMs, Kmart did not comply with all applicable Federal laws, regulations, and CMS instructions.

### D. Limitations On Prescription Drug Reimbursement Under Tricare

119. Tricare (formerly known as CHAMPUS) provides health insurance benefits, including prescription drug coverage, to uniformed members of the armed services and their family members.

120. The Tricare program is managed by Tricare Management Activity (TMA) under the Department of Defense. Tricare contracts with Express Scripts, Inc., a PBM, to administer Tricare's retail pharmacy benefits.

121. The Federal Circuit Court of Appeals has described how a drug claim is processed between Tricare and Express Scripts:

> The PBM is responsible for overseeing the distribution and payment for prescription drugs throughout the retail pharmacy network. When a TRICARE

> beneficiary purchases covered drugs at a network retail pharmacy, the pharmacy transmits data concerning the beneficiary to the PBM. The PBM then relays this beneficiary information to DOD and requests authorization to pay DOD's portion of the cost-share for the drugs to the network pharmacy. After receiving this information, DOD's Pharmacy Benefits Office checks beneficiary eligibility and potential drug interactions. DOD then authorizes the PBM to approve the transaction, accept the beneficiary's co-pay, and pay the pharmacy the difference between the beneficiary's co-pay and the retail price of the drugs. Most of this information exchange between the network pharmacy and the PBM occurs in 'real time' before the beneficiary's prescription is filled. However, DOD's payment to the pharmacy only occurs after a ten-day hold period.

*Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1309-1310 (Fed. Cir. 2006).

122. The 2008 Tricare Reimbursement Manual states:

> TRICARE reimburses the allowable cost for covered pharmaceuticals and supplies less the applicable beneficiary deductibles and cost-shares and payments made by Other Health Insurance (OHI). . . . The TRICARE allowable cost will be **the lesser of the usual and customary price** or the maximum allowable cost (MAC) or [the] contractor's contracted rate for ingredient cost**.**

Tricare Reimbursement Manual (2008), 6010.58-M, at Ch. 1 §15.3.2.1 (emphasis added). Kmart's billing practices that inflated pharmacy bills above the pharmacy's usual and customary charge defrauded Tricare when the usual and customary charge was lower than the alternative charges in the Tricare reimbursement formula.

123. Kmart's submission of an inflated claim for reimbursement to the administrator of the Tricare program, Express Scripts, was the equivalent of submitting the claim to the United States, since Express Scripts acts as the agent for the United States in reimbursing Tricare claims with federal funds. In addition, when Kmart submitted an inflated claim to Express Scripts, acting in its capacity as administrator of the Tricare program, Kmart caused Express Scripts to submit the claim to the United States (DOD) for payment.

**4. Public Health Service Programs**

124. The United States Public Health Service provides funds for a number of entities that offer health services to the poor and underprivileged (including, for example, public housing health centers, disproportionate share hospitals, black lung clinics, urban Indian organizations, and AIDS clinics). Federal regulations require that the maximum amount that Public Health Service entities can expend from program funds for the acquisition of drugs shall be the lowest of:

(1) The maximum allowable cost of a multi-source drug as established by the Secretary of HHS;

(2) EAC; or

(3) The provider's usual and customary charge to the public for the drug.

42 C.F.R. § 50.504.

125. Billing practices that inflate pharmacy bills above the pharmacies' usual and customary charge defraud Public Health Service entities when the usual and customary charge is lower than the alternative charges in the statutory reimbursement formula.

**5. State Workers' Compensation Programs**

126. [INTENTIONALLY LEFT BLANK]

127. [INTENTIONALLY LEFT BLANK]

128. [INTENTIONALLY LEFT BLANK]

129. [INTENTIONALLY LEFT BLANK]

130. [INTENTIONALLY LEFT BLANK]

131. [INTENTIONALLY LEFT BLANK]

132. All states provide workers' compensation coverage for their public employees. Although the formula for reimbursing prescription drugs varies from state to state, most state workers' compensation programs prohibit reimbursement of pharmacy drugs in excess of the pharmacy's fee to the general public for the drugs (often expressed as the pharmacies' "usual and customary price").

133. Every workers' compensation program that caps pharmacy drug reimbursement in the manner described above is vulnerable to the fraudulent billing practices alleged in this Complaint, since Kmart's practices fraudulently inflate its usual and customary prices.

**6. Other Health Care Programs**

134. The health care programs described above are intended to be illustrative and not exhaustive of the various government programs that cap the reimbursement of pharmacy drugs at the pharmacy's usual and customary price for the drugs. All of these programs, as well as private insurance companies that reimburse prescription drugs in a similar manner, are defrauded by the fraudulent billing practices alleged in this Complaint.

**E. The Meaning of "Usual and Customary"**

135. The term "usual and customary" charge, as used in the various statutes, regulations, and contracts referred to in this Complaint, is not ambiguous. When it is explicitly

defined, the definition typically provides that "usual and customary" means the price that the pharmacy charges the cash-paying public for the same drug. When "usual and customary" is not explicitly defined, it is commonly understood in the pharmacy industry to carry the same meaning, i.e., the price charged to the cash-paying public, unless a contract or rule explicitly supplies a contrary meaning. When "usual and customary" is intended to carry a different meaning, the definition of the term explicitly provides the alternative meaning. The following sources, among others, reflect the commonly accepted industry meaning of the term "usual and customary" price:

(a) The National Council for Prescription Drug Programs (NCPDP), which created standard billing forms used for drug claims, is a standard setting organization that represents virtually every sector of the pharmacy services industry. NCPDP authored explanatory materials for its billing forms that state that the "usual and customary" charge field on the billing form (field 426-DQ) means "amount charged cash customers for the prescription." Congress authorized the Secretary of HHS to "adopt" standard billing forms (42 U.S.C. § 1320d-1(a)), and under that authority the Secretary "adopted" the current NCPDP electronic form as the standard electronic health care claim form. 45 C.F.R. § 162.1102 (a). *See also* 42 CFR § 423.160 (incorporating NCPDP standards into the Medicare Part D program).

(b) The Academy of Managed Care Pharmacy (AMCP) is a professional association that includes health systems and PBMs. An AMCP Guide to Pharmaceutical Payment Methods (October 2007) defines "usual and customary" price as "[t]he price for a given drug or service that a pharmacy would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the

pharmacy." The Pharmaceutical Care Management Association, a national association dedicated to representing pharmacy benefit managers, utilizes a similar definition.

(c) Several reports by the Government Accountability Office on "usual and customary" price trends in drug pricing, issued from August 2005 through February 2011, define the "usual and customary price" as "the price an individual without prescription drug coverage would pay at a retail pharmacy." *See, e.g.,* GAO Report, "Prescription Drugs: Trends in Usual and Customary Prices for Commonly Used Drugs," February 10, 2011.

(d) An August 2009 report by HHS-OIG that compared the Medicaid FUL to Medicare Part D payments (among other subjects) stated: "Based on Medicaid's usual and customary charge provisions, if a beneficiary obtains a drug through one of these retail generic programs, the [Medicaid] program should generally reimburse the pharmacy at the discounted price, i.e., $4.00 for the 30-day supply (assuming that price is lower than the FUL amount, [MAC], etc.)." This demonstrates that HHS-OIG views "usual and customary" charges as equivalent to charges paid by cash-paying customers.

(e) The Code of Federal Regulations and the Medicare Prescription Drug Benefit Manual (Chapter 5, § 10.2, Benefits and Beneficiary Protections, Rev. 9/30/11) define usual and customary price as "[t]he price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part d drug." 42 C.F.R. § 423.100.

(f) The same Manual (Chapter 14, § 50.4.2, n. 1) states that the discounted prices that Wal-Mart charged to its customers "is considered Wal-Mart's 'usual and customary' price."

(g) Many of the largest and most significant actors in the retail pharmacy business have officially stated their understanding that the "usual and customary" charge is the charge to the cash-paying public. For example, Kmart itself has taken the position in prior litigation – along with other leading pharmacy chains such as Wal-Mart and Winn-Dixie – that the generally accepted meaning of "usual and customary charge to the general public" is the price charged to a cash customer. *See United States v. Bruno's, Inc.*, 54 F.Supp.2d 1252, 1257-58 (M.D. Ala. 1999), and briefs in support of pharmacies' motion to dismiss.

136. Kmart's RMP price clearly fits within the accepted industry meaning of "usual and customary" price.

137. On occasion, a statute, regulation, or contract will provide a definition of "usual and customary" price that differs from the standard industry meaning of the term. However, these occasions are rare, and in those instances the alternative definition is explicitly set forth in the statute, regulation, or contract.

## VI. DEFENDANT'S FRAUDULENT PRACTICES

### A. Kmart's Retail Maintenance Program Establishes A "Usual And Customary" Price For Generic Drugs

138. Kmart pharmacies fill approximately 40 million drug prescriptions a year. Kmart has a largely elderly or financially stressed patron demographic, and a large portion of their prescriptions are reimbursed (at least in part) by state and/or federal public assistance programs.

139. Kmart submits claims to Medicare Part D, Medicaid, Tricare and other government health insurance programs for drugs dispensed to program beneficiaries. The claims are submitted on electronic and paper forms created by the National Council for Prescription

Drug Programs ("NCPDP") or on forms substantially equivalent to the NCPDP forms. The claim forms contain various information fields, and one of them requires Kmart to identify the usual and customary charge for the dispensed drug.

140. Since at least 2005, Kmart has offered a generic drug pricing program that allows customers to purchase a 90-day prescription of listed generics for only $15, and 60 and 30 day prescriptions for $10 and $5 (or less), respectively. The drugs that are covered by the RMP program include some of the most widely prescribed generics, including Atenolol, Lisinopril/HCTZ, Verapamil, Furosemide, Fluoxetine, Trazedone, Sertraline, Ibuprofen, Tramadol, and Metformin, among many others.

141. There are no eligibility requirements to take advantage of the RMP price. However, it is a cash-only price, i.e., it is available to customers who pay in full at the register (whether by cash, credit card, or check) and do not use their insurance. Not surprisingly, the RMP program is attractive to Kmart customers. In 2007, more than 1,200,000 prescriptions were filled at RMP prices. Approximately 10 million prescriptions were submitted to private insurers in that year.

142. Relator is informed and believes that Kmart administers the RMP program internally as if it is a third-party insurer. Kmart utilizes software and related services of Agelity to manage its generic pricing program. RMP "bills" are created and sent to this administrative entity, but are only used for tracking RMP prescriptions within the Kmart corporate structure. RMP customers are strictly cash-paying, and are not reimbursed by or have reimbursement claims submitted to insurers.

143. Insured customers who choose to utilize their prescription drug plans instead of the cash-only RMP program pay their pre-determined co-payments (which are typically less than

the $5, $10 and $15 cash amounts), and have the balance of their prescription's price submitted for reimbursement to their insurers by Kmart. Medicaid beneficiaries generally have no co-payment for prescription drug purchases.

144. Kmart charges vastly different prices for generic prescriptions depending on whether the payer is an insurer or a cash-paying RMP customer. While RMP customers pay $15, $10, and $5 (or less) for 90-, 60- and 30-day supplies (respectively) of any generic, Kmart bills insurers – including federal and state government prescription drug programs – many multiples more. When Kmart bills the insurers, it misrepresents the amount of its "usual and customary" price on the reimbursement claims forms that Kmart submits to the insurers. In the field requiring Kmart to report its "usual and customary" price, Kmart does not report its RMP price, which is its true usual and customary price, but instead reports a much higher price. Kmart thus ignores the true "usual and customary" prices, and instead knowingly and improperly bills vastly inflated prices to public and private insurers that impose "usual and customary" pricing limits. Kmart's reporting of false and inflated usual and customary prices on its claim forms renders those claims false and fraudulent.

145. Relator discovered this scheme through his own experience as a Medicare Part D beneficiary. For example, on September 22, 2007 Relator (a Medicare Part D beneficiary) had Kmart fill a prescription for generic Lisinopril/HCTZ 20-25. Lisinopril/HCTZ is among the drugs covered by Kmart's RMP Program, and Relator expected that, after his $10 co-payment, Kmart would claim a $15 charge (the same amount paid by the cash-paying public) to his Part D plan (Paramount Elite), and seek reimbursement from Paramount for the remaining $5.

146. Relator discovered, however, that his Part D plan received a claim for $60.84 charge for the Lisinopril/HCTZ, and billed the Part D plan $50.84 ($60.84 - $10.00 co-payment).

Kmart was reimbursed $35.84, about 240 percent more than the true "usual and customary" price.

147. Kmart, thus, maintains a dual "usual and customary" pricing structure for generic drugs. It maintains one price for cash-paying RMP customers, and another, much higher "usual and customary" price for insured customers. RMP prices, however, represent Kmart's true "usual and customary" price for the hundreds of generic drugs that are included in that program, since $15 for 90-day generic prescriptions is the price most cash-paying Kmart pharmacy customers receive.

148. In contrast, other "big box" pharmacy chains properly bill insurers for drugs that are on their generic drug pricing formulary. For example, Wal-Mart offers a generics program very similar to Kmart's. A 30-day supply of listed generics at Wal-Mart is $4, and a 90-day supply is $12.

149. As he did at Kmart, Relator filled a Lisinopril/HCTZ 20-25 prescription at Wal-Mart that was charged to his Paramount Elite Part D plan. In this instance, however, Wal-Mart properly billed its "usual and customary" charge for the prescription – i.e., $12. Of that amount, Relator paid a $10 co-payment and the Medicare Part D plan paid the remaining $2.

150. Kmart maintains its pharmacy computer system so that it automatically generates and creates claims for reimbursement with inflated usual and customary prices. Internal electronic pricing information accessed by its store pharmacists does not accurately reflect the correct "usual and customary" prices for RMP generics. Instead of $15, $10 and $5, the Kmart computer system typically shows an RMP-generic price that is many multiples more. For example, the Kmart computer system reflects a cash price of $80.29 for a 90-day prescription of Lisinipril/HCTZ 20-25, an RMP generic.

151. Even though the RMP program is a popular, well-advertised nationwide pricing program for the cash-paying public, company pharmacists must "override" the system's inflated cash prices to use RMP pricing. Kmart pharmacists are instructed on how to carry out an RMP price override on the pharmacy computer system: they must enter the RMP "insurance" plan code; check Rx; enter the correct RMP price ($5, $10, $15); select "Price Override;" enter "Still Bill;" select "Fill Rx;" and, transmit.

152. Because a price override is required when charging cash-paying customers and not insured customers, insurance claims (which do not involve an override operation) are automatically made based on Kmart's inflated usual and customary pricing, rather than the true RMP cash price.

153. Kmart's failure to input and maintain accurate "usual and customary" prices for RMP generics in the company's pharmacy computer system, thus, systematically causes inaccurate claims for reimbursement to be submitted to federal and state prescription drug programs. As alleged above, the usual and customary prices for generics that Kmart bills federal and state programs are often many multiples of the true "usual and customary" prices enjoyed by cash-paying customers.

154. In contrast to its inaccurate price information, Kmart's pharmacy computer system maintains the correct public and private insurers' billing methodologies, including whether "usual and customary" price is a limitation on reimbursement. Because Kmart knowingly omits the true "usual and customary" price (i.e., RMP price) from its computerized billing and pricing system, its true, lower "usual and customary" prices are rarely if ever conveyed to governmental or private prescription drug plans.

155. Upon further investigation, Relator learned that Kmart consistently billed public

and private insurers amounts far in excess of true "usual and customary" prices for the dozens of generic drugs in its RMP Program. Relator worked at three different Kmart pharmacies – two in Ohio and one in Michigan – during his employment with Kmart (May 2007 through October 2010). The billing practices described in this Complaint were consistent at all three stores. Billing was standardized and directed from Kmart's headquarters. Electronic billing was conducted through Kmart's central computer system.

156. Relator examined hundreds of billing records at the stores where he worked. Kmart consistently billed public and private insurers more for RMP drugs than Kmart billed the cash-paying public. Moreover, in the field for the "usual and customary" price on the claim forms, Kmart consistently reported a price that was higher than its true usual and customary price, i.e., the RMP price offered to the general public. For example, between January and April, 2008, Kmart maintained in its central computer system the following inflated price differentials between its true (RMP) usual and customary prices, and the inflated "usual and customary" prices.

157. Examples of inflated usual and customary prices for 30-day prescriptions for $5 RMP generics:

80 mg simvastatin - $152.97

40 mg pravastatin - $148.97

500 mg metformin – $52.97

50 mg tramadol - $77.09

100 mg sertraline - $27.99

50 mg sertraline - $92.97

40 mg citalopram - $39.99

158. Examples of inflated usual and customary prices for 60-day prescriptions for $10 RMP generics:

500 mg naproxen - $58.79

50 mg tramadol - $115.59

100 mg sertraline - $100.79

10 mg fluoxetine - $40.99

159. Examples of inflated usual and customary prices for 90-day prescriptions for $15 RMP generics:

25 mg spironolactone - $23.97

5 mg amlodipine - $139.49

400 mg acyclovir - $80.99 100

mcg levothyroxin - $31.39

160. With respect to the Ohio Medicaid program, the following are additional examples of Kmart's opportunistic pricing and claims for reimbursement:

a. On October 28, 2007, Kmart submitted a claim to Ohio Medicaid seeking $71.09 in reimbursement for a 30-day prescription of 4 mg tizanidine (an RMP drug), and was reimbursed $24.58 by Medicaid;

b. On October 9, 2007, Kmart submitted a claim to Ohio Medicaid seeking $45.99 in reimbursement for a 30-day prescription of 75 mg diclofenac (an RMP drug) and was reimbursed $32.26 by Medicaid;

c. On October 5, 2007, Kmart submitted a claim to Ohio Medicaid seeking $118.49 in reimbursement for a 30-day prescription of 4 mg tizanidine (an RMP drug), and was reimbursed $38.50 by Medicaid.

161. The following are examples of inflated claims for reimbursement made by Kmart on the Ohio Medicaid HMO program managed by US Scripts. US Scripts manages the majority of state managed-care Medicaid programs.

a. On October 24, 2007, Kmart submitted a claim to US Scripts seeking $86.37 in reimbursement for a 30-day prescription of sertraline (an RMP drug), and was reimbursed $61.99;

b. On October 22, 2007, Kmart submitted a claim to US Scripts seeking $80.38 in reimbursement for a 30-day prescription of tramadol (an RMP drug) and was reimbursed $10.10;

c. On October 31, 2007, Kmart submitted a claim to US Scripts seeking $243.77 in reimbursement for a 30-day prescription of fluoxetine (an RMP drug) and was reimbursed $11.00.

162. The following are examples of inflated claims for reimbursement made by Kmart on Caremark's Medicare Part D plan:

a. On November 2 and October 3, 2007, Kmart submitted claims to Caremark seeking $45.08 in reimbursement for a 30-day prescription of 5 mg warfarin (an RMP drug), and was reimbursed $16.23 on each occasion. The pharmacy received $2.15 co-payments for total compensation of $18.38 on each occasion. On November 6, 2007, Kmart submitted a claim to Caremark seeking $63.88 in reimbursement for a 30-day prescription of 1 mg warfarin. Kmart received a $10 co-pay and was reimbursed $18.53 by Caremark, for a total reimbursement of $28.53.

b. On October 8, 2007, Kmart submitted a claim to Caremark seeking $89.46 in reimbursement for a 30-day prescription of 500 mg metformin (an RMP drug). Kmart received a $1 co-payment and was reimbursed $13.45 by Caremark, for total reimbursement of $14.45.

163. The following are examples of inflated claims for reimbursement made by Kmart on Humana's Medicare Part D plan:

a. On November 8, 2007, Kmart submitted a claim to Humana seeking $92.00 in reimbursement for a 30-day prescription of 1000 mg metformin (an RMP drug) and was reimbursed $13.64.

b. On November 5, 2007, Kmart submitted a claim to Humana seeking $57.94 in reimbursement for a 30-day prescription of 40 mg Lisinopril/HCTZ (an RMP drug). Kmart received a $3.51 co-pay and was reimbursed $10.53 by Humana for total $14.04 reimbursement.

c. On October 26, 2007, Kmart submitted a claim to Humana seeking $258.81 in reimbursement for a 30-day prescription of 10 mg simvastatin (an RMP drug). Kmart received a $14.13 co-pay and was reimbursed $42.37 by Humana for a total of $56.50 reimbursement.

164. The following are examples of inflated claims for reimbursement made by Kmart on Ohio Workers' Compensation Program ("OWCP"):

a. On October 10, 2007, Kmart submitted a claim to OWCP seeking $121.49 in reimbursement for a 30-day prescription of 400 mg acyclovir (an RMP drug). It was reimbursed $53.00 by OWCP.

b. On October 1, 2007, Kmart submitted a claim to OWCP seeking $77.99

in reimbursement for a 30-day prescription of 50 mg tramadol (an RMP drug). It was reimbursed $33.50 by OWCP.

c. On October 1, 2007, Kmart submitted a claim to OWCP seeking $71.99 in reimbursement for a 30-day prescription of 20 mg Citalopram (an RMP drug). It was reimbursed $24.50 by OWCP.

165. The following are examples of inflated claims for reimbursement made by Kmart on the Tricare program administered by Express Scripts.

a. On February 21, 2008, Kmart submitted a claim to Express Scripts seeking $26.25 in reimbursement for a 90-day prescription of 100 mg sertraline (an RMP drug). Kmart received a $9.00 co-pay and billed Express Scripts the balance, $17.25.

b. On March 3, 2008, Kmart submitted a claim to Express Scripts seeking $7.74 in reimbursement for a 30-day prescription of 75 mg levothyroxine (an RMP drug). Kmart received a $3.00 co-pay and billed Express Scripts the balance, $4.74.

c. On May 2, 2008, Kmart submitted a claim to Express Scripts seeking $10.25 in reimbursement for a 30-day prescription of 100 mg levothyroxine. Kmart received a $3.00 co-pay and billed Express Scripts the balance, $7.25.

166. Similarly, price quotes as of November 17, 2007 for simvastatin reimbursed under the Paramount Elite Part D plan show that 30, 60 and 90-day prescriptions for 20 mg simvastatin were priced at $151.97, $299.97 and $449.97, respectively. Under the RMP program, a cash-paying patron was charged $5, $10 and $15 for identical prescriptions. Interestingly, Kmart's

cost (as of November 12, 2007) for a 90-day simvastatin prescription was only $4.78, approximately 1/100th of its charge.

167. All of the generic drugs identified in ¶¶ 156 to 165 above are included in Kmart's RMP formulary and are charged at $5, $10 and $15 (or less) for 30, 60 and 90 days to the cash-paying public. In each instance, Kmart charged the third-party payer higher than Kmart's true usual and customary price. In addition, in the field for "usual and customary" price on the claim form submitted to the payer, Kmart falsely reported a price higher than its true usual and customary price. For example:

(a) In the claim summarized in ¶ 159(a) above, Kmart falsely reported $71.09 as its usual and customary price for a 30-day prescription of 4 mg tizanidine;

(b) In the claim summarized in ¶ 159(b) above, Kmart falsely reported $45.99 as its usual and customary price for a 30-day supply of 75 mg diclofenac;

(c) In the claim summarized in ¶ 159(c) above, Kmart falsely reported $118.49 as its usual and customary price for a 30-day prescription of 4 mg tizanidine;

(d) In the claim summarized in ¶ 163(b) above, Kmart falsely reported $58.19 as its usual and customary price for a 30-day prescription of tramadol;

(e) In the claim summarized in ¶ 160(c) above, Kmart falsely reported $93.29 as its usual and customary price for a 30-day prescription of fluoxetine;

(f) In the claim summarized in ¶ 161(a) above, Kmart falsely reported $31.99 as its usual and customary price for a for a 30-day prescription of 5 mg warfarin.

168. Had Kmart properly charged the public programs its true "usual and customary" prices for generic drugs, or properly reported its true usual and customary price on the claim forms, those governmental entities and private insurers would have paid lower reimbursements,

and Part D beneficiaries would not have reached the "donut hole" as quickly.

169. In addition, at least since 2005, Kmart has instructed its pharmacists to lower its prescription drug prices to meet competitors' generic pricing programs – particularly, Wal-Mart's $4 price for the 30-day generic prescriptions – for those generics that are on the competitor's generic program formularies. Thus, in instances where a cash-paying customer fills a prescription for a generic drug on Wal-Mart's $4 formulary, Kmart charges $4, $8 and $12 for 30, 60 and 90 day prescriptions. Indeed, as of April, 2008, 90 day prescriptions were only $10. For generics on Wal-Mart's formulary, therefore, Kmart's "usual and customary" prices are even lower than RMP prices – i.e., $4, $8 and $12 (and, $10 as of April 2008).

170. The examples provided in this Complaint are representative of a billing practice that was directed from Kmart's corporate office and was a nationwide practice.

171. As a direct result of Kmart's fraudulent overpricing scheme - and by virtue of the defendant's knowing submission of inflated claims for reimbursement to federal and state prescription drug programs for payment or approval - the U.S. and States' Treasuries have been defrauded of many tens of millions of dollars.

## VII. IMPACT ON PRIVATE INSURERS

172. The states of California and Illinois have enacted Insurance Fraud Prevention Acts that permit Relator to bring a qui tam action to recover for fraudulent claims submitted to *private* insurance companies in those states. *See* Counts III and X below.

173. Although this Complaint has focused on the impact of defendant's practices on the federal and state governments, these same practices also defraud private insurance companies in the same manner that the practices defraud the federal and state governments.

174. The practices alleged herein are systematic, nationwide practices that defraud

private insurance companies that reimburse prescription drugs in every state where defendant conducts business, including California and Illinois.

175. The maximum price that Kmart can charge a private insurance company is established in the first instance by contract between Kmart and the insurance company (or PBM acting on behalf of the insurance company). It is standard practice in the pharmacy industry to include in the contract between a pharmacy and an insurance company (or its PBM) provisions, among others, pertaining to reimbursement that provide that:

(a) Reimbursement to the pharmacy for the ingredient component of the covered drug may not exceed the pharmacy's usual and customary charge for the drug. This limitation is typically expressed as a "lesser of" formula, i.e., the pharmacy will be reimbursed at *the lesser of* (1) the pharmacy's usual and customary charge for the drug, and (2) various other defined amounts (e.g., AWP, EAC, etc).

(b) The pharmacy is entitled to charge a dispensing fee when reimbursement is based on any one of the defined amounts, but not when reimbursement is based on the usual and customary charge. The usual and customary charge is inclusive of the dispensing fee.

Relator is informed and believes that, consistent with this standard industry practice, Kmart has many contracts with private insurance companies (or PBMs on their behalf) in California and Illinois that contain the above terms.

176. The examples provided previously in this Complaint focused on drug sales reimbursed directly or indirectly by governmental programs. In the billing records that Relator examined, he also found that in sales without governmental involvement, Kmart consistently billed private insurers more for RMP drugs than Kmart billed the cash-paying public. In the

field for the "usual and customary" charge on the claim forms submitted to the private insurers, Kmart consistently reported a price that was higher than its true usual and customary charge, i.e., the RMP price offered to the general public. Following are representative examples of sales reimbursed by private insurance companies in Ohio where Relator worked:

a. On October 23, 2007, Kmart submitted a claim to Pacificare of Oklahoma, Inc. seeking $31.14 in reimbursement for a 30-day prescription of 25 mg metoprolol (an RMP drug). Kmart received a $6.00 co-pay and was reimbursed $12.74 by Pacificare for total reimbursement of 18.74.

b. On October 31, 2007, Kmart submitted a claim to Cigna seeking $32.05 in reimbursement for a 30-day prescription of 50 mg metoprolol (an RMP drug). Kmart received a $3.46 co-pay and was reimbursed $19.62 by Cigna for total $23.08 reimbursement.

c. On March 12, 2008, Kmart submitted a claim to Advance Rx-AdvancePCS ("Advance Rx") seeking $16.41 in reimbursement for a 30-day prescription of 100 mcg levothyroxine. Kmart received a $2.25 co-pay and was reimbursed $3.92 by Advance Rx for total $6.17 reimbursement.

d. On March 12, 2008, Kmart submitted a claim to Anthem Prescription Management Inc. ("Anthem") seeking $41.38 in reimbursement for a 30-day prescription of 20-12 mg Lisinopril/HCTZ. Kmart received a $5.00 co-pay and was reimbursed $5.98 by Athem for a total of 10.98 reimbursement.

e. On March 21, 2008, Kmart submitted a claim to Wellpoint Pharmacy Management ("Wellpoint") seeking $53.05 in reimbursement for a 30-

day prescription of 1 mg terazosin. Kmart received no co-pay and was reimbursed $16.98 by Wellpoint.

177. Because Kmart's billing practices were directed from Kmart's corporate office and were nationwide, Relator is informed and believes that the examples of inflated billing practices to private insurance companies in Ohio discussed in paragraph 175 above, are representative of inflated billing to private insurance companies and PBMs in California and Illinois.

**Count I**
**False Claims Act**
**31 U.S.C. §§3729(a)(1), (a)(2), and (a)(7) (1986)**
**[31 U.S.C. §§3729(a)(1)(A), (B), and (G) (2009)]**

178. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

179. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

180. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval under Medicaid, Medicare, Tricare, and various other government health care programs, within the meaning of 31 U.S.C. §3729(a)(1) (1986) [31 U.S.C. §3729(a)(1)(A) (2009)].

181. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved under Medicaid, Medicare, Tricare, and various other government health care programs, within the meaning of 31 U.S.C. §3729(a)(2) (1986) [31 U.S.C. §3729(a)(1)(B) (2009)].

182. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the United States Government, within the meaning of 31 U.S.C. §3729(a)(7) (1986) [31 U.S.C. §3729(a)(1)(G) (2009)].

183. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

184. By reason of the defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

185. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by defendant arising from their unlawful conduct as described herein.

**Count II**
**California False Claims Act**
**Cal Govt Code §12651(a)(1)-(2), (7)**

186. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

187. This is a claim for treble damages and penalties under the California False Claims Act.

188. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

189. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

190. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the California State Government.

191. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

192. By reason of the defendant's acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

193. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count III**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7**

194. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

195. This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this Count as "the Act"). The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to

three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code §1871.7(b).

196. Subsection (e) of Cal. Ins. Code §1871.7 provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code §1871.1(e). The *qui tam* provision was patterned after the Federal False Claims Act, 31 U.S.C. §§3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 et seq.

197. Subsection (b) of Cal. Ins. Code §1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

> (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
> * * * * * *
>
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
>
> * * * * * *
>
> (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:
>
> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
> (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

198. By virtue of the acts described in this Complaint, defendant knowingly presented or caused to be presented, false or fraudulent claims for health care benefits, in violation of Penal Code §550(a) and (b), in the following regards, among others:

a. By reporting a false and inflated usual and customary price on written reimbursement claim forms, defendant knowingly prepared and made a "writing . . . with the intent to present or use it . . . in support of [a] false or fraudulent claim," in violation of § 550(a)(5);

b. By submitting reimbursement claim forms that sought more than defendant was legally entitled to receive, defendant knowingly made or caused to be made a "false or fraudulent claim for payment of a health care benefit," in violation of § 550(a)(6);

c. By preparing and submitting reimbursement claims containing false information regarding defendant's true usual and customary price, defendant knowingly used "false or misleading information concerning [a] material fact . . . in support of . . . a claim for payment . . . pursuant to an insurance policy," in violation of § 550(b)(1) and (b)(2); and

d. By failing to disclose on claim forms that defendant offered a lower price to the general public through its RMP program, defendant knowingly "fail[ed] to disclose . . . an event that affects . . . the payment to which [defendant was] entitled," in violation of § 550(b)(3).

199. Each claim for reimbursement that was inflated as a result of defendant's illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

200. Private insurers, unaware of the falsity of the records, statements and claims made

or caused to be made by defendant, paid and continue to pay the claims that would not be paid but for defendant's unlawful conduct.

201. The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code §1871.7. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count IV**
**Colorado False Claims Act**
**Colo. Rev. Stat. § 25.5-4-303.5, et seq**

202. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

203. This is a claim for treble damages and penalties under the Colorado False Claims Act.

204. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado Government for payment or approval.

205. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Colorado to approve and pay such false and fraudulent claims.

206. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Colorado State Government.

207. The State of Colorado, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

208. By reason of the defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

209. Additionally, the State of Colorado is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count V**
**Delaware False Claims And Reporting Act**
**6 Del C. §1201(a)(1), (2), and (7)**

210. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

211. This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

212. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

213. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

214. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Delaware State Government.

215. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

216. By reason of the defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

217. Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count VI**
**Florida False Claims Act**
**Fla. Stat. Ann. §68.082(2)**

218. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

219. This is a claim for treble damages and penalties under the Florida False Claims Act.

220. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

221. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

222. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Florida State Government.

223. The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

224. By reason of the defendant's acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

225. Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count VII**
**Georgia False Claims Act**
**Ga. Code Ann. §49-4-168**

226. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

227. This is a claim for treble damages and penalties under the Georgia False Claims Act.

228. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

229. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

230. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Georgia State Government.

231. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

232. By reason of the defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

233. Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count VIII**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §661-21(a)**

234. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

235. This is a claim for treble damages and penalties under the Hawaii False Claims Act.

236. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

237. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

238. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Hawaii State Government.

239. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

240. By reason of the defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

241. Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count IX**
**Illinois Whistleblower Reward And Protection Act**
**740 Ill. Comp. Stat. §175/3(a)(1), (2), and (7)**

242. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

243. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

244. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

245. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

246. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Illinois State Government.

247. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

248. By reason of the defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

249. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count X**
**Illinois Insurance Claims Frauds Prevention Act**
**740 Ill. Comp. Stat. §92**

250. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

251. This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92.

252. Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

253. Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows:

> (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company . . . .

720 Ill. Comp. Stat. §5/46-1(a).

254. Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a qui tam civil action in order to create incentives for private individuals to prosecute violations of the statute. Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois. The

action shall be brought in the name of the State." 740 Ill. Comp. Stat. §92/15(a).

255. By virtue of the conduct described in this Complaint, defendant committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act: knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat. §5/46-1(a). Defendant's violative conduct included:

a. Reporting a false and inflated usual and customary price on written reimbursement claim forms;

b. Submitting reimbursement claim forms that sought more than defendant was legally entitled to receive;

c. Submitting reimbursement claims containing false information regarding defendant's true usual and customary price; and

d. Failing to disclose on claim forms that defendant offered a lower price to the general public through its RMP program.

256. As a result of such conduct, defendant has received illegal profits to which it was not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

257. The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by defendant in violation of 740 Ill. Comp. Stat. §92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XI**
**Indiana False Claims And Whistleblower Protection Act**
**IC 5-11-5.5-2(b)(1), (2), and (6)**

258. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

259. This is a claim for treble damages and penalties under the Indiana False Claims And Whistleblower Protection Act.

260. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

261. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

262. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Indiana State Government.

263. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

264. By reason of the defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

265. Additionally, the Indiana State Government is entitled to a civil penalty of at least $5,000 for each and every violation alleged herein.

**Count XII**
**Louisiana Medical Assistance Programs Integrity Law**

**La. Rev. Stat. § 437 et seq.**

266. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

267. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

268. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

269. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

270. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Louisiana State Government.

271. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

272. By reason of the defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273. Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIII**
**Maryland False Health Claims Act**
**Md. HEALTH-GENERAL Code Ann. § 2-601, et seq.**

274. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

275. This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

276. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland Government for payment or approval.

277. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Maryland to approve and pay such false and fraudulent claims.

278. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Maryland State Government.

279. The State of Maryland, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant’s unlawful conduct.

280. By reason of the defendant’s acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

281. Additionally, the State of Maryland is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIV**
**Massachusetts False Claims Law**
**Mass. Gen. Laws ch. 12 §5B(1), (2), and (8)**

282. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

283. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

284. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

285. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

286. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Massachusetts State Government.

287. The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

288. By reason of the defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

289. Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XV**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws. §400.601**

290. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

291. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

292. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

293. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

294. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Michigan State Government.

295. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

296. By reason of the defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

297. Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XVI**
**Minnesota False Claims Act**

**Minn. Stat. § 15C.01 et seq.**

298. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

299. This is a claim for treble damages and penalties under the Minnesota False Claims Act.

300. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota Government for payment or approval.

301. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Minnesota to approve and pay such false and fraudulent claims.

302. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Minnesota State Government.

303. The State of Minnesota, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

304. By reason of the defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

305. Additionally, the State of Minnesota is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XVII**
**Montana False Claims Act**
**Mont. Code Ann. § 17-8-401 et seq.**

306. Relator repeats and realleges each and every allegation contained in paragraphs 1

through 177 above as though fully set forth herein.

307. This is a claim for treble damages and penalties under the Montana False Claims Act.

308. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana Government for payment or approval.

309. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Montana to approve and pay such false and fraudulent claims.

310. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Montana State Government.

311. The State of Montana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

312. By reason of the defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

313. Additionally, the State of Montana is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XVIII**
**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §357.040(1)(a), (b), and (g)**

314. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

315. This is a claim for treble damages and penalties under the Nevada False Claims Act.

316. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

317. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

318. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Nevada State Government.

319. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

320. By reason of the defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

321. Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIX**
**New Hampshire False Claims Act**
**N.H. Rev. Stat. Ann. §167:61-b(I)(a), (b), and (e)**

322. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

323. This is a claim for treble damages and penalties under the New Hampshire False

Claims Act.

324. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

325. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

326. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the New Hampshire State Government.

327. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

328. By reason of the defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

329. Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XX
## New Jersey False Claims Act
## N.J. Stat. § 2A:32C-1

330. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

331. This is a claim for treble damages and penalties under the New Jersey False

Claims Act.

332. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

333. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

334. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the New Jersey State Government.

335. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant’s unlawful conduct.

336. By reason of the defendant’s acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

337. Additionally, the New Jersey State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XXI
## New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 et seq. and New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §44-9-1 et seq

338. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

339. This is a claim for treble damages and penalties under the New Mexico Medicaid

False Claims Act and the New Mexico Fraud Against Taxpayers Act.

340. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

341. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

342. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the New Mexico State Government.

343. The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

344. By reason of the defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

345. Additionally, the New Mexico State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

**Count XXII**
**New York False Claims Act**
**N.Y. State Fin. § 187**

346. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

347. This is a claim for treble damages and penalties under the New York False Claims

Act.

348. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

349. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

350. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the New York State Government.

351. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

352. By reason of the defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

353. Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

**Count XXIII**
**North Carolina False Claims Act**
**NC Gen. Stat. § 1-605 et seq.**

354. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

355. This is a claim for treble damages and penalties under the North Carolina False

Claims Act.

356. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina Government for payment or approval.

357. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of North Carolina to approve and pay such false and fraudulent claims.

358. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the North Carolina State Government.

359. The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

360. By reason of the defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

361. Additionally, the State of North Carolina is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XXIV
## Oklahoma Medicaid False Claims Act
## 63 Okl. St. § 5053

362. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

363. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

364. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

365. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

366. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Oklahoma State Government.

367. The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

368. By reason of the defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

369. Additionally, the Oklahoma State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

## Count XXV
## Rhode Island False Claims Act
## R.I. Gen. Laws § 9-1.1-1

370. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

371. This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

372. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

373. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

374. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Rhode Island State Government.

375. The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

376. By reason of the defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

377. Additionally, the Rhode Island State Government is entitled to civil penalties for each and every violation alleged herein.

## Count XXVI
## Tennessee False Claims Act and Medicaid False Claims Act
## Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)

378. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

379. This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

380. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

381. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

382. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Tennessee State Government.

383. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

384. By reason of the defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

385. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XXVII**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §36.002**

386. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

387. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

388. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

389. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

390. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Texas State Government.

391. The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

392. By reason of the defendant's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

393. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XXVIII**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §8.01-216.3(a)(1), (2), and (7)**

394. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

395. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

396. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or

approval.

397. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

398. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Virginia State Government.

399. The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

400. By reason of the defendant's acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

401. Additionally, the Virginia State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XXIX**
**Wisconsin False Claims For Medical Assistance Act**
**Wis. Stat §20.931 et seq.**

402. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

403. This is a claim for treble damages and penalties under the Wisconsin False Claims For Medical Assistance Act.

404. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin Government for payment or approval.

405. By virtue of the acts described above, defendant knowingly made, used, or caused

to be made or used false records and statements, and omitted material facts, to induce the State of Wisconsin to approve and pay such false and fraudulent claims.

406. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Wisconsin State Government.

407. The State of Wisconsin, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

408. By reason of the defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

409. Additionally, the State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XXX**
**Iowa Medicaid False Claims Act**
**§685.1 et seq.**

410. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

411. This is a claim for treble damages and penalties under the Iowa Medicaid False Claims Act.

412. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa Government for payment or approval.

413. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Iowa to approve and pay such false and fraudulent claims.

414. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Iowa State Government.

415. The State of Iowa, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

416. By reason of the defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

417. Additionally, the State of Iowa is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XXXI
## Washington State Medicaid Fraud False Claims Act
## Rev. Code Wash. (ARCW) § 74.09C.010 et seq.

418. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

419. This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

420. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Washington Government for payment or approval.

421. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Washington to approve and pay such false and fraudulent claims.

422. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the Washington State Government.

423. The State of Washington, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

424. By reason of the defendant's acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

425. Additionally, the State of Washington is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XXXII**
**DOE States' False Claims Acts That Have Not Been Enacted or Are Not Effective at the Time of Filing**

426. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 177 above as though fully set forth herein.

427. This is a claim for treble damages and penalties against defendant under State False Claims Acts that are enacted subsequent to the filing of this Complaint, and which permit qui tam suits. The States that may enact False Claims Acts include: Alabama, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, West Virginia, and Wyoming.

428. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to each of the States listed above.

429. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the States

listed above to approve and pay such false and fraudulent claims.

430. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay money to the State Government of each of the States listed above.

431. The State Governments of each of the States listed above, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

432. By reason of defendant's acts, the States listed above have been damaged and continue to be damaged in substantial amounts to be determined at trial.

433. The State Governments of each of the States listed above are entitled to the maximum penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendant.

**Prayer**

WHEREFORE, Relator prays for judgment against the defendant as follows:

1. that defendant cease and desist from violating 31 U.S.C. §3729 et seq., and the counterpart provisions of the state statutes set forth above;

2. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of California has sustained because of defendant's actions, plus

a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

4. that this Court enter judgment against defendant in an amount equal to three times the amount of each claim for compensation submitted by defendant in violation of Cal. Ins. Code §1871.7(b), plus a civil penalty of $10,000 for each violation of Cal. Ins. Code §1871.7(b);

5. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Colorado has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Colo. Rev. Stat. § 25.5-4-303.5, et seq.;

6. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

7. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. §68.082(2);

8. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Georgia Code Ann. §49-4-168;

9. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

10. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

11. that this Court enter judgment against defendant in an amount equal to three times

the amount of each claim for compensation submitted by defendant in violation of 740 Ill. Comp. Stat. §92, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §92;

12. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Ind. Code §5-11-5.5 et. seq;

13. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et seq.;

14. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Maryland has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Md. HEALTH-GENERAL Code Ann. § 2-601 et seq.;

15. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B et seq.;

16. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Mich. Comp. Laws §400.601 et seq.;

17. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Minnesota has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of the Minn. Stat. § 15C.01 et seq.;

18. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Montana has sustained because of defendant's actions, plus a

civil penalty of $10,000 for each violation of Mont. Code Ann. § 17-8-401 et seq.;

19. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

20. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of defendant's actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. §167:61-b(I);

21. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Jersey has sustained because of defendant's actions, plus civil penalties for each violation of N.J. Stat. §2A:32C-1 et seq.;

22. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendant's actions, plus civil penalties for each violation of N.M. Stat. Ann. §27-14-4 et seq. and N.M. Stat. Ann. §44-9-1 et seq.;

23. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New York has sustained because of defendant's actions, plus civil penalties for each violation of N.Y. State Fin. §187 et seq.;

24. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of North Carolina has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of NC Gen. Stat. § 1-605 et seq.;

25. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendant's actions, plus civil penalties for each violation of 63 Okla. St. §5053 et seq.;

26. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of defendant's actions, plus civil penalties for each violation of R.I. Gen. Laws §9-1.1-1 et seq.;

26. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

27. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

28. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. §8.01-216.3(a);

29. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of the Wis. Stat. §20.931 et seq.;

30. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Iowa has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of the Iowa Medicaid False Claims Act, § 685.1 et seq.;

31. that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Washington has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of Rev. Code Wash. (ARCW) § 74.09C.010 et

seq.;

32. that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

33. that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

34. that Relator recover such other relief as the Court deems just and proper.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

**KOREIN TILLERY LLC**

Dated: May 1, 2017

/s *Aaron M. Zigler*

Stephen M. Tillery
Aaron M. Zigler
Robert L. King
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
azigler@koreintillery.com
rking@koreintillery.com

George A. Zelcs
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com

**PHILLIPS & COHEN LLP**

Erika A. Kelton
2000 Massachusetts Ave. NW, Suite 100
Washington, DC 20036
Telephone: (202) 833-4567
Facsimile: (202) 833-1815
ekelton@phillipsandcohen.com

Larry P. Zoglin
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000
Facsimile: (415) 836-9001
lpz@pcsf.com

*Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users.

**KOREIN TILLERY LLC**

/s *Aaron M. Zigler*
Aaron M. Zigler
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
azigler@koreintillery.com